## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

**RARE BREED TRIGGERS, LLC, a**
**FLORIDA LIMITED LIABILITY**
**COMPANY, and ABC IP LLC, a**
**DELAWARE LIMITED**
**LIABILITY COMPANY**
     Plaintiffs.

     -vs-

**BIG DADDY ENTERPRISES, INC.,**
**a FLORIDA CORPORATION, d/b/a**
**BIG DADDY UNLIMITED, INC.,**
**and WIDE OPEN ENTERPRISES,**
**LLC, a NEW MEXICO LIMITED**
**LIABILITY COMPANY d/b/a**
**WIDE OPEN TRIGGERS**
     Defendants.

CASE NO. _____

**JURY TRIAL**
**DEMANDED**

---

## COMPLAINT FOR PATENT INFRINGEMENT

---

This is an action for patent infringement in which Rare Breed Triggers, LLC ("Rare Breed") and ABC IP LLC ("ABC") (collectively, "Plaintiffs") accuse Big Daddy Enterprises, Inc., d/b/a Big Daddy Unlimited, Inc. ("BDU"), and Wide Open Enterprises, LLC d/b/a Wide Open Triggers ("Wide Open") (collectively, "Defendants") of infringing U.S. Patent No. 10,514,223 ("the '223 Patent") as follows:

## PARTIES

1. Rare Breed is a limited liability company organized under the laws of the State of Florida with an address at 255 Primera Blvd Suite 160, Lake Mary, FL 32746.

2. ABC is a limited liability company organized under the laws of the State of Delaware with an address at 8 The Green, Suite A, Dover, DE 19901.

3. Upon information and belief, Defendant BDU is a corporation existing under the laws of the state of Florida, having a place of business at 7600 NW 5 Pl, Gainesville, FL 32607. According to state records, and upon information and belief, Big Daddy Enterprises, Inc. is an *alter ego* of Big Daddy Unlimited, Inc. and thus, for purposes of this action, should be treated as such.

4. Upon information and belief, Defendant Wide Open is a limited liability company existing under the laws of the state of New Mexico but operating with a place of business in the state of Florida. Wide Open operates under the business name "Wide Open Triggers" and has a place of business at 491 Oak Road, Ocala, FL 34472. According to public records, and upon information and belief, Wide Open is an *alter ego* of BDU, and thus, for purposes of this action, should be treated as such.

5. Each named entity in this proceeding shall collectively comprise "the Parties."

## JURISDICTION AND VENUE

6.  This is an action for infringement of the '223 Patent arising under 35 U.S.C. §§ 271(a)-(b), 281, and 284-85. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1338, which directs that United States District Courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, and pursuant to 28 U.S.C. § 1331, which pertains to civil actions arising under the laws of the United States.

7.  Personal jurisdiction and venue over BDU are proper in this District because BDU, a Florida corporation, resides in this district.

8.  Personal jurisdiction and venue over Wide Open are proper in this District because Wide Open is an *alter ego* of BDU, and thus, Wide Open resides in this district.

9.  Upon information and belief, Wide Open is subject to this Court's specific and general personal jurisdiction pursuant to due process and/or the Florida Long Arm Statute, due at least to Wide Open's established and substantial business in this forum, including Wide Open's physical place of business being located at 491 Oak Road, Ocala, FL 34472. Additionally, Wide Open is subject to this Court's jurisdiction for at least the following reasons: (i) a portion of the infringements alleged herein taking place in this district; and (ii) Wide Open regularly doing or soliciting business, engaging in other persistent courses of

conduct, and/or deriving substantial revenue from goods and services provided to individuals in Florida and this Judicial District.

10. Venue is proper in this district pursuant to 28 U.S.C. § 1400(b). BDU has a regular and established place of business in this District located at 7600 NW 5 Pl, Gainesville, FL 32607. Additionally, Wide Open is the *alter ego* of BDU and thus BDU maintains an unusually high degree of control of Wide Open and Wide Open's corporate existence is simply a formality.

## BACKGROUND

11. This lawsuit asserts infringement of the '223 Patent. A true and correct copy of the '223 Patent is attached hereto as Exhibit A.

12. ABC is the current assignee and owner of all right, title and interest in and to the '223 Patent. This assignment has not been recorded at the United States Patent and Trademark Office ("USPTO"). Rare Breed has the exclusive right to sell products covered by the '223 Patent.

13. Upon information and belief, Defendants have committed acts of infringement, which will be described in more detail below. These acts are in violation of 35 U.S.C. § 271 and should be considered willful.

14. Upon information and belief, Defendants are the *alter ego* of one another. BDU maintains an unusually high degree of control of Wide Open and Wide Open's corporate existence is simply a formality. The website owned and operated by

Wide Open contains a direct link called "BECOME A DEALER" which is merely Big Daddy Unlimited's "Big Daddy Partners Program." *See* Exhibit B. In addition, Wide Open interchangeably refers to itself as "Big Daddy Unlimited" on its website, touting, "Big Daddy Unlimited is unlike any other online gun store. We carry a HUGE selection of guns, gear, ammo, and accessories at highly competitive prices." *Id.* Defendants also refer to themselves interchangeably as "Wide Open Enterprises," "Wide Open Triggers," and "Big Daddy Unlimited." The content contained on Wide Open's website is purportedly owned by Big Daddy Enterprises, Inc., which claims copyright ownership in a published notice, as shown below. *Id.*



15. Additionally, in representative screenshots, Wide Open directs its patrons to follow BDU on social media, instead of itself, shown below.



Follow **Big Daddy Unlimited** on social media!



16. Upon further information and belief, the principals of BDU and Wide Open are the same persons. Anthony McKnight, Robin McKnight, and Sherrie McKnight (among others) own, direct, operate, and facilitate the business acts for both BDU and Wide Open. Those persons may have created a series of shell organizations intended to shield each other from liability for actions pursuant to their participation in the firearms industry.

17. Upon information and belief, Wide Open operated, and continues to operate a business at 491 Oak Road, Ocala, FL 34472. This is evidenced by the receipt of a demand letter signed by T. Tidwell on behalf of Wide Open at this address on September 1, 2021. *See* Exhibit C.

18. Upon information and belief, infringing triggers ordered online from either the Wide Open website or the BDU website are all shipped to the customer by BDU.

19. The Parties operate in the firearms industry. Plaintiffs are responsible for developing the Forced Reset Trigger ("FRT"), including the FRT-15™ for use in the AR-15 weapons platform. The FRT-15™ trigger is one embodiment of '223 Patent's invention.

20. The Rare Breed FRT-15™ trigger was first introduced to the market in December 2020. It is unique, being the only hammer-forced-reset trigger on the market and exclusively protected by the '223 Patent. The unique FRT-15™ trigger created a new market for the product that did not exist before. The FRT-15™ trigger has been the subject of much publicity, consumer interest, and vigorous sales.

21. Defendants are responsible for misappropriating Plaintiffs' proprietary technology and selling it as their own in direct competition with Rare Breed.

22. Until recently, BDU was the first and only distributor of the FRT-15™ trigger for Rare Breed. But, within a few months of becoming the sole distributor for Rare Breed (in May 2021), it formed a competing company, Wide Open, and began planning to unfairly compete against Rare Breed by unlawfully copying the FRT-15™ trigger and infringing the '223 Patent.

23. Shortly before announcing the coming offering of an infringing trigger, BDU refused payment for shipments of Rare Breed product. On information and belief, these funds owed to rare breed were used to fund the infringement by Wide Open. When Rare Breed learned of the planned infringement, BDU was terminated as the distributor.

24. In advance of the first sale date (September 7, 2021), BDU was advertising and offering presale of the WOT trigger.



25. On August 31, 2021, counsel for Rare Breed sent a cease and desist demand letter to BDU and Wide Open. *See* Exhibit C. All available public evidence indicated that the WOT trigger being offered was covered by claims of the '223

Patent and could not operate any other way. However, in an abundance of caution and because the Plaintiffs did not yet have a specimen to examine, BDU and WOT were offered an opportunity to explain how their trigger operated or provide a specimen by September 14, 2021. Neither BDU nor Wide Open responded.

26. In the meantime, Plaintiffs were able to purchase a specimen WOT Hard Reset Trigger from BDU. The specimen was examined carefully and found to be a near exact copy of the FRT-15™ trigger BDU had been distributing. It was also determined—without question—to be covered by one or more claims of the '223 Patent.

## The Invention

27. The '223 Patent provides a novel device for accelerating the firing sequence of any semiautomatic firearm, in contrast to a standard semiautomatic trigger or other prior art devices that allow accelerated rate of semiautomatic firing. While the '223 Patent may be adapted to many types of firearms, the Plaintiffs' FRT-15™ trigger was designed as a drop-in replacement particularly to fit AR-15 pattern firearms.

28. An AR-15 pattern weapon, for example, is considered a semiautomatic firearm. In standard semiautomatic firearms, the trigger releases a sear which allows a hammer to contact a firing pin and fire a chambered ammunition cartridge, i.e.,

a "round." Part of the force that propels the round is used to cycle the rifle's bolt carrier or "action" in a rearward direction which extracts and ejects the spent cartridge. Springs at the rear of the bolt carrier act to return the bolt to its original firing position (i.e., into battery), and while so returning, a new cartridge (i.e., "round") is placed in the firing chamber. The longitudinal reciprocation of the bolt also resets the hammer and enables the weapon to be fired again. This process can be seen in the sequence of illustrations below.

29. For background context, the following is a depiction and description of the operation of a *standard* **AR-pattern trigger mechanism**:



30. The trigger is shown in purple. The hammer is shown in brown. The disconnector is shown in green. The bolt carrier is shown in blue.

31. The process is commenced by the trigger being pulled by the user. The trigger releases the hammer from the trigger sear and allows the hammer to strike the firing pin.



32. A portion of the propellant gas is used to begin the process of sending the bolt carrier to the rear of the firearm.



33. The rear-ward movement of bolt carrier cocks the hammer on the disconnector and allows the bolt to return into battery with a new round inserted into the chamber. While this is happening, in the standard AR-pattern semiautomatic trigger, the user can either continue to hold the trigger in a pulled (i.e., fired)

state or allow the trigger to return to its reset state, in which the sear, rather than the disconnector, engages and holds the hammer.

34. The '223 Patent is an improvement on the above-described technology because it makes the disconnector unnecessary by forcibly returning the trigger to the reset state.

35. In the standard AR-pattern trigger assembly, the purpose of the disconnector is to hold the hammer in a cocked position until the trigger member is reset. The disconnector allows the firearm to be fired only a single time when the trigger is pulled and held, because the user is not typically able to release the trigger rapidly enough so that the sear engages before the bolt carrier or bolt returns to its in-battery position. The disconnector prevents the firearm from either firing multiple rounds on a single pull of the trigger, or from allowing the hammer to simply "follow" the bolt carrier as it returns to battery without firing a second round, but leaving the hammer uncocked.

36. The '223 Patent invention does not require a disconnector in the trigger mechanism. The '223 Patent teaches a forcible reset of the trigger by the hammer while the bolt returns to the in-battery position. The '223 Patent also teaches a "locking bar" which limits movement of the trigger. The locking bar acts to prevent the trigger from being pulled a second (or subsequent) time until

the bolt carrier has returned to the in-battery position. This is depicted in the illustrations below.

37. The following is a reproduction of a representative trigger assembly according to an embodiment of the '223 Patent:



38. The trigger is shown in red. The hammer is shown in brown. The locking bar is shown in green. The bolt carrier is shown in blue.

39. When the trigger is pulled, the hammer is released, which strikes the firing pin



carried in the bolt carrier.



40. As the round fires, propellant gas pressure causes the action to cycle. This begins the process of sending the bolt carrier toward the rear of the firearm.

41. As the bolt carrier moves toward the rear of the firearm, the bolt carrier engages with and cocks the hammer. The invention of the '223 Patent provides that the hammer forcibly resets the trigger, overcoming any pressure the user maintains against the trigger. Simultaneously, the locking bar engages with the trigger and mechanically prevents the shooter from pulling the trigger until the locking bar is reset. The locking bar cannot be reset until the bolt carrier returns to its in-battery position.

42. As the bolt carrier returns forward to its in-battery position, a new round is inserted into the chamber and the bolt closes. As the bolt closes, the bolt carrier

contacts and pivots the locking bar, freeing the trigger to be pulled again and the firing process repeated.

43. The claims of the '223 Patent define the scope of the invention. For example, Claim 4 of the '223 Patent specifies a housing, a hammer, a trigger member, and a locking bar.

## The Infringing Device

44. Defendants are currently making, using, selling, and/or offering for sale a knock-off version of Plaintiffs' FRT-15™ trigger assembly, which embodies the technology claimed in the '223 Patent.

45. Defendants' knock-off trigger assembly is called the "WOT Hard Reset Trigger" ("the Infringing Device").  Exemplary photographs of it and the Rare Breed FRT-15 trigger are shown below:



46. Below is a photograph of internal components, primarily the trigger, hammer, locking bar, and springs of the Infringing Device. The cut-outs in the parts, to reduce material by "skeletonizing" the parts, and the addition of a guide rod for the locking bar spring do not affect the infringing status of the Infringing Device.



47. Below is a side-by-side comparison of internal components of the Infringing Device (left) and the FRT-15™ trigger (right), exclusive of biasing springs. While infringement is determined by comparing the accused device to the patent claims, the comparison to the FRT-15™ trigger shows that it is a nearly exact knock-off of the product BDU had been distributing for Rare Breed.



48. Defendants' Infringing Device employs and embodies the technology claimed by the '223 Patent by using the hammer to forcibly reset the trigger and to prevent the trigger from being pulled again by virtue of the locking bar engaging the trigger until the forward action of the bolt carrier disengages the locking bar from the trigger. Furthermore, the Infringing Device is assembled in a housing which includes transversely aligned pairs of openings for receiving hammer and trigger assembly pins, as specified in Claim 4 of the '223 Patent.

49. FIG. 2 of the '223 Patent, shown below, is illustrative of one embodiment of the invention. FIG. 2 depicts a "drop-in" trigger assembly (with the housing partially cut away).



**FIG. 2**

50. The hammer 18 includes a sear catch 46 that engages the sear 48 on the trigger member 26, when cocked.

51. FIG. 3 is representative of one embodiment of the locking bar 62 and its relationship with the trigger 28, hammer 18, and bolt carrier 56.



**FIG. 3**

52. For the reasons discussed in more specificity below, Defendants' WOT Hard Reset Trigger ("the Infringing Device ") infringes at least one claim of the '223 Patent and thus, Defendants are liable for patent infringement pursuant to 35 U.S.C. § 271.

53. In view of the Defendants' prior relationship with Rare Breed and defiance of Rare Breed's demand letter in advance of commercial sale of the Infringing Device, the infringement is willful.

## COUNT I – INFRINGEMENT OF THE '223 PATENT

54. The allegations set forth in paragraphs 1-53 are fully incorporated into this First Count for Relief.

55. Upon information and belief, Defendants have and continue to directly and willfully infringe, including through the doctrine of equivalents, at least Claim 4 of the '223 Patent by making, using, selling, offering for sale, importing and/or providing and causing to be used without authority within the United States, the WOT Hard Reset Trigger (the "Infringing Device"). An exemplary comparison of the Infringing Device with claim 4 of the '223 Patent is illustrated in the chart below:

56.

| Claim Language | Infringing WOT Hard Reset Trigger |
|---|---|
| 4. For a firearm having a receiver with a fire control mechanism pocket, assembly pin openings in | The WOT trigger is for an AR-pattern firearm, which has a lower receiver with a fire control pocket, assembly pin openings in |

| | |
|---|---|
| side walls of the pocket, and a bolt carrier that reciprocates and pivotally displaces a hammer when cycled, a trigger mechanism, comprising: | side walls of the pocket, and a bolt carrier that reciprocates and pivotally displaces a hammer when cycled.<br><br> |
| a housing having transversely aligned pairs of openings for receiving hammer and trigger assembly pins; | The WOT trigger includes a housing with transversely aligned pairs of openings for receiving hammer and trigger assembly pins.<br><br> |
| a hammer having a sear notch and mounted in the housing to pivot on a transverse axis between set and released positions; | The WOT trigger includes a hammer with a sear notch and is mounted in the housing to pivot on a transverse axis between set and released positions. |



| | |
|---|---|
| a trigger member having a sear and mounted in the housing to pivot on a transverse axis between set and released positions, the trigger member having a surface positioned to be contacted by the hammer when the hammer is displaced by the bolt carrier when cycled, the contact causing the trigger member to be forced to the set position; | The WOT trigger includes a trigger member with a sear and is mounted in the housing to pivot on a transverse axis between set and released positions. |



The trigger member has a surface positioned to be contacted by the hammer when the hammer is displaced by the bolt carrier when cycled.

|  | Surface contacted by hammer<br><br>The contact causes the trigger member to be forced to the set position. |
| --- | --- |
| a locking bar pivotally mounted in the housing and spring biased toward a first position in which the locking bar mechanically blocks the trigger member from moving to the released position, and movable against the spring bias to a second position when contacted by the bolt carrier reaching a substantially in-battery position in which the trigger member can be moved by an external force to the released position. | The WOT trigger includes a locking bar that is pivotally mounted in the housing.<br><br>Pivot   Locking bar   Housing<br><br>The locking bar is spring biased toward a first position in which the locking bar mechanically blocks the trigger member from moving to the released position. |



The locking bar is movable against the spring bias to a second position when contacted by the bolt carrier reaches a substantially in-battery position. There, the trigger member can be moved by an external force (pull by the trigger finger) to the released position.



57. The working components of the Infringing Device are functional reproductions of the '223 Patent. This is true when comparing the working components of the Infringing Device to the language of the claims, which is the legal standard for infringement.

58. Accordingly, the Defendants' making, using, selling, offering for sale, and/or importing of the Infringing Device is a direct infringement of the '223 Patent.

59. On information and belief, the Infringing Device is marketed to, provided to, and/or used by Defendants' partners, clients, customers, affiliates, subsidiaries, *alter egos*, and assumed business identities within this District.

60. Sales of the Infringing Device directly compete against and unlawfully displace sales of the patented Rare Breed FRT-15™ trigger.

61. Upon information and belief, since at least the August 31, 2021, demand letter or no later than the filing of this Complaint, Defendants are liable as contributory infringers of the '223 Patent under 35 U.S.C. § 271(c) by offering to sell, selling, and importing into the United States components of the Infringing Device especially made or adapted for use in an infringement of the '223 Patent. The Infringing Device is a combination of separately fabricated and subsequently assembled components which are specifically made in a way to enable infringement of the '223 Patent and is not a staple article of commerce suitable for substantial non-infringing use.

62. Defendants' acts of infringement are willful and for no other purpose than to deliberately and irreparably harm Plaintiffs' business, sales, reputation, and good-will.  BDU was formerly the product distributor for Rare Breed until business relationships soured. The first major (if not sole) product that

Defendants brought to market following the split between BDU and Rare Breed was the Infringing Device.

63. Plaintiffs have been substantially harmed by Defendants' infringing activities and are entitled to relief including but not limited to a preliminary injunction, a permanent injunction, damages adequate to compensate for the infringement, being lost profits or no less than a reasonable royalty, treble damages, and attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter:

a. A judgment in favor of Plaintiffs that Defendants have infringed and induced others to infringe the '223 Patent;

b. A preliminary injunction enjoining Defendants and their officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, parents, and all others acting in active concert therewith from infringement or contributing to the infringement of the '223 Patent during the pendency of this case, or other such equitable relief as the Court determines is warranted;

c. A permanent injunction enjoining Defendants and their officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, parents, and all others acting in active concert therewith from infringement

or contributing to the infringement of the '223 Patent, or other such equitable relief as the Court determines is warranted;

d. A judgment and order requiring Defendants to pay to Plaintiffs their damages, costs, expenses, and prejudgment and post-judgment interest for Defendants' infringement of the '223 Patent as provided under 35 U.S.C. § 284, and an accounting of ongoing post-judgment infringement; and

e. Any and all other relief, at law or equity, to which Plaintiff may show itself to be entitled.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff, under Rule 38 of the Federal Rules of Civil Procedure, requests a trial by jury of any issues so triable by right.

DATED: September 15, 2021      Respectfully submitted,

/Kevin C. Maxwell/

Kevin C. Maxwell, Esq. (Florida Bar No. 0604976)
**The Law Office of Kevin C. Maxwell and
Associates**
733 West Colonial Drive
Orlando, FL 32804
kevincmaxwell@gmail.com
T: (407)480-2179
F: (407)849-2951


Glenn D. Bellamy, Esq. (Ohio Bar No. 0070321)
Charles D. Pfister, Esq. (Ohio Bar No. 0097790)
**Wood Herron & Evans LLP**
441 Vine Street
Suite 2700, Cincinnati OH 45202
gbellamy@whe-law.com
cpfister@whe-law.com
T: (513)241-2324
F: (513)241-6234


*Attorneys for Plaintiffs*