# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### GAINESVILLE DIVISION

**RARE BREED TRIGGERS, LLC, a North Dakota Limited Liability Company, and ABC IP LLC, a Delaware Limited Liability Company,**
      Plaintiffs.

-vs-

**BIG DADDY ENTERPRISES, INC., a Florida Corporation, BIG DADDY UNLIMITED, INC., a Florida Corporation, WIDE OPEN ENTERPRISES, LLC, a New Mexico Limited Liability Company d/b/a WIDE OPEN TRIGGERS, WE GOT AMMO, INC., a Florida Corporation, ANTHONY McKNIGHT, an individual, SHERRIE McKNIGHT, an individual, and DOUGLAS ENRIQUE RIOS, an individual,**
      Defendants.

CASE NO. 1:21-CV-00149-RH-GRJ

**JURY TRIAL DEMANDED**

---

## SECOND AMENDED COMPLAINT FOR PATENT INFRINGEMENT

---

This is an action for patent infringement in which Rare Breed Triggers, LLC ("Rare Breed") and ABC IP LLC ("ABC") (collectively, "Plaintiffs") accuse Big Daddy Enterprises, Inc., ("BDE"), Big Daddy Unlimited, Inc. ("BDU"), Wide

1

Open Enterprises, LLC d/b/a Wide Open Triggers ("Wide Open"), We Got Ammo, Inc. ("WGA"), Anthony McKnight, Sherri McKnight, and Douglas Enrique Rios (collectively, "Defendants") of infringing U.S. Patent No. 10,514,223 ("the '223 Patent") as follows:

## PARTIES

1. Rare Breed is a limited liability company organized under the laws of the State of North Dakota with an office at 3523 45th Street South, Suite 100, Fargo, North Dakota 58104. Rare Breed is the successor by merger to the Florida limited liability company of the same name.

2. ABC is a limited liability company organized under the laws of the State of Delaware with an address at 8 The Green, Suite A, Dover, DE 19901. ABC is an intellectual property holding company.

3. Upon information and belief, Defendant BDU is a corporation existing under the laws of the state of Florida, having a place of business at 7600 NW 5 Pl, Gainesville, FL 32607.

4. Upon information and belief, BDE is a corporation existing under the laws of the State of Florida, having a mailing address at 7600 NW 5th Place, Gainesville, Florida 32607 and principal business address at 6915 NW 4th Boulevard, Suite A, Gainesville, Florida 32607.

5. Upon information and belief, BDE holds Type 1 (Firearms dealer and gunsmith), Type 8 (Dealer/importer of firearms), and Type 10 (Manufacturer of destructive devices, ammunition for destructive devices, or armor-piercing ammunition) Federal Firearms Licenses.

6. Upon information and belief, BDU is a corporation existing under the laws of the State of Florida, having a mailing address at 7600 NW 5th Place, Gainesville, Florida 32607 and principal business address at 6921 NW 22nd Street, Gainesville, Florida 32653.

7. Upon information and belief, BDE is an *alter ego* of BDU and thus, for purposes of this action, should be treated as such.

8. Upon information and belief, Defendant Wide Open is a limited liability company existing under the laws of the state of New Mexico but operating with a place of business in the state of Florida. Wide Open operates under the business name "Wide Open Triggers" and has a place of business at 491 Oak Road, Ocala, FL 34472. Upon information and belief, Wide Open is an *alter ego* of BDU, and thus, for purposes of this action, should be treated as such.

9. Upon information and belief, Defendant WGA is a corporation organized under the laws of the State of Florida with a place of business at 491 Oak Road, Ocala, FL 34472.

10. Upon information and belief, WGA holds Type 6 (Manufacturer of only ammunition) and Type 8 (Dealers/importer of firearms) Federal Firearms Licenses.

11. Upon information and belief, WGA is an *alter ego* of Douglas Enrique Rios, and thus, for purposes of this action, should be treated as such.

12. Upon information and belief, Defendant Anthony McKnight is an individual residing in this district.

13. Upon information and belief, Defendant Sherrie McKnight is an individual residing in this district.

14. Upon information and belief, Defendant Douglas Enrique Rios is an individual residing in this district.

15. Each named entity or person in this proceeding shall collectively comprise "the Parties."

## JURISDICTION AND VENUE

16. This is an action for infringement of the '223 Patent arising under 35 U.S.C. §§ 271(a)-(b), 281, and 284-85. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1338, which directs that United States District Courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, and pursuant to 28 U.S.C. § 1331, which pertains to civil actions arising under the laws of the United States.

17. Personal jurisdiction and venue over BDE are proper in this District because BDE, a Florida corporation, resides in this district.

18. Personal jurisdiction and venue over BDU are proper in this District because BDU, a Florida corporation, resides in this district.

19. Personal jurisdiction and venue over Wide Open are proper in this District because Wide Open is an *alter ego* of BDU, and thus, Wide Open resides in this district.

20. Upon information and belief, Wide Open is subject to this Court's specific and general personal jurisdiction pursuant to due process and/or the Florida Long Arm Statute, due at least to Wide Open's established and substantial business in this forum, including Wide Open's physical place of business being located at 491 Oak Road, Ocala, FL 34472. Additionally, Wide Open is subject to this Court's jurisdiction for at least the following reasons: (i) a portion of the infringements alleged herein taking place in this district; and (ii) Wide Open regularly doing or soliciting business, engaging in other persistent courses of conduct, and/or deriving substantial revenue from goods and services provided to individuals in Florida and this Judicial District.

21. Personal jurisdiction and venue over WGA are proper in this District because WGA, a Florida corporation, resides in this district.

22. Personal jurisdiction and venue over Anthony McKnight are proper in this District because he is a Florida resident and resides in this district.

23. Personal jurisdiction and venue over Sherri McKnight are proper in this District because she is a Florida resident and resides in this district.

24. Personal jurisdiction and venue over Douglas Enrique Rios are proper in this District because he is a Florida resident and resides in this district.

25. Venue is proper in this district pursuant to 28 U.S.C. § 1400(b). BDU has a regular and established place of business in this District located at 7600 NW 5 Pl, Gainesville, FL 32607. Additionally, Wide Open is the *alter ego* of BDU and thus BDU maintains an unusually high degree of control of Wide Open and Wide Open's corporate existence is simply a formality.

## BACKGROUND

26. This lawsuit asserts infringement of the '223 Patent. A true and correct copy of the '223 Patent is attached hereto as Exhibit A.

27. Rare Breed purchased the '223 Patent from Wolf Tactical, LLC, on May 7, 2020, to start a business to sell a commercial product that embodies the technology claimed in the '223 Patent.

28. Rare Breed planned to launch its business and start selling the FRT-15™ trigger in or around December of 2020.

29. In anticipation of the public launch of the FRT-15™, Rare Breed recognized the need to compartmentalize business responsibilities to ancillary entities. This provided protection to Rare Breed, as well as to its assets and owners. To do this, the owners of Rare Breed created ABC and XYZ Distrubution, LLC [sic] ("XYZ") on December 2, 2020, and November 24, 2020, respectively.

30. XYZ is a manufacturing and distribution company responsible for overseeing and effectuating the manufacture and distribution of FRT-15™ triggers for Rare Breed.

31. Prior to the creation of ABC and XYZ, Rare Breed was co-owned by Mr. Maxwell, Michael Register, Lawrence DeMonico and Cole Leleux. But, as part of Rare Breed's compartmentalization of certain business responsibilities, Mr. Register, Mr. DeMonico and Mr. Leleux divested themselves of any ownership interest they had in Rare Breed.

32. Another part of the business organization plan before Rare Breed launched the FRT-15™ was to assign the '223 Patent to ABC. The '223 Patent was assigned to ABC by Rare Breed Triggers, LLC ("Rare Breed") on December 8, 2020.

33. ABC is the current assignee and owner of all right, title and interest in and to the '223 Patent. This assignment has not been recorded at the United States Patent and Trademark Office ("USPTO").

34. ABC and XYZ entered into a Patent License Agreement on December 10, 2020. *See Dkt.* 102. The Patent License Agreement provided XYZ with certain exclusive rights under the '223 Patent and allowed XYZ to use subcontractors for manufacturing purposes while also allowing XYZ to assign, transfer, or sublicense any of the exclusive rights set forth in the Agreement with ABC's prior written consent. *Id.*

35. XYZ and Rare Breed entered into an Agreement for Purchase and Sale of Goods on December 8, 2020. *See Dkt.* 103. The Agreement for Purchase and Sale of Goods provided Rare Breed with the exclusive right to purchase FRT-15™ triggers from XYZ in order to allow Rare Breed to fulfill its role of being the only commercial vendor of products that embody the '223 Patent, *i.e.*, the FRT-15™. An Addendum thereto dated December 7, 2021, recognized that Rare Breed had relocated the situs of its company to North Dakota. *Id.*

36. Even though Rare Breed assigned the '223 Patent to ABC, Rare Breed knew that it needed to possess certain exclusive rights under the '223 Patent as part of the business organization in order to protect its interest in FRT-15™ sales. So, the principals involved with Rare Breed, ABC and XYZ—including Mr. Maxwell, Mr. Register, Mr. DeMonico, and Mr. Leleux—through those entities entered into an oral agreement that transferred certain exclusive rights under the '223 Patent to Rare Breed (the "Oral Agreement"). Those exclusive rights

included, at least, the exclusive right to commercially vend products embodying the '223 Patent, *i.e.*, the FRT-15™. The need for, purpose, and terms of the Oral Agreement were fully understood by ABC, XYZ, and Rare Breed. All parties to the Oral Agreement have affirmed its existence and terms under penalty of perjury. *See Dkts.* 98-100.

37. Thus, Rare Breed has had the exclusive right to sell products covered by the '223 Patent since December 2020.

38. The exclusive rights transferred to Rare Breed by the Oral Agreement included, at least, the exclusive right to commercialize, advertise, offer for sale, sell, and profit from technology embodying the '223 Patent. The principals, through ABC, XYZ, and Rare Breed, also agreed that the only sales XYZ was permitted to make would be directly to Rare Breed. Any other sales by XYZ were prohibited, since XYZ was the sole manufacturer and distributor for Rare Breed and Rare Breed would be the sole authorized entity to sell the FRT-15™ trigger to the consuming public.

39. ABC, XYZ, and Rare Breed agreed to transfer these exclusive rights to Rare Breed to maintain Rare Breed's position as the public-facing entity in the FRT-15™ business and because Rare Breed was the entity best suited to assume such responsibilities.

40. Rare Breed became an active business with daily operations, a social media presence, and recognizability. Rare Breed became recognized as the sole source of FRT-15™ triggers to the consuming public, Rare Breed became exclusively responsible for the overall chain of commerce that results in the sale of FRT-15™ triggers, and Rare Breed is the daily active business to net a profit from the sale of technology embodying the '223 Patent. Customers and market participants associate the FRT-15™ with Rare Breed and appreciate the investment Rare Breed has continually made in protecting the FRT-15™'s exclusivity.

41. The Oral Agreement was made at or around the same time as, and in conjunction with: (1) the Assignment Agreement between Rare Breed and ABC; (2) the Patent License Agreement made between ABC and XYZ; and (3) the Agreement for Purchase and Sale of Goods between XYZ and Rare Breed.

42. To date, none of ABC, XYZ, or Rare Breed have deviated from the terms laid out in the Patent License Agreement, Agreement for Purchase and Sale of Goods, or the Oral Agreement entered concomitant therewith. To date, Rare Breed remains the exclusive, commercial seller of FRT-15™ triggers.

43. Although Rare Breed, ABC, and XYZ were satisfied with the Oral Agreement giving Rare Breed the exclusive right to commercially vend products embodying the '223 Patent, as well as advertise and profit therefrom, those

entities were not satisfied with the likely and persistent attacks to Rare Breed's standing to sue each time Rare Breed sought to protect and enforce its patent rights.[1]

44. To make clear and memorialize the terms of the Oral Agreement (and hopefully avoid the standing attacks in future lawsuits), ABC gave written consent to XYZ on January 28, 2022, to exclusively sublicense to Rare Breed certain exclusive patent rights under the '223 Patent (*see Exhibit* D *hereto*) and XYZ gave Rare Breed a written exclusive sublicense on January 29, 2022 (*see* Exhibit E hereto*).*[2]

45. Upon information and belief, Defendants have committed acts of infringement, which will be described in more detail below. These acts are in violation of 35 U.S.C. § 271 and should be considered willful.

46. Upon information and belief, Defendants are the *alter ego* of one another. BDU maintains an unusually high degree of control of Wide Open and Wide Open's corporate existence is simply a formality. The website owned and operated by

---

[1] Rare Breed is a current party to four separate patent infringement lawsuits, all brought pursuant to Rare Breed's exclusive rights under the '223 Patent. Rare Breed has also sent myriad Cease and Desist Demand Letters to known infringers, which have been mostly effective in preventing unauthorized and infringing conduct.

[2] It should be noted that Exhibits D and E herein are copies of documents which are of-record in the related case *Rare Breed Triggers LLC et al. v. Big Daddy Unlimited, Inc. et al.*, Case No.: 1-22-cv-00061. Specifically, *Dkt.* 18, Exhibits F and G.

Wide Open contains a direct link called "BECOME A DEALER" which is merely Big Daddy Unlimited's "Big Daddy Partners Program." *See* Exhibit B. In addition, Wide Open interchangeably refers to itself as "Big Daddy Unlimited" on its website, touting, "Big Daddy Unlimited is unlike any other online gun store. We carry a HUGE selection of guns, gear, ammo, and accessories at highly competitive prices." *Id.* Defendants also refer to themselves interchangeably as "Wide Open Enterprises," "Wide Open Triggers," and "Big Daddy Unlimited." The content contained on Wide Open's website is purportedly owned by BDU, which claims copyright ownership in a published notice, as shown below. *Id.*



47. Additionally, in representative screenshots, Wide Open directs its patrons to follow BDU on social media, instead of itself, shown below.





48. Upon further information and belief, the principals of BDU and Wide Open are the same persons. Anthony McKnight and Sherrie McKnight (among others) own, direct, operate, and facilitate the business acts for both BDU and Wide Open. Those persons have created a series of shell organizations intended to shield each other from liability for actions pursuant to their participation in the firearms industry.

49. Upon information and belief, Wide Open operated, and continues to operate a business at 491 Oak Road, Ocala, FL 34472. This is evidenced by the receipt of

a demand letter signed by T. Tidwell on behalf of Wide Open at this address on September 1, 2021. *See* Exhibit C.

50. Upon information and belief, infringing triggers ordered online from either the Wide Open website or the BDU website are all shipped to the customer by BDU.

51. The Parties operate in the firearms industry. Plaintiffs are responsible for developing the Forced Reset Trigger ("FRT"), including the FRT-15™ for use in the AR-15 weapons platform. The FRT-15™ trigger is one embodiment of '223 Patent's invention.

52. The Rare Breed FRT-15™ trigger was first introduced to the market in December 2020. It is unique, being the only hammer-forced-reset trigger on the market and exclusively protected by the '223 Patent. The unique FRT-15™ trigger created a new market for the product that did not exist before. The FRT-15™ trigger has been the subject of much publicity, consumer interest, and vigorous sales. As shown in Paragraph 77, below, the Rare Breed FTR-15™ trigger has consistently been marked with "US PAT. 10514223" in compliance with 35 U.S.C. § 286.

53. Defendants are responsible for misappropriating Plaintiffs' proprietary technology and selling it as their own in direct competition with Rare Breed.

54. Until recently, BDU was the first and only distributor of the FRT-15™ trigger for Rare Breed. But, within a few months of becoming the sole distributor for Rare Breed (in May 2021), it formed a competing company, Wide Open, and began planning to unfairly compete against Rare Breed by unlawfully copying the FRT-15™ trigger and infringing the '223 Patent.

55. Shortly before announcing the coming offering of an infringing trigger, BDU refused payment for shipments of Rare Breed product. On information and belief, these funds owed to Rare Breed were used to fund the infringement by Wide Open. When Rare Breed learned of the planned infringement, BDU was terminated as the distributor.

56. In advance of the first sale date (September 7, 2021), BDU was advertising and offering presale of the WOT trigger.



57. On August 31, 2021, counsel for Rare Breed sent a cease and desist demand letter to BDU and Wide Open. *See* Exhibit C. All available public evidence indicated that the WOT trigger being offered was covered by claims of the '223 Patent and could not operate any other way. However, in an abundance of caution and because the Plaintiffs did not yet have a specimen to examine, BDU and WOT were offered an opportunity to explain how their trigger operated or provide a specimen by September 14, 2021. Neither BDU nor Wide Open responded.

58. In the meantime, Plaintiffs were able to purchase a specimen WOT Hard Reset Trigger from BDU. The specimen was examined carefully and found to be a near exact copy of the FRT-15™ trigger BDU had been distributing. It was also determined—without question—to be covered by one or more claims of the '223 Patent.

### The Invention

59. The '223 Patent provides a novel device for accelerating the firing sequence of any semiautomatic firearm, in contrast to a standard semiautomatic trigger or other prior art devices that allow accelerated rate of semiautomatic firing. While the '223 Patent may be adapted to many types of firearms, the Plaintiffs' FRT-15™ trigger was designed as a drop-in replacement particularly to fit AR-15 pattern firearms.

60. An AR-15 pattern weapon, for example, is considered a semiautomatic firearm. In standard semiautomatic firearms, the trigger releases a sear which allows a hammer to contact a firing pin and fire a chambered ammunition cartridge, i.e., a "round." Part of the force that propels the round is used to cycle the rifle's bolt carrier or "action" in a rearward direction which extracts and ejects the spent cartridge. Springs at the rear of the bolt carrier act to return the bolt to its original firing position (i.e., into battery), and while so returning, a new cartridge (i.e., "round") is placed in the firing chamber. The longitudinal reciprocation of the bolt also resets the hammer and enables the weapon to be fired again. This process can be seen in the sequence of illustrations below.

61. For background context, the following is a depiction and description of the operation of a *standard* **AR-pattern trigger mechanism**:



62. The trigger is shown in purple. The hammer is shown in brown. The disconnector is shown in green. The bolt carrier is shown in blue.

63. The process is commenced by the trigger being pulled by the user. The trigger releases the hammer from the trigger sear and allows the hammer to strike the



firing pin.

64. A portion of the propellant gas is used to begin the process of sending the bolt carrier to the rear of the firearm.



65. The rear-ward movement of bolt carrier cocks the hammer on the disconnector and allows the bolt to return into battery with a new round inserted into the chamber. While this is happening, in the standard AR-pattern semiautomatic trigger, the user can either continue to hold the trigger in a pulled (i.e., fired) state or allow the trigger to return to its reset state, in which the sear, rather than the disconnector, engages and holds the hammer.

66. The '223 Patent is an improvement on the above-described technology because it makes the disconnector unnecessary by forcibly returning the trigger to the reset state.

67. In the standard AR-pattern trigger assembly, the purpose of the disconnector is to hold the hammer in a cocked position until the trigger member is reset. The disconnector allows the firearm to be fired only a single time when the trigger is pulled and held, because the user is not typically able to release the trigger rapidly enough so that the sear engages before the bolt carrier or bolt returns to its in-battery position. The disconnector prevents the firearm from either firing multiple rounds on a single pull of the trigger, or from allowing the hammer to simply "follow" the bolt carrier as it returns to battery without firing a second round, but leaving the hammer uncocked.

68. The '223 Patent invention does not require a disconnector in the trigger mechanism. The '223 Patent teaches a forcible reset of the trigger by the

hammer while the bolt returns to the in-battery position. The '223 Patent also teaches a "locking bar" which limits movement of the trigger. The locking bar acts to prevent the trigger from being pulled a second (or subsequent) time until the bolt carrier has returned to the in-battery position. This is depicted in the illustrations below.

69. The following is a reproduction of a representative trigger assembly according to an embodiment of the '223 Patent:



70. The trigger is shown in red. The hammer is shown in brown. The locking bar is shown in green. The bolt carrier is shown in blue.

71. When the trigger is pulled, the hammer is released, which strikes the firing pin carried in the bolt carrier.



72. As the round fires, propellant gas pressure causes the action to cycle. This begins the process of sending the bolt carrier toward the rear of the firearm.



73. As the bolt carrier moves toward the rear of the firearm, the bolt carrier engages with and cocks the hammer. The invention of the '223 Patent provides

that the hammer forcibly resets the trigger, overcoming any pressure the user maintains against the trigger. Simultaneously, the locking bar engages with the trigger and mechanically prevents the shooter from pulling the trigger until the locking bar is reset. The locking bar cannot be reset until the bolt carrier returns to its in-battery position.

74. As the bolt carrier returns forward to its in-battery position, a new round is inserted into the chamber and the bolt closes. As the bolt closes, the bolt carrier contacts and pivots the locking bar, freeing the trigger to be pulled again and the firing process repeated.

75. The claims of the '223 Patent define the scope of the invention. For example, Claim 4 of the '223 Patent specifies a housing, a hammer, a trigger member, and a locking bar.

## The Infringing Device

76. Defendants are currently making, using, selling, and/or offering for sale a knock-off version of Plaintiffs' FRT-15™ trigger assembly, which embodies the technology claimed in the '223 Patent.

77. Defendants' knock-off trigger assembly is called the "WOT Hard Reset Trigger" ("the Infringing Device"). Exemplary photographs of it and the Rare Breed FRT-15 trigger are shown below:



78. Below is a photograph of internal components, primarily the trigger, hammer, locking bar, and springs of the Infringing Device. The cut-outs in the parts, to reduce material by "skeletonizing" the parts, and the addition of a guide rod for the locking bar spring do not affect the infringing status of the Infringing Device.



79. Below is a side-by-side comparison of internal components of the Infringing
Device (left) and the FRT-15™ trigger (right), exclusive of biasing springs.
While infringement is determined by comparing the accused device to the
patent claims, the comparison to the FRT-15™ trigger shows that it is a nearly
exact knock-off of the product BDU had been distributing for Rare Breed.



80. Defendants' Infringing Device employs and embodies the technology claimed
by the '223 Patent by using the hammer to forcibly reset the trigger and to
prevent the trigger from being pulled again by virtue of the locking bar
engaging the trigger until the forward action of the bolt carrier disengages the
locking bar from the trigger. Furthermore, the Infringing Device is assembled in
a housing which includes transversely aligned pairs of openings for receiving
hammer and trigger assembly pins, as specified in Claim 4 of the '223 Patent.

81. FIG. 2 of the '223 Patent, shown below, is illustrative of one embodiment of the invention. FIG. 2 depicts a "drop-in" trigger assembly (with the housing partially cut away).



**FIG. 2**

82. The hammer 18 includes a sear catch 46 that engages the sear 48 on the trigger member 26, when cocked.

83. FIG. 3 is representative of one embodiment of the locking bar 62 and its relationship with the trigger 28, hammer 18, and bolt carrier 56.



**FIG. 3**

84. For the reasons discussed in more specificity below, Defendants' WOT Hard Reset Trigger ("the Infringing Device ") infringes at least one claim of the '223 Patent and thus, Defendants are liable for patent infringement pursuant to 35 U.S.C. § 271.

85. In view of the Defendants' prior relationship with Rare Breed and defiance of Rare Breed's demand letter in advance of commercial sale of the Infringing Device, the infringement is willful.

## COUNT I – INFRINGEMENT OF THE '223 PATENT

86. The allegations set forth in paragraphs 1-85 are fully incorporated into this First Count for Relief.

87. Upon information and belief, Defendants have and continue to directly and willfully infringe and/or willfully induce infringement, including through the

doctrine of equivalents, at least Claim 4 of the '223 Patent by making, using, selling, offering for sale, importing and/or providing and causing to be made, used, sold, offered for sale, and/or imported without authority within the United States, the WOT Hard Reset Trigger (the "Infringing Device"). An exemplary comparison of the Infringing Device with claim 4 of the '223 Patent is illustrated in the chart below:

88.

| Claim Language | Infringing WOT Hard Reset Trigger |
|---|---|
| 4. For a firearm having a receiver with a fire control mechanism pocket, assembly pin openings in side walls of the pocket, and a bolt carrier that reciprocates and pivotally displaces a hammer when cycled, a trigger mechanism, comprising: | The WOT trigger is for an AR-pattern firearm, which has a lower receiver with a fire control pocket, assembly pin openings in side walls of the pocket, and a bolt carrier that reciprocates and pivotally displaces a hammer when cycled.<br><br> |
| a housing having transversely | The WOT trigger includes a housing with |

| | |
|---|---|
| aligned pairs of openings for receiving hammer and trigger assembly pins; | transversely aligned pairs of openings for receiving hammer and trigger assembly pins.  |
| a hammer having a sear notch and mounted in the housing to pivot on a transverse axis between set and released positions; | The WOT trigger includes a hammer with a sear notch and is mounted in the housing to pivot on a transverse axis between set and released positions.  |



RELEASED POSITION

| | |
|---|---|
| a trigger member having a sear and mounted in the housing to pivot on a transverse axis between set and released positions, the trigger member having a surface positioned to be contacted by the hammer when the hammer is displaced by the bolt carrier when cycled, the contact causing the trigger member to be forced to the set position; | The WOT trigger includes a trigger member with a sear and is mounted in the housing to pivot on a transverse axis between set and released positions.<br><br><br><br>RELEASED POSITION<br><br>The trigger member has a surface positioned to be contacted by the hammer when the hammer is displaced by the bolt carrier when cycled. |



**SET POSITION**

The contact causes the trigger member to be forced to the set position.

| | |
|---|---|
| a locking bar pivotally mounted in the housing and spring biased toward a first position in which the locking bar mechanically blocks the trigger member from moving to the released position, and movable against the spring bias to a second position when contacted by the bolt carrier reaching a substantially in-battery position in which the trigger member can be moved by an external force to the released position. | The WOT trigger includes a locking bar that is pivotally mounted in the housing.<br><br><br><br>The locking bar is spring biased toward a first position in which the locking bar mechanically blocks the trigger member |

from moving to the released position.



**FIRST POSITION**

The locking bar is movable against the spring bias to a second position when contacted by the bolt carrier reaches a substantially in-battery position. There, the trigger member can be moved by an external force (pull by the trigger finger) to the released position.



**SECOND POSITION**

89. The working components of the Infringing Device are functional reproductions of the '223 Patent. This is true when comparing the working components of the Infringing Device to the language of the claims, which is the legal standard for infringement.

90. Accordingly, the Defendants' making, using, selling, offering for sale, and/or importing of the Infringing Device is a direct infringement of the '223 Patent.

91. On information and belief, the Infringing Device is marketed to, provided to, and/or used by Defendants' partners, clients, customers, affiliates, subsidiaries, *alter egos*, and assumed business identities within this District.

92. Sales of the Infringing Device directly compete against and unlawfully displace sales of the patented Rare Breed FRT-15™ trigger.

93. Upon information and belief, since at least the August 31, 2021, demand letter or no later than the filing of this Complaint, Defendants are liable as contributory infringers of the '223 Patent under 35 U.S.C. § 271(c) by offering to sell, selling, and importing into the United States components of the Infringing Device especially made or adapted for use in an infringement of the '223 Patent. The Infringing Device is a combination of separately fabricated and subsequently assembled components which are specifically made in a way

to enable infringement of the '223 Patent and is not a staple article of commerce suitable for substantial non-infringing use.

94. Upon information and belief, WGA is the consignee, *i.e.*, the responsible entity, for importing the Infringing Device into the United States. WGA has been responsible for multiple separate air shipments of Infringing Devices into the United States and has applied for import permits from the United States Department of Homeland Security for international customs' purposes. WGA has also purchased Infringing Devices on behalf of BDE/BDU and is a key link in the chain of infringing commerce.

95. Upon information and belief, WGA sold the Infringing Device at least to BDU, BDE, and/or Wide Open for resale.

96. Mr. Rios and WGA were put on notice of Plaintiffs' infringement claim by letter dated November 11, 2021. *See* Exhibit F hereto.

97. Upon information and belief, BDE, BDU, Wide Open, and/or Mr. Rios sold the Infringing Device to consumers. The sales by Mr. Rios came both through individual acts of Mr. Rios selling Infringing Devices at private gun conventions and shows and through Mr. Rios directing his business, WGA, to sell Infringing Devices to market retailers such as BDE, BDU and/or Wide Open.

98. Upon information and belief, Anthony McKnight is a principal of BDE, BDU, and/or Wide Open and who controls and/or directs those companies.

99. Mr. McKnight possesses ultimate authority on strategic and executive level business decisions undertaken by BDE/BDU.

100. Mr. McKnight also possesses ultimate authority on strategic and executive level business decisions undertaken by all affiliate, subsidiary, and/or related entities that fall under the umbrella or within the "Big Daddy" corporate suite of companies.

101. Upon information and belief, Anthony McKnight participates in regularly held executive level meetings between persons in charge of strategic business decisions for BDE/BDU.

102. Upon information and belief, Anthony McKnight has—during these regularly held executive meetings, as well as outside these meetings—specifically discussed with persons under his direct control his plans and efforts to copy the FRT-15™ trigger through a Bosnian manufacturer and importer, as well as sell the knock-off FRT-15™ as the "WOT."

103. Upon information and belief, these weekly meetings are for the purpose of identifying strategy for the "Big Daddy" suite of companies, which Mr. McKnight owns and/or controls.

104.    Upon information and belief, these meetings are conducted and directed by Anthony McKnight and cover the business agendas for all the current Defendants as well as WGA.

105.    Upon information and belief, Anthony McKnight has also directed the creation of putative liability shielding institutions such as "Wide Open Enterprises" and Mr. McKnight personally recruited Douglas Rios to invest in and nominally own/operate Wide Open Enterprises.

106.    Upon information and belief, Anthony McKnight was aware of the '223 Patent, knew that the Infringing Device infringed the '223 Patent, and actively, culpably, and wrongly directed, aided, and abetted BDE, BDU, and/or Wide Open's infringing activity. Mr. McKnight's knowledge of the '223 Patent and willingness to infringe it can be inferred, at least, by Mr. McKnight's direction that engineers under his control disassemble an FRT-15™ in order to replicate its working parts. All FRT-15™ triggers bear the '223 Patent Number.

107.    Upon information and belief, Anthony McKnight has employed and directed independent contractors and internal engineers at BDE/BDU and directed them to replicate triggers that embody the '223 Patent.

108.    Upon information and belief, Mr. McKnight instructed gunsmiths on how to disassemble the FRT-15™ (which is the commercial embodiment of the '223 Patent) and copy its parts for the purpose of exporting the technology to have

the product duplicated overseas and imported to the United States in violation of patent and other laws.

109.  Upon information and belief, Mr. McKnight has failed to maintain a separate identity from or between his businesses, instead shifting assets, intertwining corporate responsibilities among entities, and intermingling assets, expenses, and revenue from related and unrelated entities and personal sources.

110.  The FRT-15™ bears the '223 Patent number and has since its first commercial embodiment.

111.  Upon information and belief, Anthony McKnight personally participated in, induced, and/or approved the commission of the tort of patent infringement or specifically directed other officers, agents, or employees of the companies he controls to commit the tortious act of patent infringement.

112.  Upon information and belief, Sherri McKnight is a principal of BDE, BDU, and/or Wide Open and who controls and/or directs those companies.

113.  Upon information and belief, Sherri McKnight is also an executive officer of BDE/BDU and participates in strategic and executive business decision making at BDE/BDU.

114.  Upon information and belief, Sherri McKnight participates in strategic and executive level business decisions undertaken by all affiliate, subsidiary, and/or related entities that fall under the umbrella of the Big Daddy suite of businesses.

115.   Upon information and belief, Sherri McKnight participates in regularly held executive level meetings between persons in charge of strategic business decisions for BDE/BDU and has specifically discussed with persons under her direct control the plans and efforts to copy the FRT-15™ trigger through a Bosnian manufacturer and importer, as well as to sell the knock-off FRT-15™ as the "WOT."

116.   Upon information and belief, Sherri McKnight is the executive head of human resources for the "Big Daddy" suite of companies.

117.   Upon information and belief, Ms. McKnight has instructed employees of BDE/BDU to identify themselves as employees of Wide Open and vice versa when interacting with customers of either entity.

118.   Upon information and belief, Sherri McKnight was aware of the '223 Patent, knew that the Infringing Device infringed the '223 Patent, and actively, culpably, and wrongly directed, aided, and abetted BDE, BDU, and/or Wide Open's infringing activity.

119.   Upon information and belief, Sherri McKnight personally participated in, induced, and/or approved the commission of the tort of patent infringement or specifically directed other officers, agents, or employees of the companies she controls to commit the tortious act of patent infringement.

120.  Upon information and belief, Ms. McKnight observes no corporate formalities, fails to separate business from business, and directs and/or controls "employees" of other entities such as WGA and Wide Open, despite having no purported ownership and/or control over entities such as WGA and Wide Open.

121.  Ms. McKnight's knowledge of the '223 Patent and her willingness to infringe it can be inferred, at least, by Ms. McKnight's purported acts of direction and control over "employees" of Wide Open—a business set up exclusively to sell the Infringing Device. Ms. McKnight has instructed employees of Big Daddy to identify as employees of Wide Open, and vice versa, and Ms. McKnight manages customer service requests on behalf of both entities, including requests for reimbursement and/or replacement of broken or damages Infringing Devices—the sale and/or distribution of which constitutes patent infringement.

122.  Upon information and belief, Douglas Enrique Rios is a principal of Wide Open and/or WGA and who controls and/or directs those companies.

123.  Upon information and belief, Mr. Rios participated and/or conceived a scheme to sell a sum-certain number of Infringing Devices through a variety of platforms, including web-based sales, distributor sales, wholesale distribution, and cash sales at gun shows.

124.  Upon information and belief, Douglas Enrique Rios was aware of the '223 Patent, knew that the Infringing Device infringed the '223 Patent, and actively, culpably, and wrongly directed, aided, and abetted WGA and/or Wide Open's infringing activity.

125.  Upon information and belief, Mr. Rios sells firearms components, including WOT triggers, under aliases and for cash.

126.  Upon information and belief, Mr. Rios intermingles his personal cash receipts from sales of Infringing Devices at gun conventions and showcases with cash sales and revenue for BDE/BDU. Mr. Rios actively conceals assets in order to obscure the provenance of money derived through individual acts of patent infringement.

127.  Upon information and belief, Mr. Rios organized and controlled the overseas manufacture of infringing WOT triggers that BDE/BDU employees had copied and created or caused to be created liability shielding organizations, such as WGA.

128.  Upon information and belief, Mr. Rios created or caused to be created liability shielding organizations such as We Got Ammo for purposes of importing infringing WOT triggers and selling them to retail distributors including his own company, Wide Open.

129.    Upon information and belief, Douglas Enrique Rios personally participated in, induced, and/or approved the commission of the tort of patent infringement or specifically directed other officers, agents, or employees of the company he controls to commit the tortious act of patent infringement.

130.    Upon information and belief, Douglas Enrique Rios personally sold the Infringing Device directly to cash customer consumers.

131.    On information and belief, Wide Open's corporate structure is a sham or was created merely in an attempt to shield Anthony McKnight, Sherri McKnight, and Douglas Enrique Rios from liability for willful patent infringement. As such, Wide Open is the alter ego of Anthony McKnight, Sherri McKnight, and Douglas Enrique Rios and/or of BDE/BDU.

132.    Defendants' acts of infringement are willful and for no other purpose than to deliberately and irreparably harm Plaintiffs' business, sales, reputation, and good-will.  BDU was formerly the product distributor for Rare Breed until business relationship soured. The first major (if not sole) product that Defendants brought to market following the split between BDU and Rare Breed was the Infringing Device.

133.    The Defendants are jointly and severally liable for the infringement.

134.    Plaintiffs have been substantially harmed by Defendants' willful infringing activities and are entitled to relief including but not limited to a preliminary

injunction, a permanent injunction, damages adequate to compensate for the infringement, being lost profits, lost royalties, and/or no less than a reasonable royalty, treble damages, and attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter:

a. A judgment in favor of Plaintiffs that Defendants have infringed and/or induced others to infringe the '223 Patent;

b. A preliminary injunction enjoining Defendants and their officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, parents, and all others acting in active concert therewith from infringement or contributing to the infringement of the '223 Patent during the pendency of this case, or other such equitable relief as the Court determines is warranted;

c. A permanent injunction enjoining Defendants and their officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, parents, and all others acting in active concert therewith from infringement or contributing to the infringement of the '223 Patent, or other such equitable relief as the Court determines is warranted;

d. A judgment and order requiring Defendants to pay to Plaintiffs their damages, costs, expenses, and prejudgment and post-judgment interest for

Defendants' infringement of the '223 Patent as provided under 35 U.S.C. §

284, and an accounting of ongoing post-judgment infringement; and

e. Any and all other relief, at law or equity, to which Plaintiff may show itself

to be entitled.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff, under Rule 38 of the Federal Rules of Civil Procedure, requests a

trial by jury of any issues so triable by right.

DATED: June 8, 2022                     Respectfully submitted,

/s/*Glenn D. Bellamy*
Glenn D. Bellamy, Esq. (Ohio Bar No. 0070321)
  gbellamy@whe-law.com
Charles D. Pfister, Esq. (Ohio Bar No. 0097790)
  cpfister@whe-law.com
**Wood Herron & Evans LLP**
2700 Carew Tower
441 Vine Street
Cincinnati OH 45202
T: (513)241-2324
F: (513)241-6234

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 8, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a copy to all counsel of record.

<u>/s/Glenn D. Bellamy</u>
Glenn D. Bellamy, Esq.
***Attorney for Plaintiffs***