**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**GAINESVILLE DIVISION**

RARE BREED TRIGGERS, INC., )
)
Plaintiff, ) Case No: 1:25cv181, 1:21cv149
)
v. ) Gainesville, Florida
) April 17, 2026
BIG DADDY ENTERPRISES, INC., )
et al, )
) 9:02 AM
Defendants. )
______________________________ )

**TRANSCRIPT OF SHOW CAUSE PROCEEDINGS**
**BEFORE THE HONORABLE ROBERT L. HINKLE**
**UNITED STATES DISTRICT JUDGE**
**(Pages 1 through 288)**

Court Reporter: MEGAN A. HAGUE, RPR, FCRR, CSR
111 North Adams Street
Tallahassee, Florida 32301
megan.a.hague@gmail.com

*Proceedings reported by stenotype reporter.*
*Transcript produced by Computer-Aided Transcription.*

APPEARANCES:

For the Plaintiff:

Contarino Roth, LLC
By: JACOB W. ROTH
Attorney at Law
jroth@contarinoroth.com
2255 Glades Road
Suite 324A
Boca Raton, Florida 33431

Contarino Roth, LLC
By: JOSIAH A. CONTARINO
Attorney at Law
jcontarino@contarinoroth.com
101 Eisenhower Parkway
Suite 300
Roseland, New Jersey 07068

Wood Herron & Evans LLP
By: GLENN D. BELLAMY
Attorney at Law
gbellamy@whe-law.com
2700 Carew Tower
Cincinnati, Ohio 45202

For the Defendant:

Baker Law Group PLLC
By: MICHAEL J. SMITH
Attorney at Law
Michael.smith@jbakerlawgrouptx.com
1106 Clayton Lane
Suite 565
Austin, Texas 78723

**P R O C E E D I N G S**

(Call to Order of the Court at 9:02 AM on Friday, April 17, 2026.)

THE COURT: Good morning. Please be seated.

We're here for hearings in two related cases. What I'll call the new case is Case 1:25cv181. What I'll call the old case is Case 1:21cv149.

The principal thing we're here on is the show cause hearing in the new case. Then there are three pending motions in the old case.

We'll deal with the show cause matter first, and then we'll deal with the motions before we leave today.

The order setting the hearing said that the McKnights and Mr. Rios were to be present.

Mr. Smith, they all here?

MR. SMITH: They are all here, Your Honor.

THE COURT: All right. Very well.

I'm familiar with the matters. I've read your papers. I don't really need an opening statement, but I'll be happy to hear anything you wish to make in the way of an opening statement. I think ten minutes is probably enough. I don't know that we need to go more than that.

It's the plaintiff's burden, essentially, the plaintiff's motion. I'll hear from the plaintiff first.

MR. CONTARINO: Thank you, Your Honor.

Do you want appearances, or do you have them?

THE COURT: I think the court reporter has them, so I think we know who's here.

MR. CONTARINO: Thank you.

Good morning, Your Honor.

My name is Josiah Contarino, and on behalf of the plaintiffs, I would like to walk you through quickly a high-level view of what you will see in terms of evidence for this order to show cause hearing.

The contempt proceeding, which is over contempt -- this contempt proceeding is pretty straightforward. There are four enjoined defendants. Anthony McKnight, Douglas Rios, Sherrie McKnight, and Performance Triggers has repeatedly used Performance Triggers to skirt their obligation to refrain from making or selling Forced Reset Triggers, first, under the settlement agreement with plaintiff and now, second, under this Court's preliminary injunction.

Presently, we see that in three ways:

First, these defendants use an alternate website named fasttriggers.com to sell triggers prohibited by this Court's preliminary injunction.

Second, these defendants use an alternate website name, triggerpartsusa.com, to sell triggers prohibited by this Court's preliminary injunction.

Third, the practice of these defendants has been to

create the appearance of separation with the Performance Triggers' website while retaining control and profiting from it by selling triggers prohibited, again, first, by the settlement agreement and then, second, by Your Honor's preliminary injunction.

This Court will see through documents filed with the State of Florida how these defendants continually switch owners, operators, create cutout entities to shield their violative behavior.

This Court will see documents received from third parties that show the connection between these defendants and Fast Triggers and Trigger Parts USA.

And this Court will see these defendants controlling the finances of Performance Triggers even after it dissolved, even after the entity purportedly owning it was canceled. And you'll hear testimony regarding these issues. And at the end the evidence, this Court will see we'll show by a preponderance of the evidence that the enjoined defendants are, in fact, in contempt of this Court's preliminary injunction.

Thank you.

THE COURT: All right. Thank you.

Mr. Smith?

MR. SMITH: Good morning, Your Honor. Michael Smith of Baker Law Group on behalf of the defendants Mr. and Mrs. McKnight, Douglas Rios, and -- yeah, those three.

Your Honor, first, this is the wrong venue for this argument. If they want to expand the scope of the preliminary injunction, as they're trying to do here to bring in Mr. Robinson, that should be done in front of the arbitrator and not in front of the Court, as he is not a party to the lawsuit; he's not a party to the arbitration. He is now the owner of performancetriggers.com through an arm's length transaction, but he's not actually a party to any of these cases, Your Honor.

THE COURT: If he is participating in violating my injunction --

MR. SMITH: Your Honor --

THE COURT: -- why isn't he properly in front of me?

MR. SMITH: I would respectfully disagree, Your Honor. He's not violating your order because he's not a party. He's not been enjoined. He's not working in concert with the McKnights.

THE COURT: Well, let me ask it, I guess, a different way. If a United States District Court has entered an injunction and a person who is not a party works with the parties to violate the injunction, that person is in contempt; correct?

MR. SMITH: Correct, Your Honor. And I would agree that then you would have jurisdiction over Mr. Robinson for that. I agree.

THE COURT: That's -- that's the assertion.

MR. SMITH: Right.

That being said, Your Honor, Rare Breed has continually tried to bring in other people and other products to fall underneath the scope of their settlement agreement. The settlement agreement should be no broader than the preliminary injunction that was -- sorry -- the consent injunction that was entered in the 149 case back in 2022.

That was limited to the WOT, the ALAMO-15, and anything else referred to as the '223 patent. The terms of that --

THE COURT: I don't -- let me, as we walk through this, make sure I understand your position.

This is the new case?

MR. SMITH: Correct, Your Honor.

THE COURT: The new case is not limited to those two devices.

MR. SMITH: Correct, Your Honor. Our argument is that --

THE COURT: The arbitrator's injunction -- his preliminary relief was not limited to those two devices.

MR. SMITH: Correct, Your Honor.

THE COURT: The preliminary injunction I entered in the new case is not limited to those two items.

MR. SMITH: Correct, Your Honor.

THE COURT: So if they're selling the items that are

prohibited in my injunction --

MR. SMITH: Then they would be in violation; I would agree, Your Honor.

THE COURT: All right.

MR. SMITH: However, when the injunction went into place, Performance Triggers took all items under the injunction off the website. They stayed off the website until --

THE COURT: You think if I pull up the Performance Triggers' website right now, these triggers are not for sale on that website?

MR. SMITH: They are for sale on that website, but that website is not controlled by Anthony McKnight, Sherrie McKnight, or Douglas Rios.

THE COURT: They're not getting any money from it?

MR. SMITH: They are getting no money from it.

They sold the assets of Performance Triggers, which included the website, the customer lists, and things like that. There is still some merchant processing going through as Reginald has been getting his merchant processing up and running. But Reginald Robinson has been in the trigger business for a couple of years now. He has his own company called Bump -- I believe it's Bump Stock [sic], where he's been selling these same products. He was not enjoined from selling on Bump Stock. He saw an opportunity with Performance Triggers because it had name recognition, and so he bought the assets of the

company when he learned that my clients were enjoined from selling those triggers on that site anymore.

THE COURT: So he didn't get any triggers? He didn't get any product?

MR. SMITH: He bought no inventory. He received no inventory. There was no transfer of any assets other than the website, the customer lists, and the other things listed in the Asset Purchase Agreement. That is what Reginald Robinson bought. It was an arm's length transaction. He is not associated with the McKnights. He is a former employee of Big Daddy Unlimited. He worked with Performance Triggers. Because he is a social media influencer, he helped make videos for Performance Triggers.

But when Performance Triggers was enjoined by this Court and by the arbitrator, all those items came off that website. They did not go back on the website until after the sale of the assets to Reginald Robinson.

And so for those reasons, Your Honor, we don't believe that my clients are in violation of this injunction.

THE COURT: So if you go back to the Wayback Machine, you can find what was on that website at any given time --

MR. SMITH: Correct.

THE COURT: -- true?

And so as soon as the arbitrator entered his order, the website came down?

MR. SMITH: A few days after, Your Honor, because there was some dispute whether or not there was a bond required for the injunction.

THE COURT: A few days?

MR. SMITH: Yes. I believe the preliminary injunction was entered on January 20th or so. By early February, the site was down.

THE COURT: And it was up for a little while because you thought the arbitrator got it wrong?

MR. SMITH: We thought that the injunction required a bond.

THE COURT: You thought the arbitrator was wrong?

MR. SMITH: Correct.

THE COURT: And so you just ignored the arbitrator's order?

MR. SMITH: No, Your Honor. We pushed for having a bond set, and we were back in this court.

THE COURT: And what did the arbitrator do when you moved to stay the injunction pending a ruling on the bond?

MR. SMITH: He came out and said, There will be no injunction until the bond is paid. His injunction was not effective until the bond was paid.

THE COURT: And he said that?

MR. SMITH: Yes.

But by the time the bond was paid, Performance

Triggers was not -- the performancetriggers.com website was not selling any of these items.

It's also important to note that Performance Triggers --

THE COURT: Wait. Wait. Performancetriggers.com website was not selling these items?

MR. SMITH: Correct.

THE COURT: It's selling them today.

MR. SMITH: Yes, it is, under new ownership.

THE COURT: Got it. Okay.

MR. SMITH: Thank you, Your Honor.

THE COURT: Thank you.

MR. CONTARINO: Thank you, Your Honor.

We'd like to call our first witness, Plaintiff Lawrence DeMonico.

(Mr. DeMonico entered the witness stand.)

**LAWRENCE DEMONICO, PLAINTIFF'S WITNESS, DULY SWORN.**

THE COURTROOM DEPUTY: Be seated, please.

For the record, please state your name and spell your last name.

THE WITNESS: Lawrence DeMonico, D-e-M-o-n-i-c-o.

DIRECT EXAMINATION

BY MR. CONTARINO:

Q. Mr. DeMonico, what is your position with Rare Breed Triggers?

A. President.

Q. And what is Rare Breed Triggers' business?

A. We are in the business of designing, manufacturing, and selling Forced Reset Triggers.

Q. Are you aware of litigation between Rare Breed and Anthony McKnight, Sherrie McKnight, Doug Rios, and Performance Triggers that brings us here today?

A. Yes, sir.

Q. And can you give a summary of what this litigation is about?

THE COURT: We are going to be here a long, long time if we are doing this.

The record is already the record. I know what the litigation is about.

If I can get you to move right through to what matters, that will help us all.

MR. CONTARINO: Very good, Your Honor.

For the record, we had exhibits such as the arbitrator injunction, the bond order, but can we dispose of that if we want to move quicker.

THE COURT: You can. Those matters are already of record.

Mr. Smith, is there any objection to considering those on this motion?

MR. SMITH: No, Your Honor, no objection.

MR. CONTARINO: All right. We'll move to P4.

Your Honor, permission to approach?

THE COURT: You may.

The evidence presentation system is all up and running. You can do this with paper, if you wish, but you can also use the electronics.

MR. CONTARINO: Okay. I can do that.

And in that case, would you want a copy of every one in paper or would you just like --

THE COURT: I don't need the paper, but before you leave, the courtroom deputy is going to get the papers so that these -- if you are admitting exhibits and they're not already available electronically, then we need the paper.

MR. CONTARINO: Very good.

THE COURT: Either way.

MR. CONTARINO: I think the computer. This will be trickier for me.

(Pause in proceedings.)

BY MR. CONTARINO:

Q. As this is getting restarted, Mr. DeMonico, I'm showing you a document that's been marked as Exhibit P4. This is a certified and sealed copy of the Performance Triggers Articles of Incorporation.

MR. CONTARINO: And we move to admit this as a public record that's been certified.

THE COURT: Do you have an exhibit number?

MR. CONTARINO: P4.

THE COURT: Exhibit P4 is admitted.

(PLAINTIFF'S EXHIBIT P4: Received in evidence.)

BY MR. CONTARINO:

Q. Mr. DeMonico, if you would look at the document.
Based on it, who incorporated Performance Triggers?

A. Anthony McKnight.

Q. And based on this document, who is president of Performance Triggers?

A. Anthony McKnight.

(Pause in the proceedings.)

MR. CONTARINO: Courtroom Deputy, are you having issues -- I think I got it.

THE COURTROOM DEPUTY: Okay.

MR. CONTARINO: I'm calling to the screen what's been marked as P5. And this is Performance Triggers' May 2022 amendment.

For the same reasons, we move to admit P5.

THE COURT: P5 is admitted.

(PLAINTIFF'S EXHIBIT P5: Received in evidence.)

BY MR. CONTARINO:

Q. Mr. DeMonico, based on this document, P5, who is now listed as president of Performance Triggers?

A. Rev2A, Inc.

MR. CONTARINO: I'm calling to the screen P6. This is a 2023 amendment for Performance Triggers.

And based on the same reasons, Your Honor, as the previous two, we move to admit this into evidence.

THE COURT: It is admitted.

(PLAINTIFF'S EXHIBIT P6: Received in evidence.)

BY MR. CONTARINO:

Q. Now, Mr. DeMonico, if you look at the document, who is president of Performance Triggers?

A. Rev2A, Inc., was removed as president, and C&C Holdings Group, LLC, was added as president.

MR. CONTARINO: Calling to the screen P7. This is a certified copy of a 2023 Performance Triggers amendment -- I'm sorry. This is -- yeah. This is a 2023 annual report for Performance Triggers.

And for the same reasons, we move to admit this into evidence, Your Honor.

THE COURT: P7 is admitted.

(PLAINTIFF'S EXHIBIT P7: Received in evidence.)

BY MR. CONTARINO:

Q. Who does this list, Mr. DeMonico, as president of Performance Triggers?

A. Christopher Rios is listed as president.

Q. And do you have an understanding of who Christopher Rios is?

A. Douglas Rios' brother.
Q. Calling to the screen P8. It's a certified copy of the 2024 Annual Report for Performance Triggers.
And, Mr. DeMonico, who is listed as owner of Performance Triggers on this document?
A. Douglas Rios is listed as the owner.
MR. CONTARINO: And we'd like to move this into evidence, Your Honor, on the same reason.
THE COURT: P8 is admitted.
(PLAINTIFF'S EXHIBIT P8: Received in evidence.)
MR. CONTARINO: Calling to the screen P9. This is the 2024 Articles of Dissolution for Performance Triggers.
Your Honor, for the same reasons, we'd like to admit this into evidence.
THE COURT: That's P9?
MR. CONTARINO: P9.
THE COURT: P9 is admitted.
(PLAINTIFF'S EXHIBIT P9: Received in evidence.)
BY MR. CONTARINO:
Q. And, Mr. DeMonico, who is listed as owner on this document for Performance Triggers?
A. C&C Holdings, LLC, is listed as the owner.
Q. And when's the date of dissolution?
A. November 26th of 2024.
Q. I'm calling to the screen what's been marked as P10.

And do you recognize this document, Mr. DeMonico?
A. Yes, sir.
Q. And what is it?
A. It's a certification of business records for Capital City Bank.
Q. And it concerns documents in connection with which bank account?
A. Checking account 8088. Specifically, it's a spreadsheet of the ACH single payment transfers.
Q. Calling up P11.
Do you recognize this document, Mr. DeMonico?
A. Yes, sir. This is an EIN form.
Q. And for which company?
A. It is for C&C Holdings Group, LLC.
Q. Can you see the Bates number on the bottom right of the page?
A. Yes, sir. It's marked "CapCityBank_13."
Q. Scrolling down in this document, page 3, which is "CapCity_15," do you recognize this?
A. Yes, sir, it's an operating agreement for C&C Holdings Group, LLC.
Q. And moving down to the signature page of this agreement, who is signing and in what capacity?
A. Christopher Rios has signed as manager and member.
MR. CONTARINO: Your Honor, I move to admit Exhibits

P10 and P11 into evidence as self-authenticating under FRE 902(11) and as records of regularly conducted business activity under 803(6).

THE COURT: Those are admitted without objection.

(PLAINTIFF'S EXHIBITS P10 & P11: Received in evidence.)

THE COURT: And I note without objection -- some judges have the opposing lawyer stand up and say they object or don't object. I don't do that. If you have an objection, you stand up and say, Objection, and I'll know there's an objection. When you say nothing, I know there's no objection.

MR. SMITH: Thank you, Your Honor.

THE COURT: That's been the case for all of these, and I've admitted them.

BY MR. CONTARINO:

Q. Calling to the screen P12.

Do you recognize this document, Mr. DeMonico?

A. Yes, sir. It's an account agreement for the Performance Triggers account.

Q. And the Bates Number -- no Bates number.

MR. CONTARINO: This was also provided in response to the subpoena, Your Honor, from Capital City Bank. So under the same rules, we'd move to admit this into evidence.

THE COURT: P12 is admitted.

(PLAINTIFF'S EXHIBIT P12: Received in evidence.)

BY MR. CONTARINO:
Q. And who are the -- based on this document, Mr. DeMonico, who are the authorized signers, signatories?
A. The authorized signers for this account are Anthony McKnight, Douglas Rios, Christopher Rios, and Eva Gregorovic.
Q. And coming down to the second page, are there any others?
A. Ivanka Toneva.
Q. Calling to the screen P13.
And do you recognize this, Mr. DeMonico?
A. It is a bank statement for the account ending in 8088 -- it is dated 1-31-2025 -- for Performance Triggers.
MR. CONTARINO: And on the same basis as the other Capital City Bank records, Your Honor, we move to admit this into evidence. It's P13.
THE COURT: P13 is admitted.
(PLAINTIFF'S EXHIBIT P13: Received in evidence.)
BY MR. CONTARINO:
Q. And, Mr. DeMonico, do you recall when these records were provided by Capital City Bank approximately?
A. The summer of -- I think toward the end of the summer in '25.
Q. Earlier we looked at Performance Triggers' Articles of Dissolution dated November of 2024.
Do you remember that?

A. Yes, sir.
Q. So this Performance Triggers bank account statement comes before or after that dissolution?
A. After it was dissolved.
MR. CONTARINO: I'm calling to the screen P14, and this was identified in that certification as ACH single payment report.
For the same basis, Your Honor, we move to admit P14 into evidence.
THE COURT: P14 is admitted.
(PLAINTIFFS' EXHIBIT P14: Received in evidence.)
BY MR. CONTARINO:
Q. Mr. DeMonico, if you look all the way to the left, there's a column for "Customer Name."
Which company is identified?
A. High Kaliber Studios, Inc, Kaliber spelled with a K.
Q. And then roughly in the middle column of this document it says "User Name."
Who's identified there?
A. Anthony McKnight.
Q. And then two columns to the right of that, there's "Account Number Internal."
Which account is identified?
A. Account ending in 8088.
Q. And that's the Performance Triggers' account that we looked

at before; is that right?
A. Yes, sir.
Q. And then a few columns further, "Recipient Name," do you see where it says that?
A. I do.
Q. Okay. If you go to the last recipient name on the second page, who is identified?
A. Eva Gregorovic.
Q. And do you recall seeing her name on the signature card we looked at previously?
A. Yes, sir.
Q. Starting in February of 2024, can you see how much she was paid?
A. $2,050. It appears to be weekly.
Q. And then we're looking up -- if we look at those dates, they go up sequentially throughout the calendar year of 2024 and then into 2025.
Do you see that?
A. That is correct. It goes well into 2025.
Q. And so those weekly payments to Eva Gregorovic continue -- start before the dissolution of Performance Triggers and then --
A. And goes well after. It looks like I see a payment here in August of '25.
Q. Moving down the page a little bit, do you see where it says "Graphics by Griffin"?

A. Yes, sir, I do.
Q. As far as dates and payment, same question about those: Before and after dissolution?
A. I see payments in '24, through the end of '24, into '25, also through August of 2025.
Q. If we move down quite a few pages here, you see "We Got Ammo"?
A. Yes, sir, I do.
Q. When do those payments start?
A. Those start in June of '23.
Q. And then they continue through what date?
A. August of '25.
Q. So, again, before and after dissolution; right?
A. That is correct, sir.
Q. Mr. DeMonico, I'm calling up P16.
Do you recognize -- P15. I'm sorry.
Do you recognize this document?
A. Yes. It is Articles of Incorporation for We Got Ammo, Inc., and it is dated September 16th of 2020.
Q. And what -- where did this document come from?
A. The Secretary of State for Florida, otherwise known as Sunbiz.
Q. Did you review this on the Sunbiz database?
A. I did.
Q. When was that?

A. Two days ago, on Wednesday.
Q. If you take a look at it, is this a fair representation of what you reviewed on the Sunbiz database?
A. Yes, sir.
MR. CONTARINO: Your Honor, based on that, we move to admit Exhibit P15 into evidence under FRE 901 and 803(8)(B) as a public record of a state agency and a record from a public office where such items are kept.
THE COURT: P15?
MR. CONTARINO: P15.
THE COURT: It's admitted.
(PLAINTIFF'S EXHIBIT P15: Received in evidence.)
BY MR. CONTARINO:
Q. Who is the incorporator of We Got Ammo, Inc.?
A. I believe -- I think it's on the next page.
Right there.
The incorporator is Douglas Rios.
Q. And who is listed as vice president?
A. The vice president is Douglas Rios.
Q. I'm calling up to the screen P16.
And do you recognize this?
A. It is a cover letter from the amendment section for We Got Ammo, Inc.
Q. And same as before, did you review this on the Sunbiz database?

A. Yes, sir. Two days ago, on Wednesday.
Q. If you look through this, is this a fair representation of what you saw when you reviewed it on the Sunbiz database?
A. Yes, sir.
MR. CONTARINO: For the same reason, Your Honor, we'd like to move to admit P16.
THE COURT: P16 is admitted.
(PLAINTIFF'S EXHIBIT P16: Received in evidence.)
BY MR. CONTARINO:
Q. Looking at page 3, what is the amendment that's made to We Got Ammo?
A. I'm sorry. Can you repeat that?
Q. Looking at page 3, what's the amendment made to We Got Ammo?
A. The name has been changed from We Got Ammo, Inc., to WGA Global, Inc.
Q. Calling up to the screen P17.
And, Mr. DeMonico, do you recognize this document?
A. Yes, I do. It's an annual report for WGA Global. It came from the Florida Secretary of State, also known as Sunbiz, and it is dated February 4th of 2026.
Q. And did you review this on the Sunbiz database?
A. Yes, sir. Two days ago, on Wednesday.
Q. And it's just one page here.
Is this a fair representation of what you saw when you

reviewed it there?
A. Yes, sir.
MR. CONTARINO: For the same reasons, Your Honor, we move to admit P16.
THE COURT: P16 I think I had said was admitted.
This is P17.
MR. CONTARINO: I'm sorry.
THE COURT: P17 is admitted.
(PLAINTIFF'S EXHIBIT P17: Received in evidence.)
BY MR. CONTARINO:
Q. And if you look at the titles of president and vice president, who do those belong to?
A. The president is Douglas Rios, and the vice president is his brother, Christopher Rios.
MR. CONTARINO: I'm calling to the screen P41, and this is a certified sealed copy of High Kaliber Studios, Inc.'s Articles of Incorporation.
And for the same reasons as the other certified copies, Your Honor, we move to admit P41.
THE COURT: P41 is admitted.
(PLAINTIFF'S EXHIBIT P41: Received in evidence.)
BY MR. CONTARINO:
Q. Before, Mr. DeMonico, we looked at the single payment -- ACH single payment report.
And the customer name on the very left of that in that

column was what?
A. High Kaliber Studios, Inc.
Q. And in this Articles of Incorporation for High Kaliber Studios, Inc., who is the incorporator?
A. The incorporator is Anthony McKnight.
Q. I'm calling to the screen P18.
Mr. DeMonico, do you recognize this?
A. I do. It is an annual report for High Kaliber Studios, Inc. It came from the Florida Secretary of State website, also known as Sunbiz.
Q. Did you review it on the Sunbiz database?
A. I did two days ago, on Wednesday.
Q. This is one page.
If you take a look at it, is this a fair representation of what you reviewed on the Sunbiz database two days ago?
A. It is.
Q. I'm calling to the screen P19.
Mr. DeMonico, do you recognize this document?
THE COURT: We've lost the feed.
There it is.
Thank you.
THE WITNESS: Yes, sir.
BY MR. CONTARINO:
Q. And what is it?
A. It is a screenshot of a product and performance dashboard

report for the Performance Triggers' website.

Q. And how do you know?

A. It was provided to us by the respondents.

Q. And is there --

MR. CONTARINO: I don't know why it's doing that, Your Honor, cutting in and out.

THE COURT: Wiggle the connection.

BY MR. CONTARINO:

Q. Are there Bates stamp numbers on this?

A. Yes, sir. The Bates numbers are on the bottom right-hand corner, RESP_4.

MR. CONTARINO: Your Honor, we move to admit into evidence under 901, by testimony of a witness with knowledge and by its distinctive characteristics as a Bates stamp defense production, and under either RFE 801(a) as computer output, nonstatement, or 801(d)(2) as a statement by a party opponent.

THE COURT: That's P19?

MR. CONTARINO: That's P19.

THE COURT: That is admitted.

(PLAINTIFF'S EXHIBIT P19: Received in evidence.)

BY MR. CONTARINO:

Q. If we look at the second page, the date range is what, Mr. DeMonico?

A. The date range is from January 1 of '24 through December 31 of '24.

Q. And is there a grand total summary that you see?
A. The grand total summary for 2024 is $1,670,895.57.
Q. If we look at the third page, what's the date range?
A. The date range is from January 1 of 2025 through December 31, 2025.
Q. And what's the grand total summary there?
A. The grand total summary is $6,475,361.75.
Q. Is there any indication from these numbers that after the dissolution of Performance Triggers, Inc., it made less money than before its dissolution?
A. No, sir. In fact, it skyrocketed from the time of dissolution through 2025.
Q. Calling to the screen P20.
And, Mr. DeMonico, do you recognize this document?
A. Yes, sir.
Q. What is it?
A. It is a declaration of David Bitar, certifying records of regularly conducted business activity. It is from Cybersource Corporation.
Q. And does it in its body identify Bates numbers to which this certification attaches?
A. It is referenced matter CYBS00001-00036.
Q. Calling to the screen P21.
Do you see this document -- do you recognize this document, Mr. DeMonico?

A. Yes, sir. It's a merchant information document from authorize.net.
Q. And if you look at the Bates numbers in the bottom right, do those match the certification that we just looked at?
A. CYBS00014.
Q. So the CYBS, that matches?
A. Yes, sir.
Q. Does your company, Rare Breed, use a merchant account for its business?
A. Yes, we do.
Q. Can you explain the purposes of the merchant account?
A. You make sales through a website, but in order to take payments, you must have a merchant account to transact those payments and then deposit them into your bank account.
Q. Very good.
If we are looking at the first page here --
MR. CONTARINO: Well, actually, same as the Capital City Bank records, Your Honor, under 902(11) and 803(6), we move to admit P20 and P21 into evidence.
THE COURT: Those are admitted.
(PLAINTIFF'S EXHIBITS P20 & P21: Received in evidence.)
BY MR. CONTARINO:
Q. On this P21, who is listed as the principal for this merchant account?
A. Doug Rios.

Q. And what's the bank account associated with this Performance Triggers merchant account?
A. The Performance Triggers bank account ending in 8088.
Q. And the routing number?
A. The routing number ends in 0688.
Q. Same bank account that we were looking at earlier with Capital City Bank?
A. Yes, sir.
Q. What's the -- moving to the second page, what's the creation date of this merchant account such that Performance Triggers could start receiving money for sales online?
A. The creation date is April 1st of '22.
Q. And then you see there it says there "Survey Completion [sic] Date," "Billing Activation Date," the "TOS Agreement Date."
Do you see that? What are those?
What's the date?
A. They are October 14th of '22.
Q. The Honorable Court referred to the old case in this matter.
Do you recall what that is involving the patent litigation?
A. Yes, sir.
Q. And now it's moved on into a contempt posture.
But going back to the patent litigation aspect of it, do you recall there being a preliminary injunction entered?

A. Yes, sir.
Q. And did that preliminary injunction remain effective through that litigation?
A. No, sir. It was vacated in February of '22.
Q. And was there continued motion practice regarding the viability of that preliminary injunction after February of 2022?
A. Yes, sir. Motion practice continued through June.
Q. So the creation date of this merchant account for Performance Triggers is between that time of the preliminary injunction being in flux; is that right?
A. Yes, sir.
Q. And then in that case when was settlement entered into, approximately?
A. Settlement was September/October of '22.
Q. And there was a consent decree and permanent injunction entered as well?
A. It was. It was entered October 19th of 2022.
Q. And then so is it that four or five days before that the -- as the survey completion [sic] date, the billing activation date, the TSO agreement date for this merchant account? That's when those were activated?
A. They were activated on October 14th, five days before the consent judgment and permanent injunction had been signed by the Court.
Q. Going to the last page of this P21.

I'll try to magnify it here.

Can you see when payments were starting -- transactions were starting for this merchant account, if you look about halfway up the page to the right?

A. Okay. It looks like transactions started coming in -- it looks like 98 transactions for December of '22.

Q. And then a few pages up, when do those transactions cease?

A. It looks like there were -- okay. They came to an end in October of 2025.

Q. I'm calling up P22.

And do you recognize this document, Mr. DeMonico?

A. It is also a merchant information form from authorize.net.

Q. And who is the business for this merchant account?

A. Performance Triggers.

Q. And the principal's name here is who?

A. C.A. Griffin.

Q. And the banking account information, what's that?

A. It is the Capital City Bank Performance Triggers account ending in 8088.

Q. And the creation date of this one, P22, is what?

A. September 8th of 2025.

Q. And the litigation in this new lawsuit naming Performance Triggers as defendant, when was that filed, approximately?

A. Summer of '25.

Q. Okay. And the transaction activation date here is what?

A. The transaction activation date is October 10th of 2025.
Q. Same drill: We look at the bottom here for transactions.
I'll try to blow this up a little bit, magnify it.
When do that they start for this merchant account for Performance Triggers?
A. Can you zoom out just a tad, please?
September of 2025?
Q. Yeah. You see how many transactions for that?
A. Three transactions in September of 2025.
Q. So roughly the same month transactions stop in the Performance Triggers account where Douglas Rios was listed as a principal; is that right?
A. That is correct.
Q. And then transactions stopped about what month?
A. There were 3,200 transactions in November of 2025.
Q. And if we just call up the certification for these -- for when the documents were provided, what's that dated?
A. December 10th of 2025.
Q. So reasonable that these documents would only go to -- through November?
A. That is correct.
Q. Going back to P19, does this show sales for Performance Triggers through 2025?
A. It shows sales for the entire year of 2025.
Q. And who -- did -- are you familiar with the respondents

that provided this document?
A. Yes, sir.
Q. Their identity -- you're familiar with their identity?
A. Yes, sir.
Q. Does it include C.A. Griffin?
A. No, sir, it does not.
Q. Calling up P23 --
MR. CONTARINO: I'm sorry, Your Honor. Was P22 admitted? Did I move to admit 22?
THE COURT: I didn't have a checkmark. If not, P22 is offered.
No objection?
P22 is admitted.
MR. CONTARINO: Thank you, Your Honor.
(PLAINTIFF'S EXHIBIT P22: Received in evidence.)
MR. CONTARINO: Thank you, Your Honor.
BY MR. CONTARINO:
Q. Mr. DeMonico, this is P23.
Can you identify this document?
A. These are checks or money orders for deposit into Performance Triggers' bank account ending in 8088.
MR. CONTARINO: And, Your Honor, these are also from the Capital City Bank subpoena. And for the same reasons for those documents, we move to move to admit P23.
THE COURT: P23 is admitted.

(PLAINTIFF'S EXHIBIT P23: Received in evidence.)

BY MR. CONTARINO:

Q. The second page of P23 is just a magnification of the third money order here so that we can see it.

Who is this made payable to, Mr. DeMonico?

A. Fast Triggers/Performance.

Q. And what is the memo line?

A. W-O-T, WOT/AR-15.

Q. And how much is this for?

A. $300.

Q. And can you make out the address there, or some of it?

A. Lady Lake, Florida 32159.

Q. And the line above that?

A. Oh, thank you.

720 North U.S. Highway 441. It looks like maybe a number, 1067.

Q. And this is deposited into Performance Triggers' bank account?

A. That's correct, account ending in 8088.

Q. And the address is Lady Lake, Florida?

A. Yes, sir.

Q. If we look at the Performance Triggers' annual report, what's the -- what's the principal place of business for Performance Triggers?

A. The principal place of business for Performance Triggers is

4505 Kenny Road, No. 1102, Kenny, Ohio 43220.
Q. So not Florida?
A. No, sir, not in Florida.
Q. Okay. I'm calling up P24.
And do you recognize this document, Mr. DeMonico?
A. Yes, sir. It is a Cloudflare, Inc., certificate of authenticity.
Q. And you see the Bates number on the bottom right?
A. Yes, sir. It's Cloudflare_001.
Q. And the date of this?
A. November 21st of 2025.
Q. Calling up P25.
And do you recognize this document?
A. It's Stripe billing details.
Q. And is the Bates number the same as the certification?
A. The Bates number is Cloudflare_002.
Q. Okay. So second page.
MR. CONTARINO: Your Honor, we move to admit P24 and P25, self-authenticating under 902(11) and records of regularly conducted business under 803(6).
THE COURT: Those are admitted.
(PLAINTIFF'S EXHIBITS P24 & P25: Received in evidence.)
BY MR. CONTARINO:
Q. Are you familiar, Mr. DeMonico, with Stripe?
A. Yes, sir.

Q. What's that?
A. Stripe is a merchant account.
Q. Can you make out the billing address here?
A. The billing address is 27831 Northwest 46th Ave., 32669, Florida.
Q. Would you repeat that again, the beginning? I think I misheard you. Just the billing address.
A. 27831 Northwest 46th Ave., Newberry --
Q. No. That's the customer --
A. Oh, I'm sorry. The billing address?
Q. Yeah.
A. I apologize.
It is 4101 Northwest 282nd Street, Newberry, Florida 32669.
Q. And now what about the customer address?
A. It is 27831 Northwest 46th Ave., Newberry, Florida 32669.
Q. And what's the -- what's the record name for this document?
A. The website associated with this record is fasttriggers.com.
Q. I'm calling up P26 to the screen.
And do you recognize this document?
A. Yes, sir. This is the -- it's a report from the Alachua County Property Appraiser's website.
Q. And where did -- okay.
And did you review this on the Alachua County Property Appraiser website?

A. I did two days ago, on Wednesday.
Q. And you looked through it?
(Pause in the proceedings.)
BY MR. CONTARINO:
Q. Is this a fair representation of what you saw on the official Alachua County Property Appraiser website?
A. Yes, sir.
MR. CONTARINO: Your Honor, we'd move to admit this under 803(8)(B), public record of a state agency and a record from a public office where such items are kept.
THE COURT: This is P?
MR. CONTARINO: P26.
THE COURT: And I think you already offered and I admitted P24 and P25.
And so P26 is now admitted.
(PLAINTIFF'S EXHIBIT 26: Received in evidence.)
BY MR. CONTARINO:
Q. And the location address here, Mr. DeMonico, can you identify that?
A. Yes, sir. It is 4101 Northwest 282nd Street, Newberry, Florida 32669.
Q. Same address as we saw on the Stripe information for fasttriggers.com?
A. Yes, sir.
Q. And the owner information, can you identify the owners?

A. Yes, sir. It is Anthony and Sherrie McKnight.
Q. And the address under their name, what's that?
A. 27831 Northwest 46th Ave., Newberry, Florida 32669.
Q. Same as the customer address on the Stripe information for Fast Triggers?
A. Yes, sir.
Q. If we move back to P25, the Stripe data for Fast Triggers, and we look at the IP logs, what is the timestamp there for the first login?
A. April 11th of 2024.
Q. And looking at the one on the bottom, the last timestamp is what?
A. October 14th of 2025.
Q. And do you recall from that certification -- I'll pull it up -- when these documents were received?
A. November 21st of 2025.
Q. I'm showing document -- calling to the screen P27.
And do you recognize this document, Mr. DeMonico?
A. Yes, sir. It is a screenshot of fasttriggers.com.
Q. And have you visited that URL on the Internet?
A. Yes, sir, two days ago, on Wednesday.
Q. If we look at P27, is this a fair representation of what you saw when you visited it online?
A. Yes, sir.
MR. CONTARINO: Under 901 and 801(d)(2), either as a

statement by a party opponent or its coconspirator, we move to admit P27.

THE COURT: P27 is admitted.

(PLAINTIFF'S EXHIBIT P27: Received in evidence.)

BY MR. CONTARINO:

Q. And if you look at the devices, Mr. DeMonico, on -- as we scroll through, would you be able to identify which are Forced Reset Triggers or parts that would violate the Court's injunction?

A. Yes, sir, I can identify that.

Q. That first one here is AK Super Safety Kit.

A. That would violate the agreement -- I apologize -- the preliminary injunction.

Q. AS Designs ARC-Fire?

A. That would violate the preliminary injunction.

Q. The Atrius Forced Reset Selector, 3 Position.

A. It would violate the preliminary injunction.

Q. The Atrius Forced Reset Selector, 3 position, AMBIDEXTROUS?

A. It would violate the preliminary injunction.

Q. FAST Curved Face Mil-Spec Trigger.

A. It would not.

Q. The Super Safety (Cam, Lever, and Safety Detent)?

A. It would violate the preliminary injunction.

Q. The Super Safety Kit for AR-15?

A. It would violate the preliminary injunction.

Q. The Super Safety Kit for AR-15 (FLAT face)?
A. It would violate the preliminary injunction.
Q. Taurus TX22?
A. It would violate the preliminary injunction.
THE COURT: Do you know whether that website is still up with those products?
THE WITNESS: It was two days ago, Your Honor.
THE COURT: Did you check it today?
THE WITNESS: I did not check it today, Your Honor.
BY MR. CONTARINO:
Q. Okay. Moving to -- calling up P28.
Do you recognize this document?
A. It is Stripe billing details.
Q. And for which -- which website?
A. The website associated with this document is triggerpartsusa.com.
Q. And the billing address, what's that?
A. 4101 Northwest 282nd Street, Newberry, Florida 32669.
Q. And that's the same address that we reviewed earlier belonging to the McKnights?
A. Yes, sir.
Q. And the customer address?
A. That is 7600 Northwest 5th Place, Gainesville, Florida, 32607.
MR. CONTARINO: We move to admit P28, again,

self-authenticating, 902(11), and regularly conducted business activity, 803(6).

THE COURT: P28 is admitted.

(PLAINTIFF'S EXHIBIT P28: Received in evidence.)

BY MR. CONTARINO:

Q. Going back to P23, we looked at these money orders earlier. We're going to -- the top right money order and the second-on-the-left money order are going to be on pages -- blown up, magnified, on pages 3 and 4.

This first money order, who is it made payable to?

A. Trigger Parts USA/Performance Triggers.

Q. Handwriting of Trigger Parts USA look the same as Performance Triggers there?

A. No, sir, it does not.

Q. And for how much was this made to?

A. $163.19.

Q. And what's the address?

A. 2310 North Henderson Ave., No. 1518, Dallas, Texas 75206.

Q. So, again, we looked at Performance Triggers' address. That was in Ohio; right?

A. It was in Ohio.

Q. Not Dallas, Texas?

A. No, sir.

Q. And yet this money order ended up in the Performance Triggers' bank account; yes?

A. Yes, sir.

Q. Going to the fourth page, another magnified copy of a money order.

THE COURT: You might try back and forth or wiggling the connection. That's the extent of my advice on how to deal with the screen going black. Beyond that, you're on your own.

MR. CONTARINO: Okay. I'll take it out and try again.

There we go, for now.

BY MR. CONTARINO:

Q. Who is this made out to, Mr. DeMonico?

A. Trigger Parts USA/Performance Triggers.

Q. Do you see a little difference in the handwriting there?

A. Yes, sir. They're not the same.

Q. How much is this made to?

A. $144 and zero cents.

Q. And that same Dallas address?

A. Yes, sir.

Q. We looked at P28 previously and had the address of -- in Newberry, Florida, and 7600 Northwest Place.

Focusing on that address, I'm going to call up P29.

And do you recognize this, Mr. DeMonico?

A. Yes, sir. This is an annual report from the Florida Secretary of State website for Big Daddy Unlimited, Inc., dated April 28th of 2022.

Q. And you reviewed this on the Sunbiz database?

A. I did two days ago, Wednesday.
Q. And this is a fair representation of what you saw?
A. Yes, sir.
Q. And can you identify the address listed here?
A. Yes, sir. It is 7600 Northwest 5th Place, Gainesville, Florida 32607.
MR. CONTARINO: Your Honor, we move to admit P29 for the same -- under the same basis as the other annual reports viewed on the database?
THE COURT: P29 is admitted.
(PLAINTIFF'S EXHIBIT P29: Received in evidence.)
BY MR. CONTARINO:
Q. So that address here for BDU -- and who's the officer named?
A. The president is Anthony McKnight.
Q. So that address, 7600 Northwest, same address here in the Trigger Parts USA-Stripe --
(Indiscernible crosstalk.)
A. Yes, sir.
BY MR. CONTARINO:
Q. And if you look at the time that the log started, what is that date?
A. March 14th of 2024.
Q. And they ended?
A. October 16th of 2025.

Q. And, again, these documents were provided the next month in November from Cloudfare-Stripe; right?
A. That is correct.
Q. Calling to the screen P30.
And do you recognize this document, Mr. DeMonico?
A. Yes, sir. It is a merchant account report from authorize.net.
Q. And who is the principal listed here?
A. Christian Griffin.
Q. And we saw that last name before, Griffin --
A. Yes, sir.
Q. -- associated with another merchant account?
A. Can you pull that back up, please?
Q. Yes.
A. C.A. Griffin is also the principal for the Performance Triggers account as well.
Q. And the company that this is associated with is what?
A. I apologize. Can you repeat that?
Q. The company that this is associated with is what?
A. Trigger Parts USA.
Q. All right. If we look to the last page, can you see when transactions started on this merchant account?
A. I see two transactions for April of '24.
Q. The money orders that we've just looked at to Trigger Parts USA, were those dated before or after this merchant account was

opened?
A. I don't know. Can you show me again, please?
Q. Yes.
A. After. This is dated February 14th of '25.
Q. And this?
A. And also February 14th of '25.
MR. CONTARINO: For the same reasons as the other Cybersource materials, I move to admit P30 into evidence.
THE COURT: P30 is admitted.
(PLAINTIFF'S EXHIBIT P30: Received in evidence.)
BY MR. CONTARINO:
Q. Pulling up to the screen P31.
Do you recognize this document, Mr. DeMonico?
A. Yes, sir. This is a screenshot of the Trigger Parts USA website.
Q. And did you go to the URL triggerpartsusa.com?
A. I reviewed it two days ago, on Wednesday.
Q. And let me look through here.
Is this a fair representation of what you reviewed online?
A. Yes, sir.
Q. These devices on the first page, let me know which ones would violate -- would be Forced Reset Triggers or parts under the Court's injunctions.
Partisan Disruptor (BLACK)?
A. It would violate.

Q. Partisan Disruptor (GREEN)?
A. It would violate.
Q. Super Selektor 3?
A. It would not violate.
I mean -- I'm sorry -- it would violate. I apologize.
Q. Okay. Super Selektor 3 position Forced Reset Safety?
A. It would violate.
Q. GT Nitride Bolt?
A. It would not.
Q. FULL AUTO BOLT CARRIER?
A. It would not.
Q. The Glock FRT v2?
A. It would violate.
Q. TPUSA TX22?
A. It would violate.
Q. The AR-15/M4 BUFFER?
A. It would not.
Q. Super Selektor Replacement Lever?
A. It would violate.
Q. The Carbine Recoil Buffer?
A. It would not violate.
Q. The buffer -- these two buffers on page 2?
A. The A5 Length Recoil Buffer would not.
The M4 Carbine Recoil Buffer would not.
Q. The Curved Mil-Spec Super Selektor AR-15 (UNCUT) Trigger?

A. It would not.
Q. Calling up P32.
And can you identify this, Mr. DeMonico?
A. This is a screenshot of the Trigger Parts USA website.
Q. And did you review this URL page?
A. I did two days ago, on Wednesday.
Q. And is this a fair representation of what you reviewed?
A. Yes, sir.
MR. CONTARINO: For the same reasons as the previous exhibit, we move to admit P32, Your Honor.
THE COURT: P32 is admitted.
(PLAINTIFF'S EXHIBIT P32: Received in evidence.)
BY MR. CONTARINO:
Q. And same drill, Mr. DeMonico: Identify which of these products would constitute Forced Reset Triggers or parts under the Court's injunction.
AK Super Safety?
A. It would violate.
Q. AS Designs ARC?
A. It would violate.
Q. Glock FRT v2?
A. It would violate.
Q. The Nitride Bolt?
A. It would not violate.
Q. The Kabuto Mini Fast?

A. It would violate.
Q. The KooKoo AK Trigger?
A. It would violate.
Q. The S7 Super Safety Slip and Trigger Kit?
A. It would violate.
Q. Super Safety FLAT Face Trigger Kit?
A. It would violate.
Q. Super Safety for AR?
A. It would violate.
Q. Super Safety Trigger Kit?
A. It would violate.
Q. Any of these buffers on page 2, would they violate?
A. The buffers would not.
But I'd like to point out the detents that are in the first position, that is not a buffer. The question is whether or not that detent is -- or can only be used for a Forced Reset Trigger or part. That's only for a Forced Reset Trigger. But I can't tell without looking at the details of it whether or not its intended only use is for a Forced Reset Trigger. So I can't determine that one.
Q. Fair enough.
The BOLT CARRIER on page 3?
A. It does not.
Q. The Replacement Lever for the Super Safety?
A. It does violate.

Q. The Trigger Curved: PRECUT Super Safety?
A. It does violate.
Q. The Trigger Flat SKELETON PRECUT?
A. It does violate.
Q. TPUSA TX22?
A. It does violate.
Q. Calling to the screen P33.
Do you recognize this document, Mr. DeMonico?
A. That is an asset purchase agreement.
Q. And do you know how this was received?
A. From the respondents.
Q. And does it have Bates numbers identifying that?
A. It does, RESP-001783.
MR. CONTARINO: Your Honor, we move to admit P33 into evidence.
THE COURT: P33 is admitted.
(PLAINTIFF'S EXHIBIT P33: Received in evidence.)
THE COURT: I don't think you offered P31. Would you like to offer that one?
MR. CONTARINO: Yes, I would.
THE COURT: P31 is admitted.
(PLAINTIFF'S EXHIBIT P31: Received in evidence.)
BY MR. CONTARINO:
Q. And what does this purport to be on its face?
A. It's an asset purchase agreement between C&C Holdings, LLC,

and Christopher Rios and Bump Cerakoting & More, Inc.
Q. And this was signed when?
A. February 9th of '26.
Q. And the arbitrator's preliminary injunction, when was that entered? Was that entered in February?
A. I believe so.
Q. Okay. This is -- we're not offering it. It's already been stipulated to, but here is the preliminary injunction award.
THE COURT: It's dated January 20th, isn't it?
MR. CONTARINO: Yeah. I'm going down to that.
BY MR. CONTARINO:
Q. What's the date for that, Mr. DeMonico?
A. January 20th of 2026.
Q. So that refreshes your recollection?
A. Yes, sir. Thank you.
Q. And we looked at the 2025 revenue for Performance Triggers.
Do you recall about what that was?
A. Roughly 6.7 million.
Q. And the purchase price for the -- for that business, that website, is what?
A. A fantastic deal of $275,000.
MR. CONTARINO: I'm calling up to the screen P42, a certified and sealed copy of the articles of incorporation for Bump Cerakoting & More, Inc.
And for the same reasons, Your Honor, we move to admit

P42.

THE COURT: P42 is admitted.

(PLAINTIFF'S EXHIBIT P42: Received in evidence.)

BY THE COURT:

Q. On the second page, Mr. DeMonico, please read Article III?

A. *The purpose for which this corporation is organized is: CERAKOTING, SANDBLASTING, PAINTING.*

And for context, cerakoting is a type of painting specifically used in the firearm industry.

Q. Thank you for that.

What, if anything, in that description indicates its purpose was to own and operate a 6-plus-million-dollar-per-year trigger company?

A. There is none.

Q. Calling up P34.

Do you recognize this document?

A. Yes, sir. This is a screenshot of the Performance Triggers website.

Q. And did you visit this URL, performancetriggers.com?

A. I did two days ago, on Wednesday.

Q. We just scrolled through that.

Is this a fair representation of what you viewed when you visited the URL?

A. Yes, sir.

Q. Which of these products would constitute a Forced Reset

Trigger or Forced Reset Part that would violate the Court's injunction?
Super Selektor 3 Position?
A. This would violate.
Q. Super Selektor 3 Position Forced Reset Safety Kit?
A. This would violate.
Q. The Super Safety Kit for AR-15 Platform (CNC version) - CURVED?
A. This would violate.
Q. Super Selektor Kit?
A. This would violate.
Q. Partisan Disruptor?
A. This would violate.
Q. Glock FaRTs v2?
A. This would violate.
Q. TX22?
A. This would violate.
Q. PROFlex RainBow SUPER G-Flex?
A. This is a -- I believe this to be a binary trigger. And if that is the case, it would not violate.
MR. CONTARINO: Okay. That's all I got.
If I haven't offered it, Your Honor, I offer -- move to admit P34.
THE COURT: P34 is admitted.
(PLAINTIFF'S EXHIBIT P34: Received in evidence.)

MR. CONTARINO: P35, 36, and 37 are just notice letters from me to enjoined defendants, to High Kaliber Studios, and to Mr. Robinson, with a copy of the Court's preliminary injunction. I'd like to offer those into evidence.

THE COURT: P35 and 36?

MR. CONTARINO: And 37.

THE COURT: Those are admitted.

(PLAINTIFF'S EXHIBITS P35-P37: Received in evidence.) admitted 35, 36, 37.

MR. CONTARINO: At this point, Your Honor, plaintiff rests with reserving the right to redirect, if necessary.

THE COURT: Cross-examine.

MR. SMITH: Your Honor, I'm not sure how this is going to work since I actually don't have access to all of the exhibits that Mr. Contarino was just using.

THE COURT: He'll probably pull them up for you. And if not, you probably have a paper copy there and can put it on the presenter. But I suspect they'll pull it up for you if you ask.

MR. CONTARINO: Yeah. How would we -- I can connect here?

THE COURTROOM DEPUTY: You can try.

MR. ROTH: I have paper for you for everything and everyone else. That's what we came in for.

THE COURT: While you're doing that, we talked about

paper and electronics earlier. What's going to help is if you will file on CM/ECF the electronic copies that you've just gone through. If you'll do a notice of filing and attach each one of those exhibits separately with the label -- with the number. If you want to add a description, that would be helpful too, but the number at least so that you'll have a notice of filing. For example, it will have an attachment. Hopefully, Attachment 18 will actually be Exhibit 18. It doesn't always work out that way, but if you add a description, that might help.

MR. SMITH: Mr. DeMonico -- I'm sorry. Actually, we can go to my computer first.

MR. ROTH: I'll unplug. And you'll just let me know, Mr. Smith.

MR. SMITH: Okay.

THE COURT: We can do this. We're going to take a morning break here at some point. If it was going to be a five- or ten-minute cross, I was going to finish; but if it's going to be much longer, we can go ahead and take the break.

MR. SMITH: It will probably be closer to 20, Your Honor.

THE COURT: Let's take a break.

Let's take 15 minutes. We'll start back at 10:45 by that clock. It looks like that clock is right. So we'll start back at 10:45.

(Recess taken at 10:40 AM.)

(Resumed at 10:55 AM.)

THE COURT: Please be seated.

Mr. DeMonico, you are still under oath.

Mr. Smith, you may proceed.

MR. SMITH: Thank you, Your Honor.

Do I need to do something on my end to get this --

THE COURT: I'm sorry? Speak up.

MR. SMITH: I'm asking if I need to do something to get my screen up.

THE COURTROOM DEPUTY: You want your screen to show?

MR. SMITH: Just for a moment, yes.

THE COURTROOM DEPUTY: Okay.

MR. SMITH: Thank you.

CROSS-EXAMINATION

BY MR. SMITH:

Q. Mr. DeMonico, do you recognize this document from the arbitration?

A. Yes, sir.

Q. Okay. And this is a document setting the bond for the preliminary injunction entered by the arbitrator; right?

A. Order setting bond for preliminary injunction, yes, sir.

Q. And so the preliminary injunction was initially entered on January 20, 2026, and the arbitrator on February 27, 2026, set the bond at $300,000; is that fair?

A. Yes, sir.

Q. And the last sentence says: *The preliminary injunction shall take effect upon the posting of a $300,000 bond*; correct?
A. Yes, sir.
Q. And I understand that Rare Breed has posted that bond now?
A. Yes, sir.
Q. Mr. DeMonico, prior to February 27, 2026, is it your understanding the Performance Triggers website had been taken down or at least the enjoined products had been removed?
A. No, sir.
Q. Okay. Do you know whether they were up, or you just don't know what --
A. No, I know that they remained up.
After what date, please?
Q. After January 20th was there a time when the Performance Triggers website delisted those products?
A. I believe those products stayed up for quite some time.
Q. But did they come down prior to February 9th?
A. And what is -- February 9th -- what's specific about February 9th?
Q. That was the date that Performance Triggers' website was sold to Reginald Robinson.
A. I believe there was a period of a day or two where those products had come off of the website.
Q. Okay. And -- but -- can we go to --
A. I just can't tell you what those specific days were.

Q. Sure.

MR. SMITH: Plaintiff's 33, please.

Scroll to the bottom, please.

BY MR. SMITH:

Q. This is the Asset Purchase Agreement for the Performance Triggers website.

And what's the date on that, Mr. DeMonico?

A. February 9th.

MR. SMITH: If we can scroll back up, please, to -- scroll down, please, to the list of assets.

BY MR. SMITH:

Q. And so as of February 9, 2026, Reginald Robinson became -- or Bump Cerakoting became the owner of the Performance Triggers website; right?

A. That's what you're claiming.

Q. And Reginald Robinson is not named in the preliminary injunction from the arbitrator, is he?

A. He is not listed by name.

Q. Okay. And he received the website performancetriggers.com and other related domain names; correct?

A. He received or Bump Cerakoting received?

Q. Sorry. Bump Cerakoting received?

A. And what exactly are you asking me?

Q. He received the website performancetriggers and other related domain names?

A. That's what it says, yes, sir.
Q. He received customer lists?
A. Yes, sir.
Q. He received social media accounts?
A. Yes, sir.
Q. All intellectual property, including previously produced media and content?
A. Yes, sir.
Q. All merchant accounts, including Google, Amazon, PayPal, Stripe, and other similar merchant accounts?
A. I don't know if that's possible.
Q. Okay. But they can be transferred or he can set up a new --
A. A merchant account is tied to an individual's social security number, so I don't believe that that can be purchased or transferred. I think an individual would have to apply for a new one.
Q. Okay. Do you have any reason to believe that he did not do that?
A. Have any reason to believe that he did not do what?
Q. Register for a new merchant account.
A. No. But I don't believe that merchant accounts, including Amazon, PayPal, Stripe, or any similar merchant accounts could have been transferred.
Q. Okay. But to the extent they could have been, they were by

this agreement; right?
A. This agreement claims to have transferred them.
Q. Are you familiar with Reginald Robinson?
A. Not really, sir.
Q. Okay. Are you aware that he had an e-commerce website that was selling Forced Reset Triggers and Trigger Parts prior to this lawsuit ever being filed?
A. No, I wasn't, but I'd love to have that information. We could add him as a defendant.
Q. He's not a signatory to this settlement agreement in this case, is he?
A. No, he's not.
Q. He's not bound by the permanent injunction entered in the 149 case, is he?
A. I mean, I think that might be arguable based on Rule 65 language.
Q. Okay. He's not named as an enjoined party, is he?
A. His name is not listed.
Q. He's not named in the preliminary injunction in the arbitration, is he?
A. Not by name.
Q. Okay. Performance Triggers, the company, was shut down by the Articles of Dissolution in 2024?
A. That is correct.
Q. Okay. C&C Holdings Group was shut down and dissolved in

late 2024 as well; right?
A. I believe so, but I'd really like to confirm that before I answer that.
Q. Okay.
A. Can you put a document up to allow me to confirm that?
Q. You were going through some of the websites.
MR. SMITH: If we can pull up P31, please.
Scroll down to the Glock.
There you go.
BY MR. SMITH:
Q. On the left-hand side, the Glock FRT v2 you claim violates the preliminary injunction.
Is the Glock FRT v2 actually named in the preliminary injunction?
A. It is a FRT by its own name.
Q. Is it named in the injunction?
A. I believe the injunction lists things and says other -- also things that are similar meet this requirement.
Can we pull that up and confirm that, please?
MR. SMITH: Do we have the arbitrator's award?
Keep going. Keep going. Let's go down to the enjoined.
BY MR. SMITH:
Q. So this is the arbitration award for preliminary injunction; correct?

A. Yes, sir.
Q. Okay. Oh, my apologies. You may be correct.
The Glock has not previously been named by the plaintiff in this case, though, has it?
A. But it says: *...are prohibited from engaging in the manufacture or sale of Forced Reset Triggers or any parts that could be used in Forced Reset Triggers, including, but not limited to:*
*1. The Partisan Disruptor.*
*2. Super Selektor.*
*3. 3-Position Forced Reset Safety for AR-15 for Super Safety Kit; and*
*4. The TaurusTX22, until otherwise ordered by this arbitration.*
Specifically, I'd like to point out the "including, but not limited to."
Q. Understood.
During the preliminary injunction hearing, was the Glock ever mentioned?
A. I don't believe so, but by the name itself, it claims to be an FRT.
MR. SMITH: We can go back to the Asset Purchase Agreement, please.
Scroll down to the consideration, payment.

BY MR. SMITH:
Q. When counsel asked you about this, there was evidence on the record that in 2025 Performance Triggers did a little over $6 million in business; right?
A. 6.7 and some change.
Q. Okay. And so when you saw this number of $275,000, I believe you said that was a fantastic deal; right?
A. I would have jumped at it had it been offered to me.
Q. Okay. I believe it's Rare Breed's claim that the majority of income in 2025 for Performance Triggers was coming from FRTs and FRT parts; right?
A. Can we pull up the web report? We can take a look at that.
Q. I believe you've stated that on the record previously. I'm just --
A. Well, I don't know if I have, but we can confirm that if we pull up the report.
Q. Well, in -- when did -- when did FRTs become available to be sold on the market again?
A. By and large or by us?
Q. By the settlement you entered into with the DOJ and the ATF.
A. Okay. We entered into the settlement agreement with the United States of America on May 13th of 2025, and that became public on May 16th, 2025.
Q. Okay. And so after May the -- is it fair to say that the

Forced Reset Trigger market was open again?
A. I don't think that's fair to say.
Q. And were people allowed to sell them?
A. Well, that's -- I mean, I guess that's up for debate, and I say that because we hold 14 patents in Forced Reset space. So so long as they're not intending on violating or infringing on a patent and people are selling noninfringing Forced Reset Triggers, I think that it would be open, unless you're also -- we're referring to your clients that are violating a settlement agreement.
Q. Well, I'm using this for illustration purposes.
In 2024, the income -- or the revenue, total revenue, for Performance Triggers was roughly 1.7, and in 2025, it became 6.7; right?
A. That is correct.
Q. The biggest difference between 2024 and 2025 is that the government said that Forced Reset Triggers were no longer machine gun parts; right?
THE COURT: That's just not so.
Didn't the settlement agreement cut handguns out?
MR. SMITH: It cut out handguns for Rare Breed Triggers. It did not cut them out of the market completely, Your Honor.
THE WITNESS: It also said that the settlement agreement only applied to Rare Breed Triggers, no other parties.

BY MR. SMITH:
Q. Okay. But it's fair to say, starting in May of 2025, a lot of people showed up on the market selling Forced Reset Triggers based on their understanding of that ruling, right, or that settlement agreement?
A. I don't really want to speculate as to what people may or may not have thought.
Q. Okay. When you take a company that's doing $6.7 million worth of business and you basically shut it down with an injunction, does that affect, in your opinion, the valuation of that asset of that website?
MR. CONTARINO: Objection, Your Honor, to opinion testimony.
THE COURT: Overruled.
THE WITNESS: All right. Will you please repeat the question?
BY MR. SMITH:
Q. Sure.
If we have a 6.7 -- a website that's doing $6.7 million a year, right, and a preliminary injunction is entered prohibiting them from selling almost all the products on that website, in your opinion would that devalue the website significantly?
A. I don't know that -- I don't know that they could even transfer that asset. I think it would be, you know, encumbered based on the fact they're in litigation over that specific

asset.

But I don't even really know how to address that question. I think there's a lot of variables involved.

Q. Okay. So you would not agree that basically gutting a $6.7-million-a-year website to not being able to sell anything would not damage its value?

A. I do agree with that.

Q. Okay. And so that $275,000 is much more reflective of a website that has essentially been shut down than it is of a $6.7 million business; right?

A. I really don't know how to answer that question.

Q. Okay.

THE COURT: Mr. Smith, I thought your position was the website wasn't shut down, and he's free to do anything he wants with it?

MR. SMITH: It is now open. Mr. Robinson has bought the website. He has put it back up. He is now selling the products.

THE COURT: Well, which is it? Was the website shut down or was it not shut down?

MR. SMITH: It was shut down, Your Honor. My clients shut it down in response to the preliminary injunction. They then sold the asset because it was worthless to them at that point.

THE WITNESS: I'd like to clarify. The website was

never shut down.

THE COURT: Wait just a minute.

We're doing a lot of arguing here. I get the point.

I'm going to let you -- I'll say this to both sides: I'm going to let you have closing argument at the end of the case, and I look forward to it. We need to talk about it.

MR. SMITH: Right.

THE COURT: I'm happy to have any input.

We've got today. We are going to be here until 4:00 o'clock tomorrow morning if that's what it takes, depending on staff availability. But I'm available. If I were you, I would try to get the case over more quickly.

I'll also say this: If the goal is to run out the clock, it's not going to work.

MR. SMITH: Understood, Your Honor.

BY MR. SMITH:

Q. Mr. DeMonico, regardless of all of the records that were introduced of payments back in 2025, ACH transfers, other things, all of that predates the injunction in this case; right?

A. It predates the injunction. It's post the settlement agreement.

Q. Okay. We're not here --

A. But I will --

Q. We are not here today on the settlement agreement. We are here today as to whether or not my clients are in contempt of a

preliminary injunction issued by the arbitrator; correct?
A. Yes, sir.
So I would like to point out the website was never taken down, ever.
Q. And the injunction did not become effective until the $300,000 bond was posted post-February 27th; correct?
A. The injunction was issued by Judge Damoorgian. He issued a preliminary injunction. We --
Q. And that was in dispute as to whether it was effective until a bond was posted. In fact, we were back in this courtroom presenting argument as to whether or not a bond was required. We went back to the arbitrator. The arbitrator set the bond and specifically put in his order it would become effective upon posting of the bond; right?
A. I agree that it was in dispute until such time as the bond had been put up.
Q. Okay. And for some period between January 20th and February 9th, there was a time period when all of the products that were in dispute were removed from the Performance Triggers website; right?
A. No, sir, that is not true.
Q. Okay. You don't have any evidence showing on a particular date what that website looked like other than the ones that have been introduced today?
A. I believe we do have evidence, and I believe we actually

discussed it with you during a hearing.
Q. Okay. And after that discussion, those products were removed from the website?
A. No, sir, they were not. Some of them were, not all of them.
Q. Okay. But you would agree with me that prior to either January 20th or February 27th, my clients were not enjoined from selling any of these products; right?
A. Hold on. Your clients, are we referring to Performance Triggers and --
Q. The McKnights and --
A. -- Bump Cerakoting or --
Q. No. Bump Cerakoting is not my client, sir.
My client is Anthony McKnight, Douglas Rios, Sherrie McKnight, Performance Triggers -- all of the Big Daddy entities.
None of them were enjoined by a court from selling the products at issue on a preliminary injunction until it was issued in January; right?
THE COURT: That's just absolutely wrong. I entered an injunction.
MR. SMITH: Correct, Your Honor.
THE COURT: The consent injunction that I entered was an injunction.
MR. SMITH: Agreed, Your Honor.

THE COURT: And it precluded them from selling the WOT and the ALAMO-15.

MR. SMITH: Correct. And those products are not the ones in dispute here today, Your Honor. There's no argument that my clients have been selling WOTs or ALAMO-15s.

THE COURT: One of those products is called a WOT?

MR. SMITH: Correct. But that is not part of the contempt hearing today, Your Honor. The contempt hearing today is whether or not my clients are in violation of the preliminary injunction entered by the arbitrator.

That goes beyond the scope of -- yes, whether or not --

THE COURT: What -- the statement you just made was none of these products were enjoined.

MR. SMITH: None of the products that were discussed in the preliminary injunction for -- so my apologies, Your Honor. Yes, the WOT and the ALAMO-15 were enjoined.

THE COURT: I just want to make sure you understood that they understood that when I entered an injunction, it was an injunction.

MR. SMITH: No, we understand that, Your Honor.

THE COURT: All right. Good.

MR. SMITH: I apologize for that misunderstanding. The WOT and the ALAMO-15 were absolutely enjoined.

BY MR. SMITH:
Q. The Super Safety, the Disrupter, the Selektor, my clients were able to sell all of those until they were enjoined by the arbitrator; correct?
A. Absolutely not. That would have been a violation of the settlement agreement.
Q. And that's precisely why this case was brought is to determine whether there is a violation of the settlement agreement. But until that is actually determined, the only thing stopping my clients from selling is the preliminary injunction issued by the arbitrator.
A. I don't even believe that's the case.
I've got to tell you that I'm a little bit confused. There's a lot of variables going on.
Q. Uh-huh.
A. There is a permanent injunction issued by this Court that applies to the WOT-15 and the ALAMO-15 and, as you said, other items that infringe the '223 patent.
We just went over direct evidence that shows that they were selling those in violation of that permanent injunction. But when we brought the case to -- for contempt and we ended up in arbitration, the contempt stayed here. We moved to arbitration to find out -- to basically deal with the settlement agreement.
So there's a violation of the permanent injunction that brings us here. Then when we get to arbitration, there is

another preliminary injunction issued that we're back in violation of that preliminary injunction, in addition to the violation of the settlement agreement. There's just so many violations I'm having a tough --

Q. So --

A. -- time keeping up with --

Q. -- so let's back this up.

(Reporter requested clarification.)

THE COURT: It will help if we speak one at a time.

And let me take one more run at this. If you think that Mr. DeMonico's testimony about what the injunction means is going to make any difference, you're wrong. The injunction says what it says. I've read them a number of times. The ones at issue I wrote -- well, that's not true. I signed the consent injunction that you submitted. The preliminary injunction order that is the issue one here I wrote. So asking Mr. DeMonico what it means really doesn't do very much.

As I said, I'm going to give you all the time you want to argue to me. When you put a witness on the stand and you just start arguing with the witness, it really doesn't accomplish anything.

MR. SMITH: Understood, Your Honor.

THE COURT: And a lot of the direct was just publishing documents, and they could be published quicker, but it was perfectly appropriate to publish them through a witness.

But if you think it does any good just to argue with Mr. DeMonico -- he holds his own pretty well, and you hold your own pretty well, and we're really just not advancing the ball very well.

What I'm looking for is facts, so if you've got witnesses that can say what was on the website when, and then I'm interested in what we can learn about the transaction with Mr. Robinson. Those things -- those are facts. That will help me. But just arguing is not going to do much good.

MR. SMITH: Nothing further, Your Honor.

THE COURT: Redirect?

MR. CONTARINO: No, Your Honor.

THE COURT: Thank you, Mr. DeMonico. You may step down.

THE WITNESS: Thank you, Your Honor.

(Mr. DeMonico exited the witness stand.)

THE COURT: Please call your next witness.

MR. CONTARINO: I'd like to call Mr. Joshua Baker.

(Mr. Baker entered the witness stand.)

THE COURTROOM DEPUTY: Good morning.

**JOSHUA BAKER, PLAINTIFF'S WITNESS, DULY SWORN**

THE COURTROOM DEPUTY: Be seated, please.

For the record, please state your name and spell your last name.

THE WITNESS: Joshua Baker, B-a-k-e-r.

THE COURTROOM DEPUTY: Thank you.

DIRECT EXAMINATION

BY MR. CONTARINO:

Q. Mr. Baker, thank you for joining us today.
Would you -- you already announced your name.
Would you let us know what you do for work?
A. Yes, I'm the owner of Blue Hole Consulting and Relentless Triggers, LLCs.
Q. And are you familiar with Big Daddy Unlimited?
A. Yes. I was an employee there from March 2021 to August of 2022.
Q. And who was your boss at Big Daddy Unlimited?
A. Tony McKnight.
Q. And are you familiar with Sherrie McKnight?
A. Yes.
Q. Does she work at Big Daddy Unlimited?
A. Yes. She was Tony's wife and then she was also the customer service manager for a little while and then the director of operations for a little while as well.
Q. And how about Douglas Rios? Are you familiar with him?
A. Yes.
Q. And how do you have that familiarity?
A. Doug was an associate of Tony's at the time that I was working at Big Daddy Unlimited. Through a handful of different dealings, I was working with Doug and then eventually ended up

actually being a -- or Doug was one of our suppliers for Relentess Triggers.

Q. What, if anything, did Mr. Douglas Rios tell you about his making triggers in general?

A. Doug was able to supply triggers from overseas. So he was manufacturing in Bosnia and Taiwan at one point, and he was able to basically bring over triggers faster and easier than most of the U.S. manufacturers.

Q. Did you ever have an understanding that Mr. Rios was working on developing Forced Reset Triggers?

A. Yes.

Q. And what, if anything, did Mr. Rios tell you about whether he was permitted to make those what we'll call FRTs?

A. He told us he was not allowed to make FRTs at one point in our conversation, and then at another point later on, he had shifted, saying that since there was a violation inside the settlement agreement that he was able to.

Q. And did he ever say what that violation was?

A. He did not.

Q. I'm calling up to the screen P38.

Do you recognize this document, Mr. Baker?

A. Yes, this is a text message thread between me and Douglas Rios.

MR. SMITH: Your Honor, we're going to object to this as undated. We don't know when this conversation took place.

THE COURT: Overruled.

BY MR. CONTARINO:

Q. And what's the -- maybe you can help us out with that, Mr. Baker.

Do you have a --

A. February 26th of 2025.

(Reporter requested clarification.)

BY MR. CONTARINO:

Q. Just wait --

A. No, no, you're good.

Q. -- until I finish, and I'll wait until you finish.

What's the date of the -- approximate date of this text exchange?

A. February 26, 2025.

Q. And does this text chain evidence at least one of the instances where Mr. Rios told you he was working on FRTs?

A. Yes.

Q. And where does it say that there in this text?

A. He says: *FRTs are completely good to go*.

And additionally to that, above that: *I have probably 5 more triggers hitting this year including FRTs*.

MR. CONTARINO: As a document -- statement of party opponent and also authenticating it through himself, Mr. Baker, on the text, I'd like to move to add P38 into evidence.

THE COURT: P38 is admitted.

(PLAINTIFF'S EXHIBIT P38: Received in evidence.)

BY MR. CONTARINO:

Q. Moving to P39, can you identify this, Mr. Baker?

A. Yes. This is a text message thread between me and Doug Rios.

Q. And same question on the date: Do you have a date for this one?

A. February 15th of 2025.

Q. And does this -- would you read this text exchange for us?

A. Yes. Doug had sent over an official bulletin from the ATF. I said: *Oh fuck. That's huge.*

And he said: *Official Bulletin.*

I said: *For real.*

(Reporter requested clarification.)

THE COURT: And speak up for me.

THE WITNESS: Yes, sir.

He said -- or I said: *That's huge.*

To which he replied: *Official Bulletin.*

To which I replied to that: *For real. That's a massive win. What's your plan based around that?*

To which he responded: *I wish I would of never signed the damn agreement. I can't ever sell an FRT.*

And I said: *Oh shit. That's right.*

*But I can invent* -- or Doug said: *But I can invent and patent and receive a royalty.*

To which I replied: *That's not a bad way to go, less hassle on your end just not as much ROI on it for you.*

And he said: *Yeah, I would be ok with that.*

BY MR. CONTARINO:

Q. And so is this text chain evidence of at least one of the incidents where Mr. Rios told you that under the settlement agreement he was not permitted to make FRTs?

A. Yes, that is correct.

Q. And when you respond, *Oh shit. That's right*, does that response indicate that you had already known about the settlement agreement?

A. Yes, that is correct.

Q. And how is that? How did you know about it?

A. Tony McKnight had told us about it at a -- or me and an associate, Craig Butterworth, at a breakfast about it about a month prior.

Q. Okay.

MR. CONTARINO: For those same reasons, party opponent statement and authenticating through a person texting, I'd like to admit P39.

THE COURT: P39 is admitted.

(PLAINTIFF'S EXHIBIT P39: Received in evidence.)

BY MR. CONTARINO:

Q. I'm calling to the screen P40.

And, Mr. Baker, can you identify this?

A. Yes. This is an email from Fast Triggers on December 1st of 2023.
Q. And it says "Josh" there. Is that you?
A. Yes. I reviewed my email -- my personal email.
Q. You provided this in response to subpoenas in this case; is that right?
A. Yes, sir.
Q. And what was -- what was it about this that made it relevant to you to provide it in response to that subpoena?
A. The subpoena was very vague in what they were asking for, and they said "any and all marketing-related content to Wide Open Triggers."
Q. And did you have any reason to believe that this email was associated with the defendants here?
A. Yes. And the reason for that was, one, the Lady Lake address had appeared prior. And additionally to that, I had signed up for a BDU account with that same email, but that was the only email that I had used for any firearms-related content. And then this email magically appears in my inbox.
Q. When you worked at BDU, did anyone work there named Christian Griffin?
A. Yes.
Q. And what did he do?
A. He was Tony's friend and was also a photographer, so he did all the product photography for the website.

Q. And you said you were at BDU for about how long?
A. From March 2021 to August of 2022.
Q. Okay.
A. About a year and a half.
Q. And during that -- about how much of that period was Mr. Griffin also working at BDU?
A. I would say probably about eight months to a year I would see him come and go.
Q. Okay. When you worked at BDU, Big Daddy Unlimited, did you -- did you know anyone there named Reginald Robinson?
A. Yes.
Q. And what did he do at BDU?
A. Reggie was the gun store manager for a little while and then shifted over into dealing with a lot of the affiliates for Big Daddy Unlimited and then, additionally to that, was traveling. He was doing a, like, machine gun rental business that him and Tony were working on on the side.
Q. And where was that? Was that travel --
A. Throughout the state of Florida, as far as I know.
Q. Okay. While at Big Daddy Unlimited, were you ever asked to sign an NDA?
A. I was.
Q. And how did that come about?
A. It was placed on my desk. I was told I had 15 minutes to sign it; if not, I was basically being let go.

And then we basically signed it, and then we never received a copy of it.
Q. And that was in -- was that a single page or --
A. No, it was a fat booklet.
Q. About how many pages would you estimate?
A. I would say about 40 to 50 pages.
Q. At some point after your employment with BDU, was there a time where Lawrence DeMonico sought information from you relevant to Rare Breed's dispute with BDU and the defendants here?
A. Yes.
Q. And about what date would that have been?
A. That would have been early to mid-2024.
Q. And before providing Lawrence DeMonico with that information, did you alert him to what BDU is referring to as an NDA?
A. I did not, because at that time all the information that Lawrence was reaching out about was post my employment at Big Daddy Unlimited.
Q. Did Lawrence DeMonico or anyone connected to Rare Breed ever threat or bribe you to provide information?
A. No, they did not.
Q. Did Rare Breed or anyone connected with it pay you in any way --
A. No, they did not.

Q. -- for that information?
A. No, they did not.
MR. CONTARINO: And that's all I have, Your Honor.
THE COURT: Cross-examine.

CROSS-EXAMINATION

BY MR. SMITH:
Q. Mr. Baker, have you had any conversations with Tony McKnight, Sherrie McKnight, or Douglas Rios since January 2026?
A. I have not.
Q. So you have had no communication regarding this preliminary injunction issued by the arbitrator with any of them?
A. No, sir.
MR. SMITH: No further questions, Your Honor.
THE COURT: Any redirect?
MR. CONTARINO: No, Your Honor.
THE COURT: Thank you, Mr. Baker. You may step down.
THE WITNESS: Thank you, sir.
(Mr. Baker exited the witness stand.)
THE COURT: Please call your next witness.
MR. ROTH: Your Honor, we are going to call Mr. Reginald Robinson.
(Mr. Robinson entered the witness stand.)
THE COURTROOM DEPUTY: Good morning. Please raise your right hand.

**REGINALD ROBINSON, PLAINTIFF'S WITNESS, DULY SWORN.**

THE COURTROOM DEPUTY: Be seated, please.

For the record, please state your name and spell your last name for the record.

THE WITNESS: Reginald Robinson, last name R-o-b-i-n-s-o-n.

THE COURTROOM DEPUTY: Thank you.

DIRECT EXAMINATION

BY MR. ROTH:

Q. Good morning, Mr. Robinson.

Pardon me a moment. I'm just doing the tech.

A. Good morning.

Q. My name is Jacob Roth. I'll be speaking with you today.

So my first question for you: What names have you used in business or in social media, including Reginald Robinson II and Mr. Bump Fire.

A. Reginald Robinson, Reggie, Mr. Bump Fire, The Triggerman, Bump Cerakoting & More.

Q. What is your current occupation?

A. Bump Cerakoting & More.

Q. What is your role with Bump Cerakoting & More?

A. I do cerakoting, Internet, just about basically everything for it.

Q. When you say "just about everything," can you break it down for me? What are the roles or positions you have?

A. The Internet, marketing, stuff like that.

Q. Do you do inventory?
A. Yes, sir, I do.
Q. Do you do ordering for inventory?
A. Yes, sir, I do.
Q. Do you manage the website?
A. Yes, sir.
Q. Do you do bookkeeping?
A. Bookkeeping, some of it, not all. I have a team that does things like that.
Q. I'm going to ask you about your team a little bit later, but that's good to know.
Do you do shipping and fulfillment?
A. I have a team.
Q. You have a team.
Do you determine what FRTs -- and I'm going to use the phrase "FRT" to refer to Forced Reset Trigger. It's just easier and less clunky.
Do you determine what FRTs are stocked on the website?
A. Yes, sir.
Q. What websites -- and I'm going to call it Bump Cerakoting, again just to keep it easy.
What websites does Bump Cerakoting own or operate?
A. Well, performancetriggers.com.
Q. Any others?
A. No, sir.

Q. Are there any other websites that --
A. Oh, bumpfire.com, yes.
Q. Are there any other websites that you personally own or operate?
A. No, sir, other than those two.
Q. Are there any other websites that any businesses you are involved with, own, or operate?
A. No, sir.
Q. When did you first meet Mr. Anthony McKnight?
A. I'd say about five years ago.
Q. What was the occasion?
A. At the gun store Big Daddy Unlimited.
Q. And from there, how did we arrive at your employment with him?
A. Getting -- well, started working at the store and going from there.
Q. From there how did your employment with him change, if at all?
A. Just being around a lot more, learning more about the gun business and behind the scenes, and stuff like that.
Q. So you said five years ago. So this started, 2021?
A. Give or take. I'd say probably like '22.
Q. '22.
And then around what time did it become something different or more?

A. I'd say -- I mean, it started out as just he was the owner of a gun store. And me coming to work every day and learning and trying to learn more stuff, it just gradually grew on me more.

Q. You said you worked in the gun store. You said you ended up doing more with him from being around.

So what did the next step look like?

A. I started doing Internet stuff. That's when my internet name came up and stuff like that. Me and --

Q. When was that?

A. I don't know the exact time. Like, I'm really terrible with time --

Q. That's okay.

A. -- and dates and stuff --

(Indiscernible crosstalk.)

THE COURT: Folks, look, one at a time.

So, yeah, if you ask a question, you have to wait until Mr. Robinson is through speaking before you start back up.

And, Mr. Robinson, please let him finish his question all the way before you start in.

MR. ROTH: Yes, Your Honor.

THE WITNESS: Okay.

BY MR. ROTH:

Q. I'll ask it again, and I'll observe giving you right-of-way.

Month, year, when did the social media start?
A. Truthfully, like I said, I'm very terrible with time and dates like that. I don't know exactly when it started or the exact year. Like I said, I started doing gun stuff like 2020. So, of course, it happened after that. I don't know. I mean, I can't say exact date or time. I don't know, truthfully.
Q. 20 --
A. You can ask me a lot about dates and time. I'm not going to remember exactly.
Q. I'm going to ask you a year.
2022, are you doing social media for any business connected to Anthony McKnight?
A. 2022 when it first started? I can't say off the top of my head. I don't know.
Q. 2023, do you recall?
A. I can say for sure, guarantee, I know for a fact I was doing stuff in 2023 on up.
Q. Okay. When did you first meet Mrs. Sherrie McKnight?
A. Roughly the same amount of time.
Q. What was the context?
A. Same thing; working in the gun store.
Q. How have you worked with Ms. Sherrie McKnight over time?
A. Nothing real major, just, you know, coming in, clocking in, make sure I'm at work, stuff like that. It wasn't nothing real major with Miss Sherrie.

Q. What about Mr. Douglas Rios? Have you ever worked with Mr. Douglas Rios?
A. Not, like, hands-on, just really working, you know, stuff like that.
Q. What is your familiarity with Mr. Rios?
A. Him being around, things like that.
Q. Has he ever supervised your work?
A. Supervised me for work? Like, no. What would he supervise me working doing?
Q. What I mean when I say "supervise" is did he give you instructions? Did he ask you to do things, give tasks? Did he direct you in any way?
A. I wouldn't say, like, direct me. No, I wouldn't say that. No, I never actually worked worked for Doug like that, no.
Q. Did you ever work with him on any projects?
A. I mean, I did videos and stuff for G-Flex Triggers or something.
Q. Was Mr. Rios involved with those videos?
A. As far as involved, like, telling me, Oh, yeah, I want do this for a G-Flex video, yes.
Q. Was he at the location where you were doing the video, in the video?
A. No, I don't want to say he was in the video or nothing like that, but he done been around and I done did a video. Like, we could do a video right here, and he'll be around. I mean, it

wasn't --
Q. I'd like to clarify. The way you're describing it, was Mr. Rios a bystander who had nothing to do with what you were doing, or did he have something, anything to do with your videos?
A. I can say he probably have some input, like, Hey, do this or, Look like this, or something like that before it's, like, actually -- you know.
Q. I'm going to clarify. When I say, "in general," did someone direct your work or give you instructions or things like that --
A. Okay. Yes.
Q. -- if someone says, Do this or do that, I mean that when I say that.
So with that in mind, what you just described, Mr. Rios directed your work in some way?
A. Okay. Yes.
Q. Okay. Now, what about Mr. Christopher Rios? Are you familiar with him?
A. Yes, I am.
Q. How are you familiar with Mr. Chris Rios?
A. Same thing; in the gun industry.
Q. In the gun industry, connected to these businesses, the Big Daddy/McKnight businesses?
A. I never knew Chris with Big Daddy or none of that.

Q. How did you know Chris?
(Reporter requested clarification.)
THE WITNESS: Big Daddy gun store or anything like that. Worked with triggers -- the G-Flex Triggers.
BY MR. ROTH:
Q. I'm sorry. I couldn't hear you properly.
A. With the G-Flex Trigger.
Q. What was Chris's involvement with G-Flex Triggers?
A. Basically just, like, selling triggers, I guess.
Q. Chris was selling triggers.
Do you recall a business name or anything like that?
A. With Flex Industries.
Q. Flex Industries?
Was Flex Industries doing any deals or have any connection with Big Daddy or any McKnight businesses?
A. Not that I know of.
Q. Was Chris involved in any of your G-Flex videos?
A. Same thing; he'll tell me, Hey, do this video for me.
Q. Was Doug there with Chris when that would happen?
A. I would say they were around a couple of times, yeah.
Q. There were times where Doug and Chris were there together and directed or had something to do with your videos?
A. Yeah.
Q. These were videos for G-Flex Triggers?
A. Uh-huh.

Q. These were G-Flex Triggers that --
(Reporter requested clarification.)
THE WITNESS: Yes.
BY MR. ROTH:
Q. These were G-Flex Triggers that who was selling?
A. Flex Industries.
Q. Flex Industries.
Do you know if Doug Rios had anything do with Flex Industries?
A. I mean, hands-on, no, I wouldn't know what they had behind the scenes.
Q. He was around when the social media was being made for Flex Industries?
A. I don't know exactly when the social media was around or who was around when it was made.
Q. When I say that, I mean he was around when you were doing videos that were used for Flex Industries, sometimes at least?
A. He had been around.
Q. Okay.
A. I mean, we would have been at the gun range, so, yes, he would have been around.
Q. And the years that we are talking for this, is this 2023? 2022? What are we talking about for Flex Industries?
A. Off the top of my head, I can't say exactly when I started making videos for them. But, I mean, within some years, yes,

the past three, four years.
Q. So if we say 2023, you were making videos then for sure?
What year are you sure about?
A. I can say, guarantee, 2024.
Q. 2024?
A. Guarantee, off the top of my head.
Q. And did you ever communicate with Sherrie or Anthony McKnight about anything to do with Chris Rios?
A. No.
Q. Never spoke with them about anything Chris Rios did or Flex Industries?
A. For -- why would I speak with them about Chris?
Q. I couldn't tell you. I'm asking.
A. No.
Q. So now I'd like to ask about the work you've done for Anthony McKnight in general.
What are the businesses that he's been connected to that you've done any work for?
A. As far as what? Like Big Daddy Unlimited?
Q. Any work you've done for Anthony McKnight?
A. Big Daddy Unlimited, Performance Triggers. That's probably about it, I guess.
Q. Okay. So for Big Daddy Unlimited, what year did you start? What year did you end with them?
A. I started about -- I'm trying -- about, like, 2002 [sic],

somewhere in there, 2001 [sic]. I don't know exactly.

And when he shut down, I was there when he shut down. So, I mean, you can look it up and see when he shut down, and I was there when he closed down.

Q. What do you remember being the year that you stopped doing work with them?

A. I don't remember the year. I can tell you whenever he shut down. If you can look up and see when he shut down, that's when I stopped working with him.

Q. So do you remember working for them in 2022?

A. Like I told you, I don't remember exactly.

You keep asking me the same thing about these dates and times, and I keep telling you I don't remember.

Q. I'm trying to clarify any span of time that you remember doing work for them. You said you did work for them.

A. Yes, I did.

Q. I'm trying to understand --

A. And you keep asking me the same question. I told you I did work for them somewhere around about that time, in 2022 or on up.

Q. And it ended at a time that you don't recall?

A. I don't exactly know exactly what time it ended (indiscernible), no, I don't.

Q. You don't recall the year that you stopped working for them?

A. No, I don't.
Q. For Performance Triggers, did you start working for them in 2022?
A. I don't know.
Q. Or 2023?
A. I don't even know when Performance Triggers exactly started. That's what I'm trying to tell you. I don't remember exact dates. I keep telling you that. I have a problem remembering my kids' birthdays and shit. So that's what I'm trying to tell you.
Q. So you don't remember when you started working for Performance Triggers, but you know you did work for Performance Triggers?
A. Yes.
Q. The work you did for Performance Triggers, what did it involve?
A. Internet, videos -- basically, a lot of videos and stuff like that.
Q. A lot of videos.
What were the videos for?
A. Different triggers.
Q. Marketing them?
A. Marketing triggers, yes. If they have a trigger, I do a video and say, Hey, check out this trigger.
Q. Did this involve Forced Reset Triggers?

A. It involved a little of everything.
Q. I'm asking you, though, specifically Forced Reset Triggers?
A. Yes.
Q. What kind of Forced Reset Triggers?
A. I can't remember exactly the names of them -- all of them.
Q. Do you recall selling Atrius Triggers?
A. I did videos for Atrius Triggers, yes.
Q. Partisan Disrupter Trigger?
A. No, I never did a video for a Partisan.
Q. Super Safety?
A. Yes, I think I did a Super Safety video.
Q. Super --
A. Well, now that I'm thinking about it, a lot of these triggers wasn't for Performance Triggers either. I was doing videos --

(Reporter requested clarification.)

THE WITNESS: Now that I'm thinking about it, a lot of these videos that I'm doing was not for Performance Triggers, too, like that either. Like, I was -- there was other people selling them, and they was giving me triggers and like, hey, do videos for them, and I do triggers for them. And sometimes they would take a video, like, hey, or this video go here -- I mean, videos just go everywhere. So it wasn't specifically for -- specifically saying that I did them for Performance Triggers.

BY MR. ROTH:

Q. I understand, Mr. Robinson. What I'm asking about is just the work with Performance Triggers. So if there's another business right now, I'm not asking about them, just the Performance Triggers stuff.

So Performance Triggers, you did videos on the Internet; right?

A. Yes.

Q. Those videos, at least some of them --

A. Yes.

Q. -- were to market Forced Reset Triggers?

A. Yes.

Q. Those Forced Reset Triggers included Super Safety?

A. Yes.

Q. Super Selektor?

A. Yes.

Q. Atrius?

A. Yes.

Q. Thank you.

And I know -- I know you're going to tell me about dates and things like that. I'm going to have to ask about dates. If you don't know, you say you don't know. That's what we have. I have to ask about dates.

What year was the last year that you did any work for Performance Triggers?

A. As far as vid -- I mean, I know I did some videos last year. I can't remember if I did anything this year.
Q. So you can't remember for sure about 2026?
A. (Indicating verbal answer.)
Q. Could you have?
A. I haven't did many videos this year. That's why I'm saying I don't think I did any videos for him.
Q. I'm just asking: Could you maybe have done it this year?
A. I don't want to tell you I could have when I couldn't. So I can't tell you.
Q. Is there a reason you could not have?
A. Yes, because I haven't did a lot of videos this year.
Q. That's not what I asked. I understand you haven't done many videos. If you've done some videos, they could include for Performance Triggers.
What I'm asking right now: Is there a reason why it is impossible that you could have done one?
A. Is there a reason why it's impossible that I could have done one?
Q. Yeah.
A. It's --
Q. Not whether or not you remember, just is there a reason you could not have done it, not whether or not you have?
A. No.
Q. Okay. Do you remember doing any videos for them or any

marketing in 2025?
A. Yes.
Q. And I know you are bad with dates.
When was the last time period? Are we talking fall/winter, like September or something afterwards? Are we talking summer? Are we talking spring?
A. I'm going to say before it was cold out.
Q. Before?
A. Before it was cold.
Q. Before it was cold out?
A. Before wintertime.
Q. So summer? Autumn?
A. Somewhere in there.
Q. Could be in there. Okay.
For your videos for Performance Triggers, who directed the work or gave you instructions or the idea to put the videos --
A. I do all my own videos myself.
Q. Did you decide what products you would advertise, or did someone tell you, We'd like a Super Safety video, for example?
A. The majority of the time I do everything myself. I come up with it. I just do videos and say, Hey, we need some videos, and I do some videos.
Q. So if you came up with a video for a product they didn't sell, would they put that up?
A. No, they wouldn't put a product they don't sell up. No.

Q. So how did you know what videos to make?
A. Because I knew what they sell. I looked at the website.
Q. So your relationship with them was you would look at the website, see something there, make a video, send it to them; they'd put it up.
A. Majority of the time.
Q. Majority of the time.
Was that every time?
A. Yes.
Q. Did they ever tell you, This video is not so useful to us?
A. Yes.
Q. Why would they say that?
A. Maybe I didn't talk about it or go into detail or whatever is going on or nothing.
Q. So your relationship with them was you'd look at the website; you'd make a video; you'd send it to them; they'd give no feedback; they would just put it up or not put it up?
A. No, they would give feedback sometime and be, like, yeah, or sometime they wouldn't put it up, or they would collab or wouldn't collab.
Q. Would they give you any feedback: We like this video; please do this different?
A. Yeah. As I just told you, if they didn't like it, they'll say, Oh, no, we're not going to use it.
Q. Did you ever get a brief or instructions from them: We'd

love to see this kind of content?
A. Of course.
Q. How often was that?
A. I can't say exactly. It's not like an everyday conversation.
Q. Who would be the person telling you or giving it to you?
A. I get them from anybody -- the cameraman, people like that. Basically, the cameraman basically be the main people I talk to.
Q. Did Anthony McKnight ever communicate with you about Performance Triggers?
A. Yes.
Q. And what kind of communications would he have with you?
A. Like I said, I do videos and Internet, stuff like that.
Q. So he talked to you about the videos?
A. Yeah, that's it, like quick stuff. Like, Oh, that was a good video, or, Nice video, or, Nah, that wasn't a good video.
Q. And Sherrie McKnight, did she --
A. No.
Q. -- ever communicate with you?
A. No.
Q. Do you communicate with Sherrie McKnight ever?
A. I mean, we see each other, conversating, we talk, stuff like that.
Q. Texts? Phone calls? Email?
A. I wouldn't say we text or phone call, like, or email. Like

I said, we see each other through traffic. That's how we conversate.

Q. I want to clarify the last one just because I want to know what that answer means.

You never text, phone call, email, or you don't really text --

A. I don't --

Q. -- phone call --

A. I have texted her or phone call before, but I don't -- I'm not going to -- I can't think of the last time -- it had been some years, I'm pretty sure.

Q. Why would you have texted or emailed or called?

A. Hey, how you doing? What's going on today?

Q. Anything about businesses?

A. No.

Q. Anything about work?

A. No.

Q. Anything about Forced Reset Triggers?

A. Never.

THE COURT: I feel like I'm sitting through a deposition, and I know the rules give you seven hours. Pretty soon you need to get to something that has anything to do with this case.

MR. ROTH: Understood, Your Honor. I'll move forward.

BY MR. ROTH:

Q. So moving forward, how were you paid by Performance Triggers?

A. When I was doing Performance Triggers, like a video?

Q. Yeah.

A. Like, they'll send it to me in my bank account.

Q. Did they pay you per video?

A. Yes.

Q. Did they pay you based upon how many triggers they sold?

A. No, they paid me per video.

Q. Flat rate?

A. Yes.

Q. So every video you put out, you got a certain standard amount of money?

A. Give or take.

Q. Did you have an agreement with them about this?

A. Just a verbal agreement. Nothing wrote down or nothing like that.

Q. Did that agreement end at any point?

A. I mean, with my time and stuff like that, like I said, I haven't been able do videos and stuff, so I don't do as many videos as I used to.

Q. In late 2025 if you did a video for them and you sent it to them, you'd still get paid?

A. Probably. I don't -- I mean, yes, I guess.

Q. January 2026 -- before the transfer agreement but before January 2026, if you did a video for them, you'd get paid?
A. Around, like I said, the beginning of January, no, we weren't doing too many videos.
Q. What I'm asking is if you did a video for them, would you be paid?
A. So you're, like, saying if I do a video --
MR. SMITH: Objection; asked and answered.
THE WITNESS: -- right now for them, would I get paid?
THE COURT: I'll sustain the objection to it being speculative and not -- assuming facts not in evidence. So the objection is sustained.
MR. ROTH: You good?
THE COURT REPORTER: Is your microphone on, Mr. Smith? I just didn't hear your objection. If you can just speak up. I'm so sorry. No problem.
THE COURT: The objection was asked and answered, and I sustained it on two or three other grounds. And it had also been asked and answered.
BY MR. ROTH:
Q. Mr. Robinson, have you ever been paid by High Kaliber Studios, Inc.?
A. High Kaliber Studios?
Q. Yes.
A. I don't know exactly High Kaliber Studios.

Q. You're not -- are you aware of any payments you've received from High Kaliber Studios, Inc.?
A. No, sir.
Q. Have you ever received payment from Mr. Anthony McKnight personally?
A. Like personally, I don't -- yes.
Q. What for?
A. Videos, or something like that.
Q. It was him paying you and not a business?
A. I mean, well, no, not personally, like -- no, not like that, no.
Q. Has he ever paid you not through a business?
A. Not like -- no.
Q. Okay. Has Mr. Douglas Rios?
A. No.
Q. Has Mr. Chris Rios?
A. No.
Q. Have the Rios brothers every paid you through a business?
A. Yes.
Q. Any -- was it Flex Industries?
A. Yes.
Q. Was it any other businesses?
A. Not that I can think of.
Q. So, Mr. Robinson, what business did you form Bump Cerakoting to do?

A. Cerakoting and more. Basically anything else I was going to do. Just branch out and do more things.
Q. So I'm going to bring up Exhibit 42.
And are you able to see all this?
A. Yep.
Q. Okay. Pulling down, we have here the corporate purpose.
So the only thing that you formed it for, "CERAKOTING, SANDBLASTING, PAINTING"; right?
A. Like I said, and more. At the time, yes, that was it.
Q. And did you contemplate selling anything else at the time or doing goods?
A. Of course.
Q. Why didn't you put that in your Articles of Incorporation?
A. Because I didn't think I needed to do everything right then and there. I planned on doing a whole lot more stuff with this. So I should write every single thing that I planned on doing with it?
Q. What is your ownership interest in Bump Cerakoting?
A. I'm the president/owner.
Q. Does anyone else have any ownership interest?
A. No, sir.
Q. Has anyone else ever had any other interest?
A. No.
Q. So it's been all you all the way?
A. All me all the way.

Q. Okay. What is the principal place of business for Bump Cerakoting?
A. In LaCrosse. The place of business -- you want to know the address?
Q. Yeah.
A. 21803 Northwest 58 Terrace, Alachua, Florida 32615.
Q. And has that principal place of business ever changed?
A. No.
Q. What locations do you use for your business operations?
A. That location.
Q. Do you use --
A. As far as my cerakoting and stuff?
Q. Any business operations of Bump Cerakoting, what places do you use?
A. I use that.
Q. Do you use any others?
A. As far as, like, with the Performance Triggers things?
Q. I'm just saying anything Bump Cerakoting does, what --
A. I use that address.
Q. You use that.
What locations -- do you lease other office spaces? Do you have an arrangement with someone to use another building site? Just -- is that building where everything related to your business happens?
A. Yes.

Q. Is that where you store inventory?
A. No.
Q. Where do you store inventory?
A. Different places. I really don't store it on hand. Like, if you sell triggers, I'll call you and call you: Hey, I need these triggers sent here, or, Send me these, and I send it like that. As far as having inventory hands-on, I don't have a lot of inventory hands-on.
Q. The inventory you use for your business --
A. For my cerakoting and stuff like that, it's stored at that same location.
Q. Let's talk now about Forced Reset Triggers. For now, we'll just assume I'm talking about FRTs for this purpose.
A. Okay.
Q. The inventory of FRTs, where is that stored?
A. I just told you. The people who I have contact with, I call them. If I have a sale for triggers, I make these sales. I do it like that. I have some stuff on hand, but I don't have a lot of stuff. And I have it right there then at that location.
Q. These are people who work for you?
A. Not work for me, but I buy triggers from them.
Q. Please walk me through the sales process for a moment.
An order comes in from online. You want to fill it. What's your next step?

A. Okay. So I have a team working on it. So at first, before, like, when I was doing my own thing, I was -- contact -- like, I have deals with different trigger companies and different trigger people that have triggers, FRTs, Atrius, TX22.

Okay. Let's say if you call me and you, like, Hey, I need 30 triggers, I get on the phone and call and, like, Hey, this place -- this person needs 30 triggers, here, right there. And it goes like that.

I don't have to have the inventory on hand is what I'm telling you.

Q. The people who have the inventory are employees of yours?

A. Are who?

Q. Are the people who have the inventory employees of yours?

A. No, they don't work for me. I'm telling you I'm buying from other companies.

Q. The only location that you use for your business, then, is the 21803 address?

A. Yes, that's the location.

Q. So no warehouses? No fulfillment centers?

A. I got a fulfill -- well, yeah, my team -- I keep telling you I have a team that does things too.

Q. What I'm asking right now, I mean the business of Bump Cerakoting. So if your team is running a warehouse, I'm asking about that team. I'm not saying only you personally. I'm saying the business.

So the business Bump Cerakoting, does it have warehouses?
A. Yes, it has some warehouses to ship things and stuff like that.
Q. Has a fulfillment center?
A. Yes.
Q. Okay. What -- can you run me through what these locations are? I don't need exact addresses right now.
You have one warehouse, two warehouse --
A. I have one spot in Gainesville.
Q. I'm sorry. I couldn't understand you.
A. One spot.
Q. One spot?
One spot. What does it do there?
A. Sometimes they print orders there.
Q. I'm unfamiliar with the terminology. What does printing orders mean?
A. Okay. If an order gets sent in, they'll print it out and ship it out.
Q. So --
A. You understand this. You're just asking me questions about this. Obviously, you understand this.
Q. Mr. Robinson --
THE COURT: Let me make this easy. I don't understand it, but I need to get you to tell me just exactly what happens. So --

THE WITNESS: Yes.

THE COURT: Let me start, and we're going to talk one at a time.

John Doe decides today that he wants a trigger. He goes on the Performance Triggers website, and he orders a trigger, and the price is $199. I want to know how he gets that trigger; who gets that order; who fills that order; where does that -- where is that trigger now, and how does that trigger get to John Doe.

THE WITNESS: Okay. So he'll order the trigger online. Once he ordered the trigger online, he'll get notified at the -- you know, who -- the address that he paid and everything. When he get paid -- everything is paid, then it get shipped out from the address that I told you in Gainesville. I got a way to ship out. My team, they'll do that.

THE COURT: So there's a trigger right now in a warehouse in Gainesville?

THE WITNESS: No, I wouldn't say nuh-uh.

THE COURT: Well --

THE WITNESS: Okay. Well, they'll notify --

THE COURT: -- Mr. Robinson -- Mr. Robinson.

THE WITNESS: Drop shipping, it's like -- okay. Go ahead.

THE COURT: I'm going to get you to explain it to me like I'm 4, and I want to know just exactly what happens at

every stage of this. Don't hide the ball.

THE WITNESS: I'm not.

THE COURT: Just tell me what's going to happen.

So John Doe places an order online.

THE WITNESS: Uh-huh.

THE COURT: Gives a credit card right there online. I take it he can do that?

THE WITNESS: Yes, sir.

THE COURT: There's $199.

Let's start talking about the money. Where does the -- who gets the $199?

THE WITNESS: It will go to my account.

THE COURT: You've got a bank account.

Where is --

THE WITNESS: Yes, sir.

THE COURT: -- where is the bank account?

THE WITNESS: At Capital City.

THE COURT: So money goes into your bank account at Capital City Bank, the whole $199?

THE WITNESS: Yes, sir. My team will take care of the rest, like the distributing and do all that. But, yes, the money goes into the account.

You want to know exactly what I do --

THE COURT: No, I want to know --

THE WITNESS: -- or the whole process?

THE COURT: -- exactly -- I want exactly how this transaction is going to occur.

So John Doe goes online, goes on the Performance Triggers website, orders a trigger, gives a credit card entry for $199. The money shows up at Capital City Bank?

THE WITNESS: Uh-huh.

THE COURT: Yes?

THE WITNESS: And from there it would be fulfilled with the team that I have.

THE COURT: All right. And so who fills it and -- first, where is that trigger now? He's just placed that order right now.

THE WITNESS: Okay. Like I was telling him, technically, I would not know exactly -- it depends on which trigger. I might have a couple -- some hands-on, but the majority of the stuff I don't have hands-on.

THE COURT: All right. So the trigger might be in the warehouse here in Gainesville?

THE WITNESS: Yes.

THE COURT: So right now there are triggers in a warehouse in Gainesville, Florida?

THE WITNESS: I mean, like, TX22s, yes.

THE COURT: But there might not be this trigger that he just ordered?

THE WITNESS: Yes.

THE COURT: And where -- if it's -- if he -- if it's not in your warehouse, where is that trigger?

THE WITNESS: At the other companies that I order from.

THE COURT: So there is some other company -- let's call it ABC Company -- that sells this brand of Forced Reset Trigger.

How does that company find out about this order?

THE WITNESS: My team will let them know, Hey, we have this order here.

THE COURT: And who is your team? Are these employees?

THE WITNESS: Yes, sir.

THE COURT: So they get W-2s every year?

THE WITNESS: Yes, sir.

THE COURT: How many employees do you have?

THE WITNESS: It's about four or five.

THE COURT: All right. Four or five.

Tell me their names.

THE WITNESS: Okay. We got Samantha. We got Ben. We got Eva. And there's a couple other people we have.

THE COURT: So Samantha, Ben, and Eva.

THE WITNESS: It's like people that -- okay. Let's say for instance -- I don't know exactly everything because I don't do everything for the company like that.

THE COURT: But you --

THE WITNESS: I don't hire everybody, like, with the whole -- like, I got a team of people that does callbacks. Like, when people call back, I don't hire everybody for that. They, like, okay, we got a couple of people that answer the phone and do these right here for that.

THE COURT: Who hires the people for you?

THE WITNESS: I just -- I just -- I'm just talking about, You know somebody that's good for you that work with you? I got a good friend. Okay. Yeah, I got a friend that can do it. Okay. There you go. That'll work. You train him up and do it.

THE COURT: Okay. So you have -- total you have four or five employees?

THE WITNESS: Four or five, give or take, yes.

THE COURT: And you just gave me some names: Samantha, Ben --

THE WITNESS: And Eva.

THE COURT: -- Eva.

THE WITNESS: Uh-huh.

THE COURT: You don't know the other names? You've got a total of four or five employees, and you don't know all their names?

THE WITNESS: I don't.

THE COURT: Where do they go to work? They work from

home? They work at a location? Where do they work?

THE WITNESS: Home. And I got couple of them that works at this warehouse.

THE COURT: So, right now there are two people working at a warehouse in Gainesville?

THE WITNESS: No. I've got -- no, there's nobody working right now.

THE COURT: Nobody is working right now?

THE WITNESS: No.

THE COURT: So if somebody orders a gun -- a trigger right now, and it -- how do you know whether it's in the warehouse?

THE WITNESS: Well, I wouldn't know anything right now.

THE COURT: So what happens if right now -- that's what I started off trying to ask you. Right now --

THE WITNESS: Oh, you're saying right now. I wouldn't know anything -- how would I know anything sitting here right now? That's what I'm saying right now. Like, if it was out, yes. Everything is done online.

THE COURT: All right. Well, look, I know what's going on in my office in Tallahassee. You don't know what's going on in your warehouse in Gainesville?

THE WITNESS: Right here right now, no. There's nothing going on right now. If somebody placed an order, I

would not know. So how would I know right now if somebody placed an order?

THE COURT: Well, does somebody that works at this company --

THE WITNESS: Somebody would know, yes. And right now I can't know. I don't have no phone. I don't have no access to anything right now.

THE COURT: That I get. I understand that. You're in court. You're not looking at it.

But you run this business every day. You must know.

What are the hours -- what are Samantha's hours?

THE WITNESS: She do customer service, basically. She works from home. Anytime between 9 and 5.

THE COURT: Who fills orders?

THE WITNESS: Well, order fulfill, I got -- like I said, I have a team of people that doing that.

When I first got here -- when I got in the business and everything, a lot of this stuff was already intact, so a lot of stuff I didn't have to go back and do this or that. I'm still in the process of learning and doing everything without asking.

THE COURT: Tell me what was intact when you took the business.

THE WITNESS: Okay. Customer service was already intact. I didn't know anything about the customer service part.

That was already intact. The fulfillment and stuff like that, that was already intact.

THE COURT: Who did those people work for when you bought the business?

THE WITNESS: Performance Triggers.

THE COURT: So they were already employees?

THE WITNESS: Not all of them, but yes.

THE COURT: Was there somebody that worked for Performance Triggers that filled the orders?

THE WITNESS: Yes.

THE COURT: How often do the people that fill orders come to work?

THE WITNESS: Just about every day.

THE COURT: Well, how do you know they're not there now?

THE WITNESS: I wouldn't know because I'm here.

THE COURT: Well, you just told me a minute ago there was nobody there now.

THE WITNESS: That's what I'm trying to tell you. I don't think there's nobody there now because I got this stuff going on today.

THE COURT: So you came to court and all the employees went home?

THE WITNESS: I didn't say they went home. I'm just -- with all this stuff going on, I told them today is not

going to be a good day.

THE COURT: Let's take yesterday.

3:00 o'clock yesterday afternoon, was anybody at your warehouse?

THE WITNESS: 3:00 o'clock, yes.

THE COURT: So if somebody placed an order at 3:00 o'clock yesterday, there was somebody that would find out whether that order was in the warehouse?

THE WITNESS: Yes.

THE COURT: Who was that?

THE WITNESS: Yesterday I was there.

THE COURT: So you were at the warehouse yesterday at 3:00 o'clock?

THE WITNESS: Yes.

THE COURT: Were there any employees there?

THE WITNESS: Yes.

THE COURT: Who were they?

THE WITNESS: Ben, he was there.

THE COURT: Anybody else?

THE WITNESS: No. Me and Ben was there.

THE COURT: So you and Ben were at the warehouse yesterday at 3:00 o'clock?

THE WITNESS: Uh-huh.

THE COURT: So if somebody had placed an order, how would you know? Would it show up on somebody's computer screen?

THE WITNESS: Yes.

THE COURT: How many computer screens are at the warehouse?

THE WITNESS: It's not a lot. It's not like a big warehouse where there's 30 computers or nothing like that. It's about a couple of laptops.

THE COURT: So a couple of laptops?

THE WITNESS: Uh-huh.

THE COURT: One of them yours?

THE WITNESS: Yes.

THE COURT: One of them Ben's?

THE WITNESS: Yes.

THE COURT: Anybody else have one?

THE WITNESS: I mean, everybody have laptops.

THE COURT: Well, who's everybody?

THE WITNESS: I mean, you have a laptop. I'm just saying everybody have a -- everybody use their own laptop. You have your own equipment and stuff like that.

THE COURT: I want to know how many laptops your employees have.

THE WITNESS: I have no idea.

THE COURT: Well, you were at the warehouse yesterday. You didn't --

THE WITNESS: I didn't walk around counting laptops. Me and Ben sat and talked for a while, and I programmed my

laptop. I just bought a laptop.

THE COURT: I can ignore my surroundings with the best of them, but surely you've -- going to the warehouse on a regular basis of this business you own and run, surely you have some idea of how many laptops are there.

THE WITNESS: Let's say three or four laptops.

THE COURT: Yours was logged in yesterday?

THE WITNESS: No, it wasn't.

THE COURT: Was Ben's logged in yesterday?

THE WITNESS: I'm sure it was.

THE COURT: So if there was an order, would it be Ben that got it?

THE WITNESS: Yes.

THE COURT: And then what would he do?

THE WITNESS: He would fulfill the order. He can see -- well, nine times out of ten, he'll make the phone call to the right place where we get -- where we're getting the triggers from.

THE COURT: So he'd make a phone call to some --

THE WITNESS: Well, we don't make phone calls. They work through the Internet, emails, and things like that.

THE COURT: So he would get online and place an order to ABC Company, or whoever it is, that you -- is your source?

THE WITNESS: Yes.

THE COURT: And how would that trigger then get to

your customer?

THE WITNESS: They will send it. The majority of time they will send it.

THE COURT: The majority of the time or all the time?

THE WITNESS: I would say majority of the time they will send it.

THE COURT: Sometimes does your operation send it directly?

THE WITNESS: Yes.

THE COURT: So if it's in your warehouse, you send it?

THE WITNESS: Well, no, they would -- like, if we send -- let's say, for instance, if she ordered a trigger, she ordered a trigger, you ordered a trigger, that one company would be like, Well, we'll send them to you. We'll send you the three triggers. And then we'll send them out.

THE COURT: I'm not sure --

THE WITNESS: It depends on how --

THE COURT: -- I followed that.

THE WITNESS: Okay. Well, let's say, for instance, you got three different triggers going to three different places. Instead of them saying, Okay, we're going to send this one to her; we'll send it to her; we'll send it to you, sometimes they'll send me all the triggers, and I'll send them out.

THE COURT: So you have people there at your warehouse

who box up the triggers and send them to where they need to go?

THE WITNESS: Yes.

THE COURT: Who does that?

THE WITNESS: Ben. It's not a big -- that's what I keep telling y'all. It's not this big -- big-ass warehouse that y'all are assuming it look like.

THE COURT: Well, I'm not assuming anything. I'm trying to figure it out.

Does Ben have a last name?

THE WITNESS: Yes.

THE COURT: What is it?

THE WITNESS: I don't know it off the top of my head anymore.

THE COURT: But you send out a bunch of W-2s at the end of --

THE WITNESS: I don't have to do it. That's what I keep telling you. I don't have to do everything personally.

THE COURT: Who sent out the W-2s for you?

THE WITNESS: Eva.

THE COURT: Was Eva already working for Performance Triggers when you bought the company?

THE WITNESS: Yes, sir.

THE COURT: Ben was already working there?

THE WITNESS: Yes, sir.

THE COURT: Samantha was already working there?

THE WITNESS: Yes, sir.

THE COURT: Did you keep all the employees from Performance Triggers when you bought the company?

THE WITNESS: Yes, sir.

THE COURT: Did you hire any new employees?

THE WITNESS: Yes, sir.

THE COURT: Who did you hire?

THE WITNESS: Well, just -- well, like I told you earlier, like, if you knew somebody that would work beside you that can do something, they are hired like that.

THE COURT: Well, who did you hire?

THE WITNESS: Well, it was one person. I don't know their names. I never met that person, like, hands-on.

THE COURT: So you hired somebody that you never met?

THE WITNESS: Yes, sir. I didn't do the exactly hiring. It was just --

THE COURT: Who did the hiring?

THE WITNESS: Basically, everybody does it. It's just, Okay, if you think that's a good person, okay, yeah, it's good work. We'll make it -- we'll see if it work out.

THE COURT: Who made the decision to hire the new person that you said you hired?

THE WITNESS: It was just somebody Ben knew.

THE COURT: Somebody what?

THE WITNESS: Ben knew.

THE COURT: So Ben hired somebody?

THE WITNESS: Yeah.

THE COURT: When a person places an order online and you don't have the product in your warehouse, I think you've told me that Ben would send an online order to the supplier. I used the hypothetical ABC.

Does that supplier -- we'll say ABC -- sometimes ship the product directly to the buyer?

THE WITNESS: Yes.

THE COURT: If these people wanted to see the warehouse right now, you could take them down there, open it up, and let them look at it, couldn't you?

THE WITNESS: Uh-huh.

THE COURT: That's a yes?

THE WITNESS: Yes.

THE COURT: How long would it take you to come up with the personnel records that showed the full name of every one of these employees?

THE WITNESS: I don't know exactly. I'd have to make some phone calls.

THE COURT: Somebody ought to have those records. So if you called them right now and said, Have the records ready at 2:30, they'd have them ready, wouldn't they?

THE WITNESS: I mean, yeah, sure.

THE COURT: I interrupted. You can go ahead.

BY MR. ROTH:
Q. Following on that thread, Mr. Robinson, what's Eva's full name?
A. I don't know her full name exactly. I can get anything -- I can get it for you.
Q. What's Samantha's full name?
A. I can get it for you.
Q. Is it Samantha McKnight?
A. Yes.
Q. Thank you. Who is Samantha McKnight?
A. She work in customer service.
Q. Is she related to Sherrie and Anthony McKnight?
A. Sounds like it by the last name.
Q. Are you unfamiliar with whether or not Samantha McKnight is the daughter of Sherrie and Anthony McKnight?
A. Yes, she is.
Q. She is?
Why didn't you say that in the first place?
A. Because I just -- I answered the question, didn't I?
THE COURT: Mr. Robinson, this is a really serious endeavor. I'll go back and look at this transcript to see if I asked you Samantha's last name. But let me tell you, you've taken an oath to tell the truth, and it's a crime not to. You need to straighten up and answer the questions straight up.
And let me just tell both sides: I will probably be

entering an order to alert the United States Attorney to what's going on in this proceeding. So if you think you can just hide the ball, eventually we're going to get there.

I think I've probably told you this before. There have been very rare instances in my career where I have thought it appropriate to alert the United States Attorney to something going on in a trial or a hearing. When I do, I always make clear to the United States Attorney that I understand the difference between his role and my role. I don't have prosecutorial discretion.

I'm not suggesting that the facts support any criminal charge, and I'm not suggesting how the prosecutor ought to exercise any discretion. But I think both sides need to know and Mr. Robinson needs to know, we're getting to the point here where folks need to tell the truth. Violating a court injunction is not only something that could trigger a contempt finding, it is a crime.

Mr. Robinson, answer the questions.

You may proceed.

BY MR. ROTH:

Q. When did you first meet Samantha McKnight?

A. Working at Big Daddy guns.

Q. The Capital City Bank account that you mentioned, did you open that account?

A. Yes, I did.

Q. When did you open that account?
A. A little after I had started my business.
Q. Which business are we talking about? Bump Cerakoting?
A. Yes, sir.
Q. So that would be 2023 or 2024?
A. I can't -- like I told you, I don't know the exact dates, but I can get the information.
Q. Not 2026?
A. No, it didn't -- I done had that before 2026.
Q. What bank accounts does Bump Cerakoting have?
A. The one at Capital City.
Q. Any others?
A. No, sir.
Q. What credit cards does it have?
A. It doesn't have any credit cards.
Q. How does Bump Cerakoting pay its expenses?
A. I got a debit card, I mean.
Q. How many debit cards do you have?
A. That one debit card with that one account.
Q. What account is used to pay Bump Cerakoting's expenses?
A. The one at Capital City.
Q. Just the Capital City bank account?
A. Yeah, Capital City.
Q. Nothing else?
A. Nothing else.

Q. Proceeds, like the money that you get from the business you do, does it go all to the Capital City bank account, or anywhere else?
A. It goes to the -- that's the only account I have for the business or anything. No other money goes in any other account.
Q. Do you do any cash transactions?
A. Yes, I do.
Q. What do you do cash transactions for?
A. Triggers --
Q. So --
A. -- or, like, cerakoting.
Q. -- what kind of --
A. So when I cerakote, I do car parts. I mean, I cerakote anything. So people come to me if I'm doing cerakoting and stuff.
Q. For the FRTs, what kind of an order would be paid for in cash?
A. If somebody didn't want to pay with credit cards, if they wanted to buy and pay with cash.
Q. An online order --
A. Or do gun shows and stuff like that.
Q. Any online orders paid for in cash?
A. You can't pay an online order with cash.
Q. I wanted to ask, because I wasn't sure if there was a way.
So the warehouse location that we were talking about where

your team is, did you get that from Performance Triggers?
A. Yes.
Q. Did you get any other locations from Performance Triggers?
A. I didn't.
Q. Who talks to the other businesses that will give you FRTs if you don't have them?
A. I do a lot of talking to them. Like, I meet a lot of people that sell triggers. I know a lot of people that sell FRTs.
Q. The scenario that Judge Hinkle was going through, someone places the order yesterday at 3:00 p.m.
A. Uh-huh.
Q. It's for an FRT. It's not one that you have right now, so you have to call one of your contacts.
A. Uh-huh.
Q. Who does that?
A. Me or Ben. It depends.
Q. It could be you; it could be Ben.
The people that you're contacting, did Ben know them when he worked at Performance Triggers?
A. Yes.
Q. The people -- how did you get introduced to these people who give you the FRTs?
A. Me being the Internet-type person that I am, I talk to -- if I see anybody selling anything that I like or I feel I can

put my hands in, I contact them myself and --

Q. The setup with reaching out to people to get FRTs if you need it, Ben was doing that with Performance Triggers and who is doing it for you now?

A. I don't know what he was doing exactly for Performance Triggers. Like I said, I was -- when I -- let's say, for instance, a new trigger come out. I would reach out and contact and try to find out who that is, and I will get in touch with them.

Q. I'm asking about Ben's stuff right now because I'm interested in him for this.

Ben joins your company. Ben already knew a bunch of these people, already had been in touch with them, already gets triggers from them?

A. Yes.

Q. What date -- and this was recent, and it connects to the agreement. So I think there's a better shot you'll know this one.

What date did Bump Cerakoting take over the sales for Performance Triggers?

A. In February when we did all this stuff.

Q. Was there any gap between the time the agreement was executed and you taking over?

A. Well, like, as far as?

Q. I want to clarify.

A. When you say "gap," what you mean?
Q. Was there any time after you acquired the website that there was a gap where you weren't running the sales yet; you had to get everything together in order to be able to run the sales?
A. I don't know exactly what you're saying. Like, was there a gap in between?
(Reporter requested clarification.)
BY MR. ROTH:
Q. Please clarify for -- if you need to get --
A. I said "a gap in between."
Q. So the agreement, I'm going to bring it up for us.
A. From February -- you're saying from when we signed the agreement?
Q. I'm going to walk us through. I'm just going to bring it up.
So we have the agreement in front of us, and we have our sale of assets. And I want to go here to the closing.
So do you see here (indicating)?
A. Yep.
Q. Okay. So February 9th at noon, so that was when you got all the assets?
A. Yes.
Q. Yeah. So you get all the assets at noon.
Were you already running all the sales at noon? Now it's all going to your bank account? It's you who is going --

A. No, it didn't just happen that fast. Everything didn't just take -- no, it took some -- you know, transfer and stuff like that.

(Indiscernible crosstalk.)

BY MR. ROTH:

Q. Right. So I want to talk through that so I can understand just the length of time and all that was involved.

So what websites were transferred to you?

A. Performancetriggers.

Q. Just performancetriggers?

A. That's it.

Q. Okay. When -- as far as you understand, when did you get control of performancetriggers where you could go in; you could tinker around; it was yours; you had the admin access?

A. I mean, basically right after that. I mean, a day or two or so, if that long.

Q. Okay. A day or two. So it could have been February 11th?

A. Could have been the 10th, I mean.

Q. It could have been the 10th?

A. Yeah. I mean --

Q. You don't remember it being --

A. Exactly, right then and there. I mean, we talked, but I don't think I just got all the information in, like -- right then at that same second on that 9th, like, okay, the 9th at noon, okay, now here's all the information, I mean.

Q. When you took over the website February 10th, February 11th, whatever it was, did you have to turn on sales or anything like that? Did you have to do anything to, like, make it work?
A. I have a team that does all that kind of stuff as far as Internet --
Q. Did your team have to?
A. They took care of that stuff.
Q. They took -- the team that included Ben, Samantha, and Eva took care of everything?
A. So what are you asking me? Like, did they have to turn it on? Like, what you trying to say? Was the stuff off before or not?
Q. Yeah. That's a good way of putting it.
Had sales stopped and then had to be started again once you guys were in charge?
A. Sales had stopped, yes, at one time, yes.
Q. When did they stop?
A. I don't know exactly, but that's how I ended up seeing it. When I seen the sales stop, that's when I basically started talking about it. I went on the website and it had -- I went on the website. It said, We can't sell this, this, that, and the other.
Q. I'm sorry. I need you to clarify at what point in time we're talking about.

A. I don't know the exact times and dates. I keep telling you that.

(Indiscernible crosstalk.)

BY MR. ROTH:

Q. I know, but that's not --

A. I know for a fact that I went on the website, and it was on there that they wasn't selling anything. And that's when -- after that, that's when I had (indiscernible) website.

So the website was -- did stop selling stuff, yes, if that's what you're asking me.

Q. I think there's two points in time, and I want to be clear about which one I'm talking about.

There's a point of time from in January or so where the previous owners of the website had taken down some products. I'm not talking about that one. I'm asking if after February 9th at noon, as we have here, the website had been paused or frozen waiting for you to take over?

When you took over, had the website been paused or frozen and stopped selling things?

A. I don't know exactly, yeah.

Q. You don't. Okay.

So from your own awareness, there's nothing you heard about the website stopping sales, waiting for you to take over a day or two later?

A. I don't know exactly.

Q. What merchant account do you use for Bump Cerakoting?
A. You'd have to talk to my team for that.
Q. So who on your team would know about merchant accounts?
A. Eva. She would know.
Q. Eva? Eva Gregorovic?
A. Yes.
Q. And did you open any merchant accounts?
A. I'm in the process of doing it right now as we speak.
Q. Did you have any before this process?
A. No, sir.
Q. Did you hear anything about merchant accounts being transferred to Bump Cerakoting with the deal?
A. I mean, yes, we hear about the merchants and stuff like that. Yeah.
Q. Did you follow up to see if any were transferred?
A. That's what the team and stuff -- they were doing that. That's what makes me to -- well, I'm in the process right now of getting my own merchant account.
Q. Okay. So you don't know what merchant account is being used for Bump Cerakoting right now?
A. Off the top of my head, I don't know, no.
Q. Well, you said that the team would know and that you --
A. The team would know. You said -- you asked me if I know. I said, No, off the top of my head, no, I would not know.
Q. But you also don't know in general because it's not what

you handle?
A. Yes.
Q. Okay. That's what I meant.
Okay. So I want to go through the asset transfer here.
So websites, it says here under A -- I want to highlight just to make it easy.
There we go.
So it says: "All other related domain names or websites currently associated."
What does that mean?
A. Exactly what it says.
Q. What other domain names is it talking about?
A. There was no other domain names.
Q. Why would they have a term in there that's talking about domain names that don't exist?
A. It's just if there was something else or if it was other -- or anything else that comes with it. That's what I'm taking from it.
Q. But you never -- you never heard anything about there being anything other than performancetriggers.com?
A. Correct.
Q. Okay. And there are no other websites that were associated with Performance Triggers?
A. Correct.
Q. Okay. Social media accounts, what social media accounts

did you get?
A. The Instagram, the YouTube.
Q. So the Performance Triggers USA Instagram account --
A. Uh-huh.
Q. -- that you're all over, like you're the face of?
A. Exactly.
Q. Yeah. And then the YouTube channel, same thing; you are the man on that. So that's the one you got?
A. Uh-huh.
Q. Okay. No others?
A. Yeah. The Instagram -- I mean, all of them: The Facebook, the Twitter, everything.
Q. There's also a Facebook?
A. Yes.
Q. There's also a --
A. I didn't did anything on the Facebook or those accounts.
Q. But you got them?
A. The two -- yeah.
Q. So you got four of them?
A. Yeah.
Q. Instagram; YouTube; Twitter, X; Facebook?
A. If there's still a Twitter and a Facebook, but yes.
Q. You don't know if there's a Twitter or a Facebook?
A. I can't know for sure, yeah. But I know for a fact the Instagram and the YouTube.

Q. "Intellectual property owned by Performance Triggers"; so other than the words meaning what they mean, I'm asking what intellectual property did you get? What was transferred?

A. Like I said, I guess -- like old videos they had on there, I guess I own those videos now, I mean.

Q. So you're not sure? It refers to --

A. No. No. That's what I'm saying. That's what it's saying on this right here.

Q. Okay. But what I'm saying is what was transferred to you, you don't know a list?

A. No, there's not like a list or anything. No, I don't have a list.

Q. So no list of assets. Was it talked about?

A. For, like, audio? Video?

(Reporter requested clarification.)

THE COURT: We're going to take a break for lunch.

The plaintiff is going to go over your outline and find out what you need to ask and what you don't need to ask.

You know, delay works in favor of the defense, not in favor of the plaintiff. If we don't finish -- and I told you I can stay until 4:00 in the morning tomorrow, Saturday morning. But the court reporter and the courtroom deputy, the court security officers, they are not planning to be here until 4:00 in the morning.

If we don't finish today -- let me tell you, I start a

jury trial Monday morning, and I'll be in trial, I think, all next week -- we'll come back when I have a break, but I've got a pretty busy schedule coming up. So if you want to run this as long as you seem to want to run it on the plaintiff's side, I would think that the delay doesn't help you. You might want to go over your outlines and find out what you really need to know.

We're going to take an hour for lunch. I'm going to take the full hour for lunch because I think we need it. And if you'll take the hour and pare things down --

MR. ROTH: Yes, sir.

THE COURT: -- that will be excellent.

MR. ROTH: Yes, sir.

THE COURT: I'll see you -- we'll start back at 1:30.

(Recess taken at 12:30 PM.)

(Resumed at 1:30 PM.)

THE COURT: Please be seated.

Mr. Robinson, you are still under oath.

THE WITNESS: Yes, sir.

THE COURT: Mr. Roth, you may proceed.

BY MR. ROTH:

Q. Mr. Robinson, I will be snappier with things so we can move along.

Referring back to the employees that we were discussing before, it's Ben Rose (phonetic) who worked at BD, or Big Daddy Unlimited, that works for you?

A. Yes.
Q. The address for the warehouse is 6915 Northwest 4th Boulevard, Suite A?
A. Suite A, yes.
Q. Okay. I'm going to bring up -- this is my laptop. Forgive me a moment for technical difficulties using my laptop now and not Mr. Contarino's.
Oh, no.
(Pause in proceedings.)
BY MR. ROTH:
Q. Okay. So, Mr. Robinson, just point me to the screen.
So we can see on here: "List of companies"; on the right-hand side there's a column for "street address"; and it says "6915 Northwest 4th Boulevard."
Do you see that?
A. Yes.
Q. So we see in the list companies: Big Daddy Land Holdings, LLC; FULL30. We see some other names.
I'm going to move now to the profile for one of two of these companies. Can you tell me the company name right here (indicating)?
A. It's FULL30.
Q. Okay. And the address we have for that?
A. 6915 Northwest 4th Boulevard.
Q. That's Suite A; right?

A. Yes.
Q. And that's the warehouse address?
A. Yes.
Q. Okay. And we have here "registered agent" is who?
A. Big Daddy Unlimited Enterprise.
Q. And then we have the president, who?
A. Big Daddy Enterprise.
Q. And the address for Big Daddy Enterprise?
A. 6915 Northwest 4th Boulevard.
Q. All right. Thank you, very much.
And now we are going to do one more. So up here at the top -- I'm trying to highlight it for you -- what's the name?
A. HKM Operations, Inc.
Q. All right. And the address?
A. 6915 Northwest 4th Boulevard.
Q. All right. Moving down here we have "president." What's the name here, Ivanka Toneva?
A. Yup.
Q. All right. Do you know Ivanka Toneva?
A. Yes.
Q. Who is Ivanka Toneva to you?
A. She works for the -- Performance Triggers.
Q. She work for you right now?
A. Yes.
Q. What's her role for you right now?

A. She helps out with the, like, packing everything in the store, like, with the online stuff.
Q. Okay. So she came over with the deal?
A. Yes.
Q. Thank you.
So now I'm going to move over to the Performance Triggers website. This is the live website right now.
And so we have here the -- what product is this one?
A. The Super Selektor.
Q. Okay. I'm going to scroll down here. I'm going to go to the "More Information" section.
Now, what I've highlighted, it shows the brand is PTI Worldwide; right?
A. Uh-huh.
Q. Okay. So PTI Worldwide, did you take over PTI Worldwide manufacturing when you took over with the deal?
A. If that falls in the bracket, I guess, yes.
Q. So you don't know --
A. I don't know.
(Indiscernible crosstalk.)
BY MR. ROTH:
Q. Right now?
A. Exactly, yes.
Q. Where do you get these triggers from to sell?
A. It depends.

You talking about these exact ones here?
Q. This -- the PTI Worldwide --
A. I don't know exactly --
(Indiscernible crosstalk.)
THE COURT: Folks, look, we had this problem before. It's going to stop.
You can't talk over each other. I can get some drift sometimes of who is saying what when you are both talking. It's absolutely impossible for a court reporter to make an accurate record when you are both talking. This went on way too much this morning. It's going to stop.
Don't talk at the same time. I don't know how much clearer I can make it.
When you ask a question, you have to wait until he's through talking.
When you answer, get all the way through your answer and then stop. Don't start back up while Mr. Roth is talking.
THE WITNESS: Uh-huh.
THE COURT: Let's try it again.
BY MR. ROTH:
Q. I'll restate the question.
So we have the PTI Worldwide brand triggers. Where do you get those from for your sales?
A. I don't know exactly where those come from.
Q. Do you ever call Doug Rios about those triggers?

A. No.
Q. Do you get any triggers from Doug Rios?
A. No.
Q. Do you know if any of your employees get any triggers from Doug Rios?
A. No.
Q. You don't know if they do or --
A. I mean --
Q. -- they do not?
A. -- they do not.
Q. Okay. Who of your employees would be the person that would know where the PTI Worldwide triggers come from?
A. I don't know exactly who would know exactly where they come from.
Q. Would -- Ben Rose is the one who would make that kind of contact?
A. He probably would, yes.
Q. Okay. And then I'm going to move on to a different topic now.
So we are back to public records. So I want to ask you, what is the name of this entity?
A. BD UNLTD, LLC.
Q. Are you familiar with this entity?
A. No.
Q. Have you had any involvement with this entity?

A. No.
Q. So here at the bottom we have a name for the authorized person for this entity.
Whose name is that?
A. My name.
Q. You don't remember filling out anything for this entity?
A. Not off the top of my head I don't.
Q. Okay. I'm going to go now to this document.
Can you tell me what the title of this document is up here?
A. Return of Article of Organization for Florida Limited Liability Company.
Q. Okay. And over here what's the name of that company?
A. BD UNLTD, LLC.
Q. Okay. I'm going to go down here.
The file stamp, when does it show it was filed on?
A. January 4, 2024.
MR. ROTH: Your Honor, I'd like to admit this as an exhibit. And I apologize. I don't know what number we are up to in terms of exhibits.
THE COURT: Well, you had a list at some point that had numbers. Make sure it's not the same number as something else.
MR. BELLAMY: My notes show 42 is the last one.
MR. CONTARINO: Go with 47.
THE COURT: All right. This will be Exhibit 47, and

it's admitted.

MR. ROTH: Thank you, Your Honor.

THE COURT: Let's make that -- weren't they all numbered P?

MR. ROTH: Yes.

THE COURT: So this is P47.

(PLAINTIFF'S EXHIBIT P47: Received in evidence.)

BY MR. ROTH:

Q. All right. And then my last question for you, Mr. Robinson, it says here on the Articles of Incorporation the name of the authorized person is whom?

A. Reginald Robinson.

Q. Okay. Thank you very much.

MR. ROTH: Your Honor, I have no further questions at this time.

THE COURT: Cross-examine?

CROSS-EXAMINATION

BY MR. SMITH:

Q. Good afternoon, Mr. Robinson.

You bought Performance Triggers on February 9th; correct?

A. Yes, sir.

Q. So about 60 days ago, maybe, a little more than that?

A. Give or take.

Q. Are you still learning who everybody is and how the operations all work?

A. Yes, sir.
Q. Okay. I think there was some confusion earlier when Mr. Roth was asking you about employees and how the business works. I just want to walk through a little bit of -- so that we can understand how this operation works.
When an order comes in off the website -- I think the Judge was asking you this earlier -- it goes to somebody on your team?
A. Yes, sir.
Q. It goes to somebody that's an employee for Performance Triggers, or does it go to a third-party fulfillment center, or where does that go?
A. It goes to a fulfillment order, an order with the team.
Q. I'm sorry?
A. It will go with the person or a fulfillment center, yes.
Q. Okay. And are you -- so that address where the warehouse is located?
A. Uh-huh.
Q. Are you the only entity that's using that to ship products?
A. Oh, no, sir.
Q. Okay. Do you know how many other businesses are in that space?
A. Off the top of my head, no. It's at least about four. At least four -- three or four other businesses.
Q. Okay. But they are not direct employees of you. They work for Performance Triggers and some of these other companies are

using that as a shipping and fulfillment center; right?
A. Yes, sir.
Q. Okay. When you bought Performance Triggers, was it your understanding that some of those employees were going to come over with you to continue the operation?
A. Yes, sir.
Q. What was the reason for that?
A. So we can keep everything going on.
Q. Okay. I want to be clear, Performance Triggers sells a lot more than Forced Reset Triggers and parts; right?
A. Yes, sir.
Q. You sell -- I think you sell the G-Flex?
A. Uh-huh.
Q. What is a G-Flex?
A. It's a binary trigger.
Q. That's a binary trigger. That's not a Forced Reset Trigger; right?
A. Right.
Q. Okay. You sell other parts: You sell bolt carriers --
A. Yes, sir.
Q. -- detents; you sell all kinds of products through Performance Triggers; right?
A. Yes, sir.
Q. You said that you saw you had an opportunity with Performance Triggers because you visited the website and saw a

bunch of the Forced Reset Triggers could no longer be sold; correct?
A. Yes, sir.
Q. When you visited that website and saw that notice, in your mind would you have been able to purchase a Forced Reset Trigger from Performance Triggers?
A. No, sir.
Q. Okay. And so who did you talk to about buying Performance Triggers at that point?
A. Chris.
Q. Chris Rios?
A. Uh-huh.
Q. Okay. And you guys came to an agreement.
And as Mr. DeMonico opined, it was a fantastic deal; right?
A. Yes, sir.
Q. Do you know why it was such a fantastic deal?
A. Yes, sir.
Q. Why is that?
A. Because the website wouldn't allow me to sell everything like it was when I first got it.
Q. Okay. What was your understanding of the amount of revenue -- the percentage of Performance Triggers' revenue steam that was coming from Forced Reset Triggers market at that point?
A. At that point I really don't know exactly off the top of my head.

Q. You heard Mr. DeMonico mention something about $6.7 million done in 2025.

Do you think a lot of that had to do with Forced Reset Triggers or was it other products?

A. It was other products as well.

Q. Okay. But was the bulk of that from the forced reset market?

A. Probably so.

Q. And how much business is Performance Triggers doing today?

A. We still doing business. Yeah, we doing business.

Q. Are you doing the same volume?

You know, are you doing 100,000 a week, or are you doing --

(Indiscernible crosstalk.)

A. Not 100,000 a week, no.

BY MR. SMITH:

Q. Would you say you are doing about 12, 15,000 a day?

A. A day?

Q. Yeah.

A. No. Not no 12, 15,000 a day, no.

Q. Do you project that Performance Triggers is going to reach anywhere near $6.7 million this year?

A. No, sir.

Q. Why not?

A. I don't see it reaching that high. I'm not doing numbers like that.

Q. Okay. And to be clear, when you bought Performance Triggers, did you buy any inventory from Tony McKnight, Douglas Rios, or Sherrie McKnight?
A. No, sir.
Q. Did you by any inventory from Chris Rios?
A. No, sir.
Q. Any inventory that's currently in the warehouse, when was it purchased?
A. Within the past two months or months ago.
Q. And you said a lot -- sometimes you'll get orders in and you will call your vendor or your supplier and they will dropship those to the customer?
A. Yes, sir.
Q. Is that a common practice in the e-commerce business?
A. Yes, sir.
Q. Okay. Is that how you've operated Bump Fire?
A. Yes, sir.
Q. When did you set up the Bump Fire website?
A. I don't know the exact dates and time.
Q. Has it been more than a year?
A. Yes, it has been at least a year.
Q. Okay. So long before this case ever started?
A. Yes, sir.
Q. Okay. Were you selling Forced Reset Triggers on Bump Fire?
A. Yes, sir.

Q. Then what was the purposes of buying Performance Triggers if you had Bump Fire?
A. Because of the name.
Q. So it's your understanding that Performance Triggers had a name recognition out there?
A. Yes, sir.
Q. Okay. And before you bought Performance Triggers, comparatively how much business were you doing in the forced reset market through Bump Fire versus what you do with Performance Triggers?
A. Not the same.
Q. Who --
A. Well, Performance Triggers makes more money.
Q. Make more money?
A. Uh-huh.
Q. And has that been true since you took it over?
A. Yes, sir.
Q. Okay. In terms of your some of the other employee, do you have someone that does customer service?
A. Yes, sir.
Q. Who does customer service for you?
A. Samantha.
Q. Where is Samantha located?
A. She works from home, so I don't know exactly where she's located.

Q. Is she in Florida or is she somewhere else that you know of?
A. I don't know exactly, but yeah.
Q. Do you take any direction from Samantha --
A. No.
Q. -- in how you operate Performance Triggers?
A. I don't take no directions from her, no.
Q. Do you take any direction from Eva Gregorvic?
A. I take directions from her? No, I don't take directions from her.
Q. Does Anthony McKnight provide any direction to you on the operation of Performance Triggers since you bought it?
A. No.
Q. Does Doug Rios provide any direction to you --
A. No.
Q. -- on Performance Triggers since you bought it?
A. No, sir, he don't.
Q. Does Sherrie McKnight provide any direction to you on Performance Triggers since you bought it?
A. No, sir, she doesn't.
Q. Does Chris Rios provide you any direction on how to operate Performance Triggers?
A. No, sir, he doesn't.
Q. So this is your operation?
A. Yes, sir.

MR. SMITH: Nothing further, Your Honor.

THE COURT: Any redirect?

MR. ROTH: Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. ROTH:

Q. Mr. Robinson, for the warehouse address, 6915 Northwest Boulevard -- I'm sorry -- Northwest 4th Boulevard, do you pay rent?

A. Say it again?

Q. Do you pay rent?

A. Everything is together, yes, sir. I don't do it physically myself, but when I took over things, everything still going on.

Q. Who -- who do you pay rent to?

A. Like I said, I don't take care of it specifically myself.

Q. So you don't know --

A. Yes.

Q. -- who you pay rent to?

A. Uh-huh.

Q. You don't know how much the rent is?

A. No, sir, I don't.

Q. Okay. Do you know who in your business handles that?

A. Yes. I can get you the information to it (indiscernible).

Q. Do you know right now?

A. Eva. Eva, she be able to help me out with that.

Q. Would it be Eva Gregorvic or Ivanka Toneva?

A. Well, both of them will be able.
Q. Either one of them could be the one who does it?
A. Yes.
Q. Okay. Do you know all the places that Ben gets FRTs from?
A. Not everywhere.
Q. Does he check in with you about it or does his own thing?
A. He does his own thing -- just as I do my own thing, too -- and we'll meet somewhere in the center.
Q. Okay. And the purchase price of $275,000 -- I understand what's been said about the value of Performance Triggers being lower for the other people because they couldn't sell.
Why would you pay so little if you can use it without restrictions?
Isn't it worth more to you?
A. What you mean "more"?
Is it worth more to me than it is to somebody else?
Q. Worth more than $275,000?
A. I mean, it can be worth a billion dollars. That don't mean that's what I bought it for.
Q. Was there any restriction on your ability to sell when you got it?
A. Stopping me from selling it?
Q. Yeah.
A. Yes, because I wanted to keep the business.
Q. I want to clarify what I asked. The people who sold you

the business --
A. Uh-huh.
Q. -- the price they gave you was lower because they said they couldn't sell?
A. Yes.
Q. When you bought it, there was nothing stopping you from selling; right?
A. Uh-huh.
Q. So you could do a lot more business with the website when you got it?
A. Yes.
Q. But the price was still low like they couldn't sell it?
A. I'm lost. What you trying to say?
Q. I've made my point for my purposes. I think we are good.
MR. ROTH: I don't have anything more.
Thank you.
THE COURT: Mr. Robinson, the price you agreed to pay for this was $275,000?
THE WITNESS: Yes, sir.
THE COURT: Has it been paid?
THE WITNESS: No, sir.
THE COURT: How much, if any of it, has been paid?
THE WITNESS: I paid $50,000 of it so far.
THE COURT: Where did you get the $50,000?
THE WITNESS: Me. I have it.

THE COURT: Money you had?

THE WITNESS: Yes, sir.

THE COURT: What's the arrangement for the other 225?

THE WITNESS: As time goes on I just pay more and more.

THE COURT: Is there any agreement about when you'll pay him?

THE WITNESS: We say we going to pay -- we haven't set an exact number, but we said we'll see every month and we'll go from there.

THE COURT: So every month depending on how the business is doing --

THE WITNESS: Business is doing, that's how we do it.

I'm sorry about that, cutting you off, yeah.

THE COURT: Depending on how the business is doing, you'll pay him some money towards the 275?

THE WITNESS: Yes, sir.

THE COURT: What's the interest rate?

THE WITNESS: We don't have an interest rate.

THE COURT: To pay the 50 did you have to liquidate something or did you have the money sitting in a bank somewhere?

THE WITNESS: I had the money myself. I do a lot of cash and stuff with gun shows and stuff I do. I do a lot of traveling with gun shows and stuff.

THE COURT: Are you a licensed firearms dealer?

THE WITNESS: I'm not a licensed firearms dealer, no, sir.

THE COURT: When you sold FRTs through Bump -- let me start over. Better way to say it: When Bump sold FRTs before you took over Performance Triggers, how did you fill those orders?

THE WITNESS: It was the same way.

THE COURT: Well, Ben didn't work for you, did he?

THE WITNESS: No, but I was getting help with other people selling them.

THE COURT: Who were the other people that were --

THE WITNESS: I was still getting help with Ben and stuff like that.

Like I said, I've been around all those people. So Ben had helped me out to do something like that.

THE COURT: So Bump had an ongoing business where Bump was selling FRTs. And to fill orders, Ben did it?

THE WITNESS: My whole team. It wasn't just strictly Ben.

THE COURT: Was anybody on your team that's not on your team now?

THE WITNESS: No, sir.

THE COURT: Was anybody on your team that was not on Performance Triggers' team?

THE WITNESS: I -- I'm not sure. I would say no.

THE COURT: You gave W-2s to any employees at the time when --

THE WITNESS: W-2, like a 10-9 -- you know, they file their own taxes and stuff like that.

THE COURT: All right.

(Indiscernible crosstalk.)

THE COURT: So you did 1099s?

THE WITNESS: But, like I said, there's people in place that does all that, that took care of all that stuff.

THE COURT: And was it still Eva that did it?

THE WITNESS: Yes. I'm pretty sure they took care of all that stuff, yeah.

THE COURT: So at that point --

THE WITNESS: A lot of stuff -- I'm sorry -- but a lot of stuff that was going on didn't change when I came into it. I was just -- you know, certain stuff -- my main thing was still the Internet and the other side.

THE COURT: You have any other financial deal as part of this other than that you are going to pay -- that you already paid 50,000, that you are going to pay 225,000 as warranted based on the amount of business?

Any other financial deal?

THE WITNESS: No, sir.

THE COURT: Does Mr. McKnight or Ms. McKnight or either of the Rioses get any money from Performance Triggers or

from you other than any payment you make toward the $225,000 debt?

THE WITNESS: No, sir.

THE COURT: Have you made any payment yet toward the 225,000?

THE WITNESS: Not yet.

THE COURT: PTI Worldwide was referred to on one of those websites you were shown.

"PTI" means Performance Triggers Internet?

THE WITNESS: I mean, I don't know exactly, to tell you the truth.

THE COURT: I may have this wrong, so don't let me put words in your mouth.

THE WITNESS: Yes, sir.

THE COURT: But I think what you told Mr. Roth earlier was there was a brief time when there were no FRTs for sale --

THE WITNESS: Uh-huh.

THE COURT: -- on the Performance Triggers website?

THE WITNESS: Uh-huh.

THE COURT: True?

THE WITNESS: Yes.

THE COURT: Who put them back on the website?

THE WITNESS: I guess the Internet guy, one of the people that does the stuff for the Internet, exactly like the web page.

THE COURT: Same web guy that works for --
THE WITNESS: Yes, sir.
THE COURT: -- the McKnights?
THE WITNESS: Yes, sir.
THE COURT: I think that's all I have.
Questions just to follow up on my question, Mr. Roth?
MR. ROTH: No, Your Honor.
Thank you.
THE COURT: Mr. Smith?
MR. SMITH: Just a couple, Your Honor.

FURTHER EXAMINATION

BY MR. SMITH:
Q. Mr. Robinson, is an FFL, firearms license, required to sell FRTs and other firearm parts?
A. No, sir.
Q. And the web guy that you mentioned that put these back up, did he put the performance -- the products back on the Performance Triggers website after you acquired it?
A. Yes, sir.
Q. And does he work for just Performance Triggers or does he work for a number of different companies?
A. He work for a number of different companies.
Q. So he's more of a web developer and not really an employee of Performance Triggers?
A. Yes, sir.

MR. SMITH: No further question, Your Honor.

THE COURT: Well, do you suppose the web developer decided for himself what to put on the website --

THE WITNESS: No.

THE COURT: -- or do you suppose somebody told him?

THE WITNESS: I got to tell him, yes.

THE COURT: Did you tell him?

THE WITNESS: I mean, we told him to put the triggers and FRTs, and stuff like that; yes, sir.

THE COURT: "We" told him --

THE WITNESS: I mean --

THE COURT: Who is "we"?

THE WITNESS: Me, the team, like Eva, you know, us. We told him, like, Hey, we just going to start selling these now.

THE COURT: Well, who told him? Do you know which of those?

THE WITNESS: I mean, I told him, too. Like, we was all there. We were like, Yeah, we can get this back and running now, so put everything back up. That came out of my mouth.

THE COURT: So it was a meeting with a bunch of you present?

THE WITNESS: Not a lot of us. It was a couple of us.

THE COURT: Where was the meeting?

THE WITNESS: At the warehouse.

THE COURT: I did want to ask one thing. The merchant account, do you get money from the merchant account?

THE WITNESS: Yes, sir.

THE COURT: Does anybody else get money from that merchant account?

THE WITNESS: No, sir.

THE COURT: So the merchant account that exists right now, you've got control over.

I take it the credit card company, or whatever, gets paid their fee out of it?

THE WITNESS: Uh-huh.

THE COURT: But the net left over, all of that is yours?

THE WITNESS: Yes, sir. It goes in my account.

THE COURT: And so if -- and they had some bank records earlier, but they got them awhile ago.

If you went to the bank today, the only person authorized to get money from that merchant account would be you?

THE WITNESS: No, sir.

THE COURT: Are you at least on the merchant account?

THE WITNESS: Hold on. The merchant account?

THE COURT: Yeah.

THE WITNESS: Yeah, I'm not on the merchant account. I'm talking about my bank account. I'm not the only one on the bank account.

THE COURT: And that's the 8088 account that we had up here earlier?

THE WITNESS: I don't think that's that account.

THE COURT: A different account; you've got your own account?

THE WITNESS: I got my own account.

THE COURT: The merchant account where all the revenue goes from the sales that are being made --

THE WITNESS: Uh-huh.

THE COURT: -- are you on that account?

THE WITNESS: I don't think I'm -- my name is personal on that account.

THE COURT: Do you get money from that account?

THE WITNESS: Yes, because the way -- like I said, I don't know everything behind the scenes when it comes to the merchant account. Eva and -- you know, they take care of that part.

I didn't just jump in and, Oh, what's this merchant account? and put my name on it. I didn't jump in on it like that.

It was like everything that was, like, lined up and stuff that was already going, I just -- I mean, basically I didn't jump in and try to -- you know, if it was going right, I just went along with it.

THE COURT: Well, the way it used to go was the

money -- the people that would get the monies were the McKnights and the earlier entity.

Did you buy the entity?

THE WITNESS: The entity?

THE COURT: Buy the corporation?

THE WITNESS: The Performance Triggers? Yes.

THE COURT: And so -- all right. One more time -- I asked some new questions, so one more time. And don't feel like you have to ask any more questions, but you get an opportunity, if you wish.

Mr. Roth, anything further?

MR. ROTH: Yes, Your Honor, briefly.

FURTHER EXAMINATION

BY MR. ROTH:

Q. Mr. Robinson, you referred to a web guy.

What's the name of the web guy?

A. I can't think of his name right now.

Q. He came from Performance Triggers though?

A. Yes.

Q. And with regard to the entity Performance Triggers, do you know whether Performance Triggers, Inc., was dissolved?

A. As far as -- go ahead.

Q. Did you know that Performance Triggers, Inc., was dissolved in November 2024?

A. I don't know about -- I don't -- I know about

Performance Triggers website. You mean -- you saying "dissolved" saying...

Q. Just making sure that we don't have crosstalk, so I'll pick up on that.

When I say "dissolved," I mean a corporate entity --

A. Uh-huh.

Q. -- that was brought into existence, registered with the State, and then someone filed something to make it no longer registered with the State.

Did you know that Performance Triggers, Inc., was dissolved in November of 2024?

A. No.

Q. Did you know that C&C Holdings Group, LLC, was dissolved?

THE COURT: That's beyond my questions.

MR. ROTH: Fair enough, Your Honor.

THE COURT: Mr. Smith, anything to follow up on my questions?

MR. SMITH: Yes, Your Honor, just one.

FURTHER EXAMINATION

BY MR. SMITH:

Q. I just want to clarify, Reggie, did you buy the Performance Triggers' website and all of the assets associated with that website, or did you buy Performance Triggers, Incorporated?

A. I bought the website and everything that was with the

website.

MR. SMITH: Thank you.

No further questions.

THE COURT: Thank you, Mr. Robinson.

You may step down.

(Mr. Robinson exited the witness stand.)

THE COURT: Please call your next witness.

MR. ROTH: Your Honor, we'd like to call Douglas Rios.

(Mr. Douglas Rios entered the witness stand.)

**DOUGLAS RIOS, PLAINTIFF'S WITNESS, DULY SWORN.**

THE COURTROOM DEPUTY: Be seated, please.

For the record, please state your name and spell your last name for the record.

THE WITNESS: Douglas Rios, R-i-o-s.

THE COURTROOM DEPUTY: Thank you.

DIRECT EXAMINATION

BY MR. CONTARINO:

Q. Mr. Rios, a preliminary injunction was entered last month by this Court; right?

Is that a "yes."

A. Yes.

Q. And what steps did you take to comply with it?

A. What is that? What? Sorry.

Q. What steps did you take to comply with it?

A. I'd like to say something.

THE COURT: No.

(Indiscernible crosstalk.)

THE COURT: You can answer the question.

BY MR. CONTARINO:

Q. Answer the question.

A. I didn't have to take any steps.

Q. Okay. And is that because -- are you saying before the preliminary injunction entered by this Court you were not profiting in any way from the sale of FRTs?

A. No.

Q. You are not saying that?

A. Can you repeat the question?

Q. Sure.

Were you in any way profiting from --

THE COURT: You ask a question with that kind of negative, you can't tell when he says "no" what the answer was. So if you'll rephrase that, you'll get an answer you can work with.

BY MR. CONTARINO:

Q. Were you profiting in any way from the sale of FRTs before the preliminary injunction was entered by this Court?

A. Yes.

Q. Okay.

A. Yeah.

Q. How was -- how were you profiting by them?

A. I was selling FRTs.
Q. Okay. So then when I asked before what steps you took to comply with it, do you have a different answer now?
A. I left Performance Triggers in November of 2024.
Q. Okay. So after you left Performance Triggers, is your testimony that you since that time have not profited in any way from FRTs?
A. No.
Q. Okay. So up until what point were you profiting from FRTs?
A. I started profiting in FRTs again around September of 2025.
Q. Until when?
A. Probably, like, early January.
Q. Early January. Okay.
Around January 12th, does that sound about right?
A. When -- probably the first week of January, yeah.
Q. Anything lead to your stopping the profiting from the sale of FRTs?
A. That Performance Triggers couldn't -- I guess couldn't sell them anymore.
Q. Okay. So the arbitrator's preliminary injunction; right?
A. I'm not really sure which one it was.
Q. Okay. Are you profiting in any way from the manufacture of FRTs presently?
A. From the manufacture?
Q. Yeah, making them. Not selling them, but making them?

A. No.
Q. Okay. When was the last time that you did profit from making or manufacturing Forced Reset Triggers?
A. When you mean "manufacturing," I don't manufacture. Do you mean, like, importing?
Q. Yeah, in the creation process, the manufacturing process, correct.
A. Before I stopped selling in January.
Q. Okay.
THE COURT: While Mr. Contarino works on the next question, let me ask one while it's fresh in my mind.
You said you left Performance Triggers in November 2024, but then you did profit from FRTs from September 2025 until early January.
Was that unrelated to Performance Triggers? And if so, what entity were you doing that through?
THE WITNESS: I was running it through We Got Ammo.
THE COURT: All right. So no involvement with Performance Triggers after November 2024, but you were --
THE WITNESS: I've supplied Performance Triggers with FRTs, yes.
THE COURT: More recently?
THE WITNESS: From September until around January.
THE COURT: And when you said you were doing it, the entity you were doing it through was We Got Ammo?

THE WITNESS: Yeah.

THE COURT: Got it.

Thank you.

BY MR. CONTARINO:

Q. We looked earlier at some financials for Performance Triggers and it shows quite a few payments from Performance Triggers' bank account to We Got Ammo. I believe it's about $750,000.

What does that $750,000 -- what was that paid for?

A. Different things. You'll see that there's $1,500 over and over again. That's when I was with Performance Triggers, you know, working there.

A lot of development costs. You know, tooling costs money. We had to tool up for the G-Flex. We had to tool up for other triggers that we made. So pretty much development cost, inventory, and part of that was kind of like my salary.

Q. Okay. And that was up until 2024.

What about from 2024 when you left Performance Triggers until, I guess, January of this year?

A. They were just another vendor. I sold them binary triggers, parts, magazines, yeah.

Q. In the text message with Mr. Baker that we looked at before -- I can pull it up --

THE COURT: Give us the exhibit number if you have it.

MR. CONTARINO: P39.

BY MR. CONTARINO:
Q. Here it says that you wish you had not signed the agreement with Rare Breed; you can't ever sell an FRT, but you can invent and patent and receive a royalty.
That statement refers to FRTs; correct?
A. Yes.
Q. Are you presently inventing or patenting or receiving a royalty for any FRTs?
A. Absolutely not.
Q. Do you have an understanding of the brand PTI?
A. Not really. I think it's just a -- I don't think it's really a brand. Whenever I was there, it wasn't really -- we'd import a magazine and we'd call it "PTI." You know, it was really like a manu -- like an in-house thing, yeah.
Q. Okay. So fair to say that represents the import triggers?
A. I wouldn't say import triggers, but probably, you know, like we had, like, PTI -- I don't know. What was it?
Like, we had the PTI Vlad trigger that was just a drop-in AK trigger. We had the PTI AK mags, AR mags, and they were branded PTI, yeah.
Q. The Super Selektor PTI version, do you have an understanding if that's an import?
A. I'm not sure.
Q. Do you know who would know that?
A. I guess whoever is running Performance Triggers.

Q. Well, we heard earlier that is not the case.
I'm calling to the screen what's been marked as P43.
Mr. Rios, I want you to take a look at this.
Were you able to look at it?
A. Yeah.
Q. And then you see a -- I'll magnify it, but the bottom right here you can see Bates numbers?
A. Yeah.
Q. Okay. Do you know a name Zumot?
A. Yes.
Q. Who is that?
A. Omar worked for Big Daddy, Omar Zumot.
Q. Okay. So this is a text message between you and Omar?
A. It's a four-year-old text. I mean, I couldn't tell you. It looks like it.
Q. It looks like it? Okay.
A. Yeah.
Q. Would you read under the February 16, 2022 timemark, that text?
A. *Hey, do you know if Tommy got a cease and desist?*
*I ask because they sent one to Hoffman Tactical on a 3D-printed drop-in FRT kit.*
*Technically, if Rare Breed picks and chooses who they go after, their lawsuit against us can be nulled. They have to go after everyone.*

Q. And then Omar responded what?
A. *I'll call Tommy and ask him today.*
Q. And then you responded to Omar with that?
A. *Okay. Because if that's the case, we need to overwhelm them.*
Q. "Overwhelm them"; What did you mean there by "overwhelm"?
A. I don't remember the context of the text, but, you know, we were at war with Rare Breed. I'm sure they were trying to overwhelm us, and we were trying to do the same.
Q. It wasn't overwhelm them with as many products as possible?
A. I don't know. I don't know.
Q. Could it have been anything else?
What else could it have been?
A. I can't tell you what I did for Christmas two years ago. This is a four-year-old text, like 2022, February. Like, I don't know.
MR. CONTARINO: I'd like to move to admit P43, Your Honor.
THE COURT: P43 is admitted.
(PLAINTIFF'S EXHIBIT P43: Received in evidence.)
BY MR. CONTARINO:
Q. I'm calling up P21. This has been admitted already. It's the merchant account for Performance Triggers.
You're listed as the name for the principal information there; right?

A. Yes.
Q. And the checking account is the Performance Triggers checking account that we looked at.
All records of financials for Performance were this checking account; correct?
A. Yes.
Q. What's the process that you go through to open a merchant account?
A. The merchant wasn't opened by me, but you -- you got to find a merchant. You have to give them your estimated sales, business address, EIN. They run your social. And then they kind of make a risk assessment of if they are willing to take you or not.
Q. Okay. Based on that information they give you?
A. Yeah.
Q. Okay. The social security number here under your information, is that yours?
A. No.
Q. Whose is it?
A. I have no idea. My social ends in 7039.
Q. So an incorrect social security number was used to run --
(Indiscernible crosstalk.)
BY MR. CONTARINO:
Q. -- through this checking account with you as principal; yeah?

A. I'm answering: That's not my social.
Q. I'm going to call up P08. This is the certified annual report for Performance Triggers.
And this has you as owner as of 4-30-2024; yeah?
A. Yes, sir.
Q. And you were the owner at that point?
A. Yes.
Q. Anyone else the owner?
A. No. I mean, I don't think so. On paper it was me.
Q. This principal place of business, would you read that for us?
A. 4505 Kenny Road, 1102.
Q. In Kenny, Ohio?
A. Kenny, Ohio; yeah.
Q. Is Kenny, Ohio -- does that exist? Is that a municipality in Ohio?
A. Listen, I didn't set up a lot of this stuff, but I know that Kenny -- the Kenny Road, Ohio, is like a Staples or like a pack and ship place, or a FedEx, or something.
Q. Okay.
A. But I know that a lot of businesses use their principal addresses as, you know, like, virtual offices and stuff.
Q. At a Fed-Ex mailbox?
A. I think this is a Staples.
Q. At a Staples mailbox?

A. I believe so.
Q. Any employees work there for Performance Triggers at --
A. No.
Q. -- the principal place of business?
A. No, not that -- I mean, back then at Kenny Road?
Q. Correct.
A. No.
Q. So what's the purpose of that?
A. I'm not really sure. I didn't set it up.
Q. But you are the owner of Performance Triggers at this time; yeah?
A. Yeah.
Q. Aside from Performance Triggers and selling FRTs on there when you were part of Performance Triggers, what other websites have you had any involvement with that have sold FRTs at any point?
A. None.
Q. None?
A. None.

MR. CONTARINO: Okay. That's all I have.

I reserve for redirect.

THE COURT: Cross?

CROSS-EXAMINATION

BY MR. SMITH:

Q. Mr. Rios, Mr. Contarino just showed you a text from

February of 2022, do you recall that, with Omar Zumot?

MR. SMITH: Can we bring that back up, please?

P43, I believe it is.

Scroll down, please.

And blow that up.

BY MR. SMITH:

Q. Okay. So the date down there is February 18, 2022.

So this is -- after the first lawsuit was filed, do you know -- do you recall whether the initial preliminary injunction had already been set aside by that time or not?

A. I don't remember when exactly the first preliminary injunction was.

Q. Was vacated?

A. Yeah.

Q. But at that time there had been no settlement of these patent infringement cases with Rare Breed?

A. No. I remember we settled in, like, October.

Q. So in February you were still -- you and Big Daddy were still free to sell all the FRTs you wanted because it was an active litigation, provided that the original preliminary injunction had been set aside?

A. I think so, yeah.

Q. So is that what you mean when you say that you need to "overwhelm them"?

A. I might have.

Q. Just trying to --
A. Yeah.
Q. -- sell as many of them as you can while you can?
A. Yeah, I might have. Like I said, we've been at war for a while. I'm sure they want to overwhelm me, and at the time we were doing the same. That's just the honest truth.
Q. Okay. You said you left Performance Triggers in -- I believe it was October, November, 2024?
A. Yes.
Q. You left about the same time it was dissolved?
A. About a month and a week before.
Q. Okay. Why did you leave Performance Triggers?
A. I just wanted to do my own thing. I wanted to just focus on what I'm good at.
Q. And you said "We Got Ammo." That's another company that you own?
A. Yes.
Q. And what does that company do?
A. We do a lot of imports and a lot of exports. We export guns all over the world.
Q. Okay. And that's firearms, parts, triggers --
(Indiscernible crosstalk.)
A. I don't really export triggers. We export a lot of accessories, cites, and we get permits from the Department of Commerce and we ship a lot of guns.

BY MR. SMITH:
Q. And was We Got Ammo a vendor to Performance Triggers after you left?
A. Yes.
Q. And what were you selling to Performance Triggers?
A. Man, we got a container of parts with probably 50 different SKUs from ammo cans to Glock mags, Sig mags, H&K stuff, G-Flex triggers, triggers that I helped develop.
Q. Okay. Were you selling -- Performance Triggers -- any FRTs?
A. Not until September of 2025.
Q. Okay. And what prompted you to start selling them in September of 2025?
A. Well, I sold them Super Safeties. I didn't think that Super Safeties violated the '223 patent. And it's a safety; it's not a trigger. It's not a fire-controlled grip, so I figured it was good to go. And, honestly, I needed cash. This is costing a lot.
Q. And when did it first come to your mind that somehow selling the Super Safety or the Super Selektor somehow would violate the settlement agreement you had with --
A. I never sold the Super Selektor.
Q. Okay.
A. I sold Super Safety.
What was your question again?

Q. When did you first learn that that could specially violate the settlement agreement you had with Rare Breed Triggers?
A. Oh, when we got -- I mean, when we got sued. Initially, it was for the -- first Atrius, and then it was everything else. I guess as the lawsuit progressed and they started adding more and more stuff, that's where I was like, Damn, I thought Super Safeties were good to go.
Q. Okay. So once you learned that you couldn't sell Super Safeties under the settlement agreement, or at least under the injunction issued by the arbitrator, did you continue to sell FRTs to Performance Triggers?
A. I didn't continue selling forced reset safeties to Performance Triggers, no.
Q. Since the entrance of the injunction by the arbitrator in January -- well, let's say by early February, were you selling any Forced Reset Triggers or parts?
A. What was that again?
Q. Since the preliminary injunction went into effect after the posting of the bond on February 27th, have you sold any Forced Reset Triggers to anyone?
A. No Forced Reset Triggers.
Q. Have you sold any Forced Reset Trigger parts to anyone?
A. No.
MR. SMITH: No further questions, Your Honor.
THE COURT: Redirect?

MR. CONTARINO: Just briefly.

REDIRECT EXAMINATION

BY MR. CONTARINO:

Q. You were just mentioning the importing of triggers.

What are the overseas manufacturers that you've used to import triggers into the United States?

A. What type of triggers?

Q. Any?

A. Any. I've used AC-Unity, obviously. I have a couple other vendors in Turkey and --

Q. What's the name in Turkey?

A. I couldn't tell you off the top of my head. I think it's called, like, Bilsa. We did a couple of orders with them.

THE COURT: Spell it as best you can.

THE WITNESS: Bilsa, B-i-l-s-a.

A. We import the binary triggers from Taiwan.

BY MR. CONTARINO:

Q. What company is that?

A. What the hell is it called? Formosan.

THE COURT: And can you spell that?

THE WITNESS: F-o-r-m-o-s-a-n.

BY MR. CONTARINO:

Q. And you mentioned a couple entities in Turkey.

One was the Bilsa and then what's the other?

A. You know, I've done a lot of business in imports, and a lot

of the imports that I've done is also ammunition. I've imported a lot of ammo from Turkey, specifically ZSR.

Q. Same question but for the continental United States.

What manufacturers have you, if you have?

A. What -- what was that?

Q. Within the United States, same question: Which manufacturers have you used to purchase --

A. I don't think I've used manufactures. I think I've used distributors.

Q. And which distributors?

A. For FRTs?

Q. Yeah.

A. I can't tell you off the top of my head, man.

I mean, FRTs are everywhere. You know, if you go to a gun show, there's 25 guys selling it. I mean, anybody could go buy a 100 bag or 200 whenever. They are flooded.

Q. You don't have one that you bought in bulk more than others?

A. No, no.

MR. CONTARINO: That's all I have.

Thank you.

THE COURT: Mr. Smith asked you -- I think it was his last question -- whether you had sold any FRTs or FRT parts since the entry of the preliminary injunction.

THE WITNESS: Yeah.

THE COURT: I want to make sure that I've covered the breadth of that question.

THE WITNESS: Yeah.

THE COURT: As you know from having been involved in this litigation, there are differences of opinion about what's an FRT and an FRT part and --

THE WITNESS: Sure.

THE COURT: -- so forth. You referred to that in one of your answers.

THE WITNESS: Sure.

THE COURT: I want you to take the broadest possible interpretation of that, what your adversaries would say is a prohibited product or an infringing product.

THE WITNESS: Yeah.

THE COURT: If you interrupted it that broadly, since the entry of the preliminary injunction have you sold any of that?

THE WITNESS: Of the prohibited products? No.

Today we were going through, like, what's allowed to be sold and what's not. I've sold a lot of triggers, uncut triggers that are -- I guess people use them to convert them into Forced Reset Triggers, but I don't ask questions. Mr. DeMonico today said those are good to go. So, yeah, those I did.

But they are not -- they don't infringe on them and

they are not part of the settlement agreement and they are not -- that's not an FRT.

THE COURT: Those are things that Mr. DeMonico said were okay?

THE WITNESS: Yes.

THE COURT: But things that -- for example, the list that Mr. DeMonico went through with you here in the courtroom saying we were not okay, you haven't --

THE WITNESS: I've never sold a TX22. I've never sold a Glock. I would not touch a Glock FRT. I've never sold any of those.

THE COURT: Never sold anything that he listed?

THE WITNESS: Beside the Super Safety up until the first week of January.

THE COURT: Thank you.

Just questions to follow up on mine?

MR. SMITH: Just a couple, Your Honor.

THE COURT: Before you do that, let me ask another question.

Mr. Rios, this is probably beyond the scope of what anybody asked you. What do you know about who is running Performance Triggers now?

THE WITNESS: Reggie and his team.

THE COURT: You sat here and listened just as I did. Mr. Robinson -- I get it that things go on at a company that the

guy that's running it doesn't know about. The bigger the company, the more things that go on at the company that the guy at the top doesn't know about.

But there's a lot of stuff that Mr. Robinson didn't know about. Somebody there has to be making some decisions that Mr. Robinson didn't know about.

Is it just the same people that were at Performance Triggers before the sale?

THE WITNESS: Mr. Robinson bought a key turn [sic] business that was, like, a business that ran. It didn't really need, like, an owner. So with the sale came all that.

Mr. Robinson is good at sales and marketing, and that's really all he needs to be good at, I guess.

THE COURT: All right. So from your perspective, he bought the turnkey operation and kept it going?

THE WITNESS: Sounds like it, yeah.

THE COURT: All right. Now, questions to follow up on mine?

MR. SMITH: Sure.

FURTHER EXAMINATION

BY MR. SMITH:

Q. Mr. Rios, you mentioned AC-Unity.

What was AC-Unity manufacturing for you?

A. When?

Q. Let's start with the first lawsuit.

Were they the manufacturer of the WOT?
A. They were the manufacturer of the WOT.
Q. When did they stop manufacturing the WOT?
A. Damn, they stopped manufacturing the WOT, I would say, November 2021.
Q. Okay. And what other product -- did they -- let me make this short.
Did AC-Unity manufacture any other FRTs or FRT parts under the definition -- the broader definition used by plaintiffs for you or for Performance Triggers?
A. Not that I imported, not for me. I don't know if they work with other people.
Q. Okay. So the same question for your Turkish manufacturers: Did any of them manufacture FRTs or FRT parts for you that you imported?
A. No.
Q. Do you know if they did for Performance Triggers?
A. No, they wouldn't have for Performance Triggers because my duty in Performance Triggers was to find products to sell.
Q. Okay. Did -- and then, finally, your Taiwanese manufacturer, did they produce any FRTs or any FRT parts?
A. They don't touch that stuff.
MR. SMITH: No further questions, Your Honor.
THE COURT: There's one more I should have asked you earlier.

The records that we have from the Capital City Bank account have you still on the account.

THE WITNESS: Yeah.

THE COURT: Are you still on that account?

THE WITNESS: I'm -- it was -- the paperwork is sloppy, Your Honor.

And whenever I left, you know, it was kind of like a, Hey, I'm going to go do my own thing. And I guess some things stayed open; some things didn't get closed down. But in all reality, Performance Triggers was just a vendor. I have many vendors after that.

THE COURT: You may still be on the signature card for that bank account, but you haven't taken any money out or put any money in since you left Performance Triggers?

THE WITNESS: Absolutely not.

THE COURT: Got it. All right.

Mr. Roth -- or Mr. Contarino? I'm not --

THE WITNESS: I haven't taken any money out, but Performance Triggers has purchased products from We Got Ammo.

THE COURT: Got it.

THE WITNESS: Okay. Yeah.

THE COURT: And may have paid you with a check out of that account?

THE WITNESS: No, it would have been a wire.

Did I ever show up to the bank to pull money out,

absolutely not.

THE COURT: So you may have been wired money out of that account?

THE WITNESS: Yeah, I have been wired.

THE COURT: But you don't have to be on the signature card to get paid on an account?

THE WITNESS: Exactly.

THE COURT: Got it.

Okay. Any further questions just to follow up on mine?

FURTHER EXAMINATION

BY MR. CONTARINO:

Q. When you left to do your own thing, you left Performance Triggers, were you paid any severance? Were you given anything, or were you just --

A. I left with a -- I left and Tony owed me some cash, and he has paid me, you know, over time.

Q. And that was owed for what?

A. Mainly -- man, for ammunition, to paying Black Rambo, to paying influencers, to development costs; you name it.

Q. When you said that you had FRTs ready to go to Josh Baker what -- and that -- that was not 2022, that was 2025, so last year.

What FRTs are we talking about?

A. What date in 2015?

Q. February.
A. I didn't -- I didn't get into FRTs truly until September of 2025.
Q. So you said you had FRTs ready to go in February but didn't do anything with them?
A. Yeah. And I'm under oath right now and I'm telling you, like, no, in February they didn't have FRTs ready to go.
Q. So you are just blowing smoke with Baker?
A. You know, the thing with Baker is he was my friend, you know. Like, we were -- I don't know what the reason is behind everything that's happened, but me and Baker did a lot of business. Whenever -- I have a text message with Baker where he wanted to go into the business with me and we wanted to start our own e-commerce business, you know.
So, maybe -- you know, maybe I was showing off. I don't know.
But it's clear that I told him that I can't make Forced Reset Triggers. I can prove through other texts with other people from 2024, 2023, where I would say -- people are asking me about FRTs where I'm like, I can't touch them.
But I do think that the Super Safeties -- I didn't think they were covered by the original injunction, so I thought it was good to go. And I had a couple of months where I could make money and pay for these lawsuits, and I did it; yeah.
Q. And those records that you are talking about, have you

provided those in litigations?
A. I don't think my lawyer has asked me for it.
Q. Okay.
A. Yeah.
Q. The graph that we saw before with the revenue for Performance Triggers, you saw that?
A. Yeah.
Q. Do you --
A. The 6 million one?
Q. Yeah. 2025 was the 6.7 million.
A. Yeah, yeah.
Q. That was produced by respondents.
Do you have any idea where that came from?
A. Who made it?
Q. Correct.
A. Who produced it?
Q. Yeah.
A. Whoever is running Performance Triggers. I can't produce it.
I'll put it like this: If somebody had a gun to my wife's head from 2024 October up until today and told me, You have to log in to Performance Triggers and you have to do something on whatever program they are using to manage the inventory, I wouldn't be able to do it. And I wouldn't have been able to do it from 2024 to now.

Q. Okay. Your brother could though; right?
A. No.
Q. No? He's the owner of C&C Holdings that owned Performance Triggers' website, but he couldn't get into it?
A. On paper he was the owner of Performance Triggers, yes.
Q. Okay. What do you mean by that?
A. My brother had to sign the agreement in order for the sale of Performance Triggers to be valid.
Q. Okay. But he didn't really own it in --
A. At some --
Q. -- in practice?
A. -- point we were both in there and, you know, grinding it out and working. And we were co-owners, yeah.
BY MR. CONTARINO:
Q. When did his co-ownership end?
A. With me, when he left.
Q. Okay. So that's 2024?
A. October 2024.
Q. All right. So when you say he had to sign the agreement -- the document, are you talking about the agreement with Bump?
A. Yeah.
Q. Okay. All right.
MR. CONTARINO: That's all I'll ask.
THE COURT: Thank you, Mr. Rios.
You may step down and return to counsel table.

THE WITNESS: All right.

(Mr. Rios exited the witness stand.)

THE COURT: Please call your next witness.

MR. ROTH: Your Honor, plaintiff would call Mr. Anthony McKnight.

(Mr. McKnight entered the witness stand.)

THE COURTROOM DEPUTY: Would you raise your right hand.

**ANTHONY MCKNIGHT, PLAINTIFF'S WITNESS, DULY SWORN.**

THE COURTROOM DEPUTY: Be seated, please.

For the record, please state your name and spell your last name for the record.

THE WITNESS: Anthony McKnight, M-c-K-n-i-g-h-t.

THE COURTROOM DEPUTY: Thank you.

MR. ROTH: Pardon me a moment while I set this up.

(Pause in proceedings.)

MR. ROTH: It appears good on my end, but it doesn't appear for anyone else; does it?

THE COURTROOM DEPUTY: Nope. It's on.

MR. ROTH: I'll wait for that to do its thing and I'll start elsewhere.

THE COURT: If it's just your computer, it may just be a connection. If you --

(Pause in proceedings.)

MR. ROTH: I assure you, Your Honor, this is not a

tactical delay.

THE COURT: I'm certain of that.

If all else fails, you've got the paper and put it on the presenter right there beside you.

MR. ROTH: Alas, this is an Internet-based thing.

THE COURT: Ah.

MR. ROTH: So the perils, the promises, the pitfalls of technology.

DIRECT EXAMINATION

BY MR. ROTH:

Q. Mr. McKnight, I direct your attention to the screen in front of you.

Do we see that this is the website for fasttriggers.com?

A. Yes.

Q. So we've got the URL; we've got the title.

A. Yes.

Q. We see that it says "Maintenance mode on. Site will be available soon. Thank you for your patience."

A. (Nods head up and down.)

Q. So the site is down, basically?

A. Yes.

MR. ROTH: Do you mind scrolling down?

Or is there anything to scroll down?

No, that's what we've got.

BY MR. ROTH:
Q. In other words, it's defunct?
A. It's done.
Q. Let's go to Trigger Parts USA.
Same thing here. We have the triggerpartsusa.com website; right?
(No response.)
BY MR. ROTH:
Q. It appears to be defunct?
A. Yes.
Q. Anything to do on the website?
MR. ROTH: Can we scroll down?
No.
BY MR. ROTH:
Q. Mr. McKnight, are you familiar with these websites going down before this moment?
A. Going down before?
Q. As in -- I'll clarify. Prior to me showing you now --
A. Yes.
Q. -- were you aware they had gone down?
A. Yes.
Q. When did you become aware that they went down?
A. Yesterday.
Q. How did you become aware that they went down?
A. I made sure that they were taken down because the person

that -- I built the two websites. And the person that is behind them doesn't want to have any part of this. And I said, No problem. I'll turn them off for you. So they are done.

Q. You'll pardon me for clarifying.

You've built the website and you've owned and controlled them through from that point through to now?

A. I have not owned them. I control only the aspect of how they are set up, how they work; design and development, which is not much.

Q. Who owns them?

A. Actually, they are owned by Christian Griffin, whose name you have seen in here.

Q. Since January 1st, 2026, beginning of this year, were there any entities or people you are involved with anywhere selling Forced Reset Triggers?

A. Define "Forced Reset Trigger."

Q. I'll go off the definition from the injunction and the settlement agreement.

A. Yes.

Q. Can you name them for me now?

A. Performance Triggers, Fast Triggers, Trigger Parts USA, bumpfire.com.

Q. Any other websites?

I'll ask that question separately so it's easier.

A. There's dozens of them. There's at least 70 or 80.

Q. So now I'll ask any website you are involved with since January 1st, 2026, that sells Forced Reset Triggers?
A. Performance Triggers, Fast Triggers, and Trigger Parts.
Q. The websites you were referring to earlier, what did you understand my question to be asking about?
You mentioned seven or eight.
A. 70 or 80.
Q. 70 or 80 websites?
A. Selling what you would consider Forced Reset Triggers -- or -- I'm sorry -- what would be considered Forced Reset Triggers, trigger systems, fire control groups, whatever, based on our definition in the injunction.
Q. Forgive me. I'm trying to understand the answer. This is not meant to be --
A. You asked about websites.
Q. Yes.
A. And I just said there's 70 or 80 them. I mean, I know a handful.
Q. 70 or 80 you --
A. At least.
Q. -- own or control?
A. No, I have nothing to do with them. I'm just saying in general.
Q. Oh.
A. Yeah.

Q. My question was with regard to owner control.
A. Got it.
Q. So going back just to clarify, since January 1st, 2026, any websites that you own or control or are involved with that sell Forced Reset Trigger?
A. Performancetriggers, fasttriggers, triggerparts.
Q. Okay. Any business entities since January 1st, 2026, that you are involved with that sell Forced Reset Triggers?
A. Define "involved?" Work for -- you tell me.
Q. Well, go capacious: Worked for; owned, directly or indirectly. So if you own or have an ownership interest in an LLC that then has an interest in something that's in direct (indiscernible) -- so owned, directly or indirectly; do work for; direct; take profit from?
A. I do work for and did work for performancetriggers.com and for Trigger Parts and Fast Triggers.
Q. And --
A. I don't own or control, other than the fact that I was on the legacy bank account, but...
Q. Speaking of that legacy bank account -- that legacy bank account, we are talking about the Capital City Bank account for Performance Triggers that ends 8088, I believe.
That bank account was opened by whom?
A. I'm pretty sure I opened it, like, four years ago. I have no idea. You'd have to pull up the piece of paper.

Q. And it was opened in the context of running Performance Triggers, Inc,; it was an account for that business?
A. I -- yeah. I would say so.
Q. The name Performance Triggers was on it?
A. Oh, then, yeah. That's what it had to be for.
Q. When Performance Triggers dissolved, November 26, 2024, that bank account wasn't shut down?
A. It wasn't shut down. I don't remember what we did. I think we just kind of left it. I mean, honestly I don't remember.
All I remember was we were going to get rid of Performance Triggers and set it up some other way, but the bank account got left there because we couldn't figure out -- well, where are we going to put -- what are we going to do with Performance Triggers, you know, because Performance Triggers was -- I don't know.
Anyway, go ahead. Next question.
MR. ROTH: Mr. Contarino, can you pull up Exhibit -- which was the ACH, P14; right?
(Mr. Contarino nods head up and down.)
MR. ROTH: Do you mind bringing us to Eva Gregorvic and having it at the most recent transaction?
So I'm going to ask, for everyone's purposes here is that large enough to see?
It's not easy for me. I just want to make sure.

THE COURT: I can see it.

MR. ROTH: Okay. We can see it.

BY MR. ROTH:

Q. Can you see it, Mr. McKnight?

A. Yeah.

Q. Okay. So we have here -- and we admitted it earlier -- the ACH transaction -- printout of the ACH transaction spreadsheet for this bank account, the bank account you just said was left defunct and not really used after the dissolution. And you are not sure what it was used for, but you don't think it was used for much.

So I'm going to direct us to the bottom several entries here.

MR. ROTH: Can you highlight the column with the dates towards the bottom, just the bottom portion of it so we can see the 2025.

BY MR. ROTH:

Q. So what I'm bringing your attention to -- and if we can see the dates column --

A. Uh-huh.

Q. Bring our attention there.

You see towards the bottom that there's transactions for 2025 into August. And if we go all the way to the right, we can see that it's to Performance Triggers' employee Eva Gregorvic. And if we look at the payment amount, it looks to be a regular

weekly payroll payment of $2,000.

So you continued to use this bank account to do operational expenses for Performance Triggers?

A. Yeah, but that wasn't your original question.

Q. I asked if it was closed. And then you say --

A. No, I said it wasn't closed. I wasn't sure what we were going to do with it at the time. I never said that we shut it down.

We did use it to operate Performance Triggers while we were trying to figure out what is going to happen to performancetriggers.com.

Q. So November 2024, after the dissolution, you don't shut it down. You are not sure what it's going to be used for. You are still using it?

A. Correct.

Q. Then we get into January, February, March 2025. Going through to August, you still haven't figured out what you are doing and so you are still using this account?

A. Yes.

Q. Even though the business was dissolved November 2024?

A. Yes.

Q. Did anyone notify Capital City Bank that the entity the bank account was formed for had dissolved?

A. Yes.

Q. Did Capital City Bank take any steps based on that?

A. Amazingly, no.

Q. Capital City -- and I'm confirming -- just to confirm, this is not a rhetorical play.

Capital City Bank got notice from you all that you had dissolved the business that was the basis for the account; they didn't do anything about it; you all kept using it into at least August of 2025?

A. And -- yes, until recently. When the new transition went through, they were notified that, Hey, this one is going away because there's a new owner and they are taking over Performance Triggers.

Q. This bank account was closed at that point or still active?

A. No, it's still active right now because it has to stay open for probably another three or so months until we're -- Performance Triggers is out of the chargeback window for the merchant account. It's both for the new owner's protection, for the old owner's protections.

Q. How long is the chargeback window?

A. Six months, 180 days for VISA, Mastercard. It's really inconvenient.

Q. With regard to ownership of Performance Triggers, after it dissolved, we had Douglas Rios as the owner on paper. It dissolves. He says he's gone.

Who is running the show?

A. I basically manage the asset for Chris to keep it going

until we figured out what we were going to do with it.
Q. Was Chris running the business or were you running the business?
A. I was managing the business, yes.
Q. So operations were under --
A. Me.
Q. -- your control?
A. No, me.
Q. Do you mind saying that again, louder?
A. You said -- say again? Who?
Q. Operations --
A. Uh-huh.
Q. -- were under your control, not Chris'?
A. Yes, Chris wasn't there. I was managing the business for him day to day.
Q. Your management of the business continued until when?
A. Until -- until we got the injunction with the courts, and basically I was out.
Q. When we say "the injunction with the courts," what are we talking about, the arbitrator's injunction from January 20th or are we talking the March 16th one?
A. The March 16th one.
Q. So you were involved in managing the business up until March 16th?
A. Yeah, and my management role wasn't too much of anything

other than guiding and directing them. The truth is Performance Triggers pretty much runs itself. That's why it was an ideal situation for Reggie to step in.

He was intimately familiar with all the products; he's intimately familiar with the industry, and there was a strong structure of people. I mean, there was 3PL already set up, and you had warehouse space.

And, you know, honestly, nobody wanted to touch Performance Triggers because -- when did he get sued? Last year? Last July or whatever, that was it. That was the kiss of death, man. Who wants to touch that, you know, which goes to -- the question that Mr. DeMonico had was, Oh, man, that's a great deal. Okay. Well, we still got a great deal for you, but nobody else wants that deal because the company -- you know you are going to get sued right away.

Q. Mr. McKnight, you're describing a situation of having received a kiss of death in a year where we saw the dashboard where the company made $6.7 million?

A. Correct.

Q. So the kiss of death did not prevent the company from in that same year making $6.7 million?

A. That's two different things.

Q. My question was the kiss of death did not prevent making $6.7 million --

(Indiscernible crosstalk.)

BY MR. ROTH:

Q. That's it; just "yes" or "no"?

THE COURT: He can answer --

(Indiscernible crosstalk.)

THE COURT: Wait. Wait. When I'm talking, you need to wait until I'm finished too.

When you ask an argumentative question, you have to listen to the argumentive answer. My preference would be we stop with the argumentive questions and answers and just go for the facts. But when you ask that kind of argumentive question, he gets to answer --

MR. ROTH: Yes, sir.

THE COURT: -- and it doesn't have to be a "yes" or "no."

BY MR. ROTH:

Q. Allow me to restate. For our convenience we went over the company made $6.7 million in 2025 -- or I'm sorry -- the website made $6.7 million in 2025, roughly?

A. No.

Q. The dashboard that we saw that reflected roughly $6.17 million reflected sales from the website?

A. That's true.

What you said, incorrect. What you just said, to clarify, it is correct.

Q. Okay. During all this time, it was C&C Holdings that owned

the assets?
A. Correct.
Q. Were there any assets from Performance Triggers, Inc., that did not go to C&C Holdings?
A. No. No.
Q. How was the disbursement decided? Was there formal agreement at the dissolution distributing the assets?
A. No. It was -- all stayed with C&C Holdings, even though there wasn't C&C. Like, we didn't do anything different.
Q. Were you an owner of C&C Holdings at any point?
A. No.
Q. Were you an employee of C&C Holdings?
A. No, more like a consultant.
Q. You were paid by C&C Holdings?
A. No, paid by Performance Triggers, Inc.
Q. Performance Triggers, which had dissolved in 2024?
A. Yes -- well, after that I'm not really sure where I got paid, which entity it was coming out of --
Q. So --
A. -- but it wasn't a lot. It was just here and there.
Q. During the year that there were $6.7 million of sales on the website, you got paid an amount you are not sure of from somewhere?
A. Actually, I didn't get paid anything out of that amount.
Q. Have you received any compensation related to any sales or

manufacture of Forced Reset Triggers since November 26, 2024, the dissolution of Performance Triggers?

A. Yeah. I mean, if we are counting Super Safeties and stuff like that in there, yeah -- yes.

Q. Was it related to the sales on the Performance Triggers website?

A. No.

Q. Where were you -- what sales of Forced Reset Triggers did you receive compensation for?

A. Directly, none; indirectly I got paid for services.

Q. By whom?

A. Trigger Parts, Fast Triggers.

Q. Which you owned and operated?

A. I --

Q. Sorry --

A. No, I did not. I do not --

Q. Which you operated --

(Indiscernible crosstalk)

(Reporter requested clarification.)

BY MR. ROTH:

Q. The question was from Trigger Parts USA and Fast Triggers, which you operated?

A. And I said -- wait. Say that one more time. I drifted.

THE COURT: Mr. McKnight, it will help me if you speak up a little louder.

THE WITNESS: Yeah. Sorry.

Say that again. I drifted off.

BY MR. ROTH:

Q. The compensation that you claim you received for Forced Reset Trigger sales was only from Fast Triggers and Trigger Parts USA, which you operated?

A. Partially, yes.

Q. Can you explain the partially?

A. I wasn't the only person that operated it, but yes.

Q. You were an operator of these websites?

A. Correct.

Q. When we come to January of 2026, we have the interim award from the arbitrator prohibiting by name you, Sherrie, Doug, Performance Triggers, Inc., from engaging in sales.

That did not include by name Christopher Rios or C&C Holdings; correct?

A. I don't know that for a fact. I'd have to see the document.

Q. You don't recall them being bound by the injunction?

A. Hold on a second.

MR. ROTH: Can we bring up --

A. Yeah, say what you are saying one more time.

BY MR. ROTH:

Q. We are going to bring up an exhibit to assist here.

A. Oh, okay.

Q. I don't want you to have to rely on memory when we have writing.

A. Wonderful.

MR. ROTH: This is P01, the arbitration injunction award.

A. Okay. So what are you asking again?

MR. ROTH: You are going to scroll down to the part where it names who is bound.

Okay. Go up a little bit.

Okay.

BY MR. ROTH:

Q. So if we look here, the last two lines, it's naming certain people. The people who are named --

A. Uh-huh.

Q. -- by name, right, not alluding to roles -- Anthony McKnight, Sherrie McKnight, Douglas Rios, and Performance Triggers, Inc.?

A. Uh-huh.

Q. That does not say Christopher Rios?

A. Correct.

Q. It does not say C&C Holdings?

A. Correct.

Q. I'm sorry. C&C Holdings Group, LLC?

A. Right.

Q. Cool. Though Christopher Rios and C&C Holdings are not in

here, after Plaintiff RBT gave notice about triggers still being up on the Performance Triggers website, triggers were taken down.
Do you recall?
A. Yes.
Q. Yes. A notice was put up saying that these triggers could not be sold?
A. Yes.
Q. Why would these triggers be taken down due to the injunction if the owner, C&C Holdings Group, is not named in the injunction?
A. That's a great question.
Q. Did you have any role in taking down these products?
A. Yes, I'm the one that took them down.
Q. Who gave the order to take them down?
A. Well, I guess, Chris assumed that he was part of this and that Performance Triggers, Inc., really was performancetriggers.com, and we were just trying to do the right thing.
Q. Chris gave you the order to do it, or you choose to do it?
A. Christopher Rios?
Q. Yes.
A. He doesn't want us to -- he doesn't want to get in trouble for any of this.
Q. The question I'm asking --

A. I --
Q. -- did Christopher Rios --
A. No, I --
Q. -- give you the order to take it down or did you --
(Indiscernible crosstalk.)
A. I did it on my own.
BY MR. ROTH:
Q. You did it on your own?
A. Yeah.
Q. Did you speak with Christopher Rios about it?
A. Yes, before and after.
Q. But you did it on your own initiative?
A. Correct.
Q. Why did you do it on your own initiative?
A. So that it wouldn't cause more problems until we could figure out what's next.
Q. You took it down to avoid problems because of liability?
A. There's an injunction and the arbitrator said, Hey, we've decided all these items are now FRTs -- don't agree with that, but it is what it is -- take them down, so...
Q. When it came time to sell performancetriggers.com to Bump Cerakoting and More, Inc., your attorney has characterized the transaction as an arm's length transaction that was fine to do because C&C Holdings wasn't bound by the injunction.
Is that the perspective that you all had?

A. Yeah.

Q. So when it came time to transfer, C&C Holdings wasn't bound, but earlier you thought it was?

A. I don't understand the relevance.

Q. The relevance is --

THE COURT: It's really not up to you to understand the relevance.

THE WITNESS: Oh.

THE COURT: Your job is just to answer the question he asked you.

We are, once again, wandering. But if you can focus on the issues in this case, I'll make him answer your questions, but you ask him a question that deals with the facts of the case.

MR. ROTH: Yes, Your Honor. I'll tighten it up.

BY MR. ROTH:

Q. At the time that the products were taken down, there was fear by you, by Chris Rios, that C&C Holdings was covered by that injunction; yes?

A. Correct.

Q. Okay.

A. Because it was (indiscernible) of Performance Triggers, Inc.

(Reporter requested clarification.)

A. It was the owner of Performance Triggers, Inc.

BY MR. ROTH:
Q. Those fears then went away when it came time to transfer performancetriggers.com to Bump Cerakoting?
A. Yes, after we had received counsel from five different legal sources.
Q. Why would Christian Griffin be on a merchant account for Performance Triggers?
A. Because Doug was leaving and we needed a new merchant account for Performance Triggers, and Christian was an employee and par -- not partner, he was an employee, and Chris and Doug were going. So we are, like, Well, Who is going to be on the merchant account?
Or maybe Chris is -- I don't know. You know what? At that time it could have been one of their credits was bad or something and Christian was available to be on the merchant account.
Q. I want to ask a few questions off of that.
So, one, you said that Christian Griffin was an employee. Christian Griffin was an employee of the Performance Triggers operation?
A. Yes, he still is. Technically, he's not an employee of Performance -- well, yeah, he is an employee of Performance Triggers.
Q. He was employed to do what?
A. Graphic design.

Q. Was he -- did his services include doing anything beyond graphic design?
A. Not technically, no; photography.
Q. Does it include selling FRTs?
A. Not specifically, no.
Q. He owns two websites that sell FRTs, doesn't he?
A. Yeah. But his part is being a partner in the operation, and he takes the pictures. He does all that stuff; we build it, and he's part of it.
Q. When you referred to being a partner in the operation, which operation are you referring to, the Fast Triggers and Trigger Parts USA or Performance Triggers operations?
A. Fast Triggers and Trigger Parts.
Q. Partners with whom?
A. Christian.
Q. Christian is partners with whom?
A. Technically he would be with me, but not legally. I mean, it's his. He can do whatever he wants with it, but I help him on it.
Q. So Christian Griffin, in addition to running graphic design for Performance Triggers, also was running a merchant account for Performance Triggers?
A. Correct.
Q. You said that you think he stepped into the role because Doug had left. Doug says he left with the dissolution of

Performance Triggers in November of 2024.

Is that when you recall him leaving?

THE COURT: That's just not what he said. Do I have that wrong?

MR. ROTH: That would be my own understanding, Your Honor.

THE COURT: All right. Go ahead.

MR. RIOS: (Indiscernible.)

THE COURT: No, Mr. Rios. Just sit quietly.

MR. ROTH: I'd like to amend what I referred to. None of it was intentional.

THE COURT: I think he said it a month or so before, but he left earlier. He didn't leave contemporaneously with the dissolution.

BY MR. ROTH:

Q. Doug left in 2024. The merchant account with Christian Griffin --

MR. ROTH: Can we bring up the opening date.

BY MR. ROTH:

Q. I'm saying it was around September of 2025, but we are going to confirm that so we are not relying on me for dates when we have documents.

(Pause in proceedings.)

BY MR. ROTH:

Q. So, Mr. McKnight, you see here that we have billing

activation date, November 9, 2025; transaction activation date, October 10, 2025; right?
A. Yeah, looks good to me.
Q. So Christian stepped in to fill in for Doug, but there was about 11 months or so between Doug's departure and Christian stepping in?
A. There's probably another merchant account that you guys are missing.
Q. Can you name us all the merchant accounts for Performance Triggers operation?
A. There's one from Square and -- I don't know which one this is because authorized.net is a merchant account. It's a gateway. So, yeah, I mean, there's a Square account, too.
Q. Who is on the Square account?
A. That's a great question. I honestly don't know the answer to that. I'd have to go ask and see who actually backstopped it, but we had that one for a while.
Q. What does "a while" mean?
A. Over a year.
Q. Starting in 2024, 2025?
A. Maybe.
Q. So you have a Square account.
How many other accounts did Performance Triggers have while you were operating it?
A. Well, you are only allowed to have one at a time, so -- or

technically, so probably never more than two.
Q. You're only allowed to have one, so maybe two, but you're not sure?
A. Right.
Q. Right. So we have the Douglas Rios one.
Do you know if that was ever terminated?
A. I assume it was terminated based on the stuff that you guys turned over here. I mean, I don't think they are getting billed for it anymore.
Q. And the Square account?
A. The Square account probably is the one that's active right now while Reggie is looking to get a new merchant account, which takes some time with -- doing -- when you are doing a little more than -- or doing what Performance Triggers was doing in revenue.
Q. So there is an active Square account as far as you understand. It was used while you all were running it?
A. Uh-huh.
Q. And you are saying Mr. Robinson is using that same Square account now?
A. No, performance -- well, performancetriggers.com is using that Square account, yeah, and it's going into the new bank accounts.
Q. And we don't know who is on it; it could be anyone?
A. It's -- yeah. I mean, honestly, it could be Doug, Chris,

me. I doubt it's me because I'm on the VISA/Mastercard match list.
Q. I'm sorry. I couldn't hear you.
A. I'm on the VISA/Mastercard --
THE COURT: Mr. McKnight, you really need to keep your voice up for us.
THE WITNESS: I'm -- it's late in the day and I need a little caffeine.
THE COURT: Including that, all the mumbling; high volume.
THE WITNESS: I apologize.
THE COURT: If you need to, use your outside voice, but we are going to have to hear.
THE WITNESS: All right. Go ahead.
BY MR. ROTH:
Q. Do you know if Christian Griffin is providing services to performancetriggers.com currently?
A. I mean, yeah, he probably takes a picture here and there, but Performance Triggers hasn't put anything up new in weeks, I don't think.
Q. Did you terminate or end the merchant account that he is on for the website?
A. Actually -- not -- it's not -- it's not terminated, but it's not being used because of the chargeback issue. You have to wait, otherwise that will be bad.

MR. ROTH: Your Honor, I'm going to confer with my colleague for a moment.

THE COURT: You may.

(Discussion was held at plaintiff's table.)

MR. ROTH: Can you bring up Exhibit P19, the dashboards.

BY MR. ROTH:

Q. Mr. McKnight, where do these dashboards come from?

A. Performancetriggers.com.

Q. What's the service provider or the service that does these?

A. Magento.

Q. Magenta?

A. Magento.

Q. Magento. Thank you.

Magento is an e-commerce platform or what?

A. Yes.

Q. So Performance Triggers sales are run through Magento in some fashion?

A. Magento is the shopping cart platform for performancetriggers.com, yes.

Q. Who provided these records to your counsel?

A. I did.

Q. Why do you have access to them?

A. I helped build performancetriggers.com.

Q. Do you still have access to performancetriggers.com?

A. I'm sure I could get in if I needed to. I'm still friends with Reggie.

Q. Mr. McKnight, these were provided to us -- for a second (indiscernible).

These were provided to us after the transfer had happened. So for you to have provided them would mean you have access after the transfer?

A. I'd have --

MR. SMITH: I'm going to object, Your Honor. That assumes facts not in evidence. He certainly could have had these historical records --

A. Yeah, from a --

MR. SMITH: -- from a prior year.

THE COURT: And now the witness has heard your explanation and that's fine. The objection is overruled.

Ask the question and let's hear the answer.

MR. ROTH: Mr. Contarino, can you go to the --

(Reporter requested clarification.)

THE COURT: Absolute -- folks, I know it's getting late in the day, but you are all good professionals. You've done this before. There is no reason for a word to be said in the courtroom, first, while another person is speaking, or, second, that's not said loud enough for all of us to hear.

Speak up, and let's speak one at a time, and let's get on through this.

And, Mr. McKnight, just answer his questions.

THE WITNESS: Yes.

Go ahead.

MR. ROTH: Mr. Contarino, can you go to the page for 2026.

Thank you.

Can you bring your cursor to focus on the date range at the top of this page?

BY MR. ROTH:

Q. Mr. McKnight, I'm directing you -- can you read to me what this date range is?

A. January 1st through March 31, 2026.

Q. Okay. The graphs on here show sales up until the end, at least the graph directly underneath the date box?

A. Are you asking me?

MR. ROTH: Can you highlight that, Mr. Contarino?

The one to the right of it; yeah.

BY MR. ROTH:

Q. So I am just asking whether you see that the graph continues to the end of that range, and, in fact, has a spike, the one that is highlighted.

A. Yeah. I wouldn't know the relevance of it.

Q. Mr. McKnight, my question was do you see that the image before you is a graph; it continues through to the end without dropping off; there's a spike at the end?

Do you see that?
A. Yes, I see that.
Q. Thank you, Mr. McKnight. That was my question.
The date range here says March 31st, which is after February 9th; correct?
A. Yes.
Q. You had access to records that you provided that include a date range that goes after February 9th?
A. (Witness nods head up and down.)
MR. SMITH: Objection, Your Honor.
THE COURT: Overruled.
BY MR. ROTH:
Q. Would you like to confirm -- can you confirm for me that you had access to these records after February 9th?
A. I would assume so if I provided these.
Q. Thank you.
THE COURT: Is that a "yes"?
THE WITNESS: Yes.
MR. ROTH: I'd like to bring up Exhibit P23.
Can we scroll down to the individualized checks?
Thank you.
BY MR. ROTH:
Q. Mr. McKnight, do you see that the "pay to" on this check is Fast Triggers/Performance?
A. Yes.

Q. You are aware from earlier that these are checks that were deposited in the Capital City account for Performance Triggers?
A. Yes.
Q. Why were Fast Triggers' checks deposited in the Capital City account for Performance Triggers?
A. No idea.
Q. Can you tell me who is in charge of depositing checks?
A. I would say for this would have been Eva, Eva Gregorvic.
Q. Uh-huh.
MR. ROTH: Can we scroll down to the next page?
BY MR. ROTH:
Q. This check dated February 14, 2025, do you see that it says "Trigger Parts USA/Performance Triggers"?
A. Yes.
Q. Do you know why this check was deposited in Capital City -- the Capital City Bank account for Performance Triggers?
A. It looks like it was for an order number probably from Trigger Parts USA.
Q. Do you have any knowledge why a Trigger Parts USA check and payment was deposited in the Performance Triggers' bank account?
A. Honestly, now, no idea.
Q. What about then?
A. No idea. I mean, it's a year and a half. Man, look -- sorry. No, no idea.
MR. ROTH: Mr. Contarino, can you scroll down to the the

final check?

THE COURT: While he does that, do you recognize the handwriting where somebody wrote "Performance Triggers" on these checks?

THE WITNESS: No. Could have been -- could be the bank teller. I don't know. I'm not going to speculate.

BY MR. ROTH:

Q. Do you have any reason in mind why a bank teller would go out of their way to write --

THE COURT: That was my mistake for asking the question. He doesn't know the answer. Ask the next one.

BY MR. ROTH:

Q. Mr. McKnight, you see that this is a check from February 14, 2025, again to Trigger Parts USA, again with Performance Triggers written on it.

A. (Witness nods head up and down.)

Q. No knowledge of this one either?

A. No idea.

Q. Before you saw these checks now, are you familiar with any deposits for Trigger Parts USA or Fast Triggers into the Capital City Bank account?

A. No.

Q. Are you aware of any money otherwise coming into the Capital City Bank account for Fast Triggers or Trigger Parts USA?

A. No.

MR. ROTH: Mr. Contarino, can we --

BY MR. ROTH:

Q. Did Trigger Parts USA have its own bank account?

A. Yes.

Q. Where was that bank account with?

A. I'd have to look.

Q. Were you a signer on that account?

A. No.

Q. Who set it up?

A. Christian.

Q. Do you know of anyone else being a signer on it?

A. No, probably not.

Q. You receive any payments from it?

A. No.

Q. Same thing for Fast Triggers: Do you know if Fast Triggers had its own bank account?

A. That's a good question. I'd have to find out about that, too. I want to say yes, but I don't know where.

Q. To confirm, your answer is "I don't know"?

A. Say that again. Somebody was sneezing.

Q. Your answer was "I don't know"?

A. I don't know; yes.

Q. Did you receive any payments from Fast Triggers?

A. No.

Q. Did you receive any payments from sales on the Fast Triggers site?
A. Not directly, no.
Q. Could it be indirectly?
A. Yes.
Q. Can you tell me the basis for that?
A. Not off the top of my head, no. I'd have to have my stuff in front of me to figure out what...
Q. Was it a salary?
A. No.
Q. Was it a fee for service?
A. Probably for helping with something having to do with the website or hosting or anything.
Q. Any regular payments?
A. No.
Q. So you are saying everything was just catch as catch can; if it comes up, you might get paid?
A. They weren't that busy, you know what I mean? There wasn't that many transactions from there.
Q. But there were payments for services rendered?
A. Yeah, every once in awhile; yes.
Q. I believe I asked that for Fast Triggers. I'm asking the same for Trigger Parts USA.
You ever receive any payments from them?
A. Same answers.

Q. Same --
(Indiscernible crosstalk.)
BY MR. ROTH:
Q. Fee for service?
A. They are both very secondary properties.
Q. But I'm going to run through confirming how it works.
So fee for service, not a salary, not regular?
A. Correct.
Q. Were you ever involved with triggerpartsusa.com?
A. Trigger -- no. Wait. What is -- no, it's triggerpartsusa.com.
Q. I'm drawing a distinction here. This is a Trigger Parts USA. I'm not speaking about that at this moment.
I'm asking have you ever been involved with triggerparts.com?
A. I don't think so.
Q. Okay.
A. That's a better name.
Q. I have no opinion on that.
MR. ROTH: Can we bring up the Stripe data, Exhibit P28.
BY MR. ROTH:
Q. So, Mr. McKnight, I want to direct your attention --
MR. ROTH: If we can go back up.
Yeah.

BY MR. ROTH:

Q. So I want to go to Payment Methods. I want to go to Billing Address.

That address, 4101 Northwest 282nd Street, Newberry, Florida 32669, that's your home address; right?

A. Correct.

Q. Okay. This is a Stripe account profile for Trigger Parts USA; right?

A. Doesn't look like it to me. It looks like a re -- I don't know. We don't have a Stripe account.

Q. "We," referring to Trigger Parts USA as "we"?

A. They don't have a trigger (indiscernible) -- I've never had a Stripe account with anybody -- I don't think -- any entity I've ever helped out, no.

Q. This --

A. They might -- that Stripe billing details might have to do with what they use for taking the transaction.

I mean, what's this for? Cloudfare?

Q. This is a Cloudfare Stripe record.

A. Yeah, it's probably the receipt from -- they use Stripe to clear the credit card transaction to pay for Cloudfare.

Q. So --

A. That's why it has my address on it.

Q. Do you know why it has your address on it?

A. I'm sure I set up the service for them.

MR. ROTH: Can we scroll back up to the top?

And then the address that we have here -- can we highlight that in the center of the page, the 7600 Northwest 5th Place.

A. Yeah.

BY MR. ROTH:

Q. Are you familiar with that address?

A. Yes.

Q. What's it been used for that has to do with you?

A. That used to be Big Daddy Unlimited before we got kicked out of the building.

Q. So this is the former Big Daddy Unlimited address?

A. Correct.

Q. And this is also your home address -- lower before -- with the billing address --

A. 4101 --

Q. Yes.

A. -- is the home address --

Q. Yes.

A. -- yes.

Q. Are you familiar with this Amex card under Payment Methods? We have the last four of 1006 and an expiration of --

A. Yes.

Q. How are you familiar with this card?

A. That's obviously one of our cards because -- that's why

it's using that billing address.
Q. Is it a personal card for you?
A. I don't know. I'd have to go look at the card. I don't know exactly which one that one is.
Q. You don't know if it's a personal card; correct?
A. Don't know. It might be.
Q. I'd like to bring up -- this is P28.
I'd like to bring up P25.
Same --
A. Same card.
Q. I'm sorry? I couldn't hear you.
A. Same card.
Q. Yes, same card. That's the same.
Let's look at the billing address. This is still your home address?
A. Uh-huh.
Q. This would be here for the same reason, that you set it up or they used your address for it?
A. Correct.
Q. We have here another address. So this 27831 Northwest 46th Avenue, that's the same property as that lower address; right?
A. Correct.
MR. ROTH: Your Honor, one more moment just to confer?
THE COURT: You may.

Why don't we do this: Why don't we take a break. Let's take maybe 12 minutes. We'll start back at 3:35.

(Recess taken at 3:23 PM.)

(Resumed at 3:35 PM.)

THE COURT: Please be seated.

Mr. McKnight, you are still under oath.

THE WITNESS: Yes, sir.

THE COURT: Mr. Roth, you may proceed.

MR. ROTH: Yes, Your Honor.

Only a little bit more.

BY MR. ROTH:

Q. So, first, I would like to bring back up the exhibit with the merchant account that Douglas Rios is on for Performance Triggers.

A. Uh-huh.

Q. That is Exhibit P21.

And so we are going to go down; we are going to look at the Social Security Number section.

Do you see where that is, Mr. McKnight?

A. Uh-huh.

Q. Okay. So you see the last four digits here are 7327?

A. Uh-huh.

Q. Mr. Rios has said that is not his social security number.

Do you know whose it is?

A. I don't, and I'm going to have to -- I'd have to look, I

mean, honestly, at that account --

THE COURT: Is it --

THE WITNESS: It's not my social security number. I couldn't tell you if it's even a social security number, that it's not a tax ID number. I can't tell you anything about it also because that might just be the gateway information, not the actual merchant account information. That just looks like it's Doug's name was on the gateway --

BY MR. ROTH:

Q. To clarify --

A. -- not on the actual merchant account.

Q. To clarify --

A. There's --

Q. -- this social security number --

A. Yes.

Q. -- you are not familiar with who it is?

A. Correct.

Q. Do you have an idea of who this four digits could belong to?

A. I do not --

THE COURT: Come on. Who it could belong to?

If he doesn't know, he doesn't know.

Let's move it along.

MR. ROTH: Sorry, Your Honor. That was with regard to employees of his.

BY MR. ROTH:
Q. Moving on, the web guy for Performance Triggers, is that Waqas Raja? Or if it's pronounced alternatively --
A. Mostly it's myself.
Q. Has Waqas Raja --
A. Waqas Raja.
Q. Raja, okay.
A. Yes.
Q. Has Waqas Raja served as a web guy for Performance Triggers?
A. Yes, he has helped out with Performance Triggers in the past, as well as a number of other websites having nothing to do with this industry.
THE COURT: Can you spell the name?
THE WITNESS: W-a-q-a-s. Last name R-a-j-a.
BY MR. ROTH:
Q. Mr. Raja, he was employed by Performance Triggers leading up to the February 9th agreement?
A. No, he was never an employee. He was always an independent contractor.
Q. Mr. Raja provided services for Performance Triggers all the way up to the February 9, 2026 agreement; yes?
A. I'd have to look to be exact. I am not quite certain of the exact dates.
Q. Okay. You don't know?

A. I don't know.
Q. Mr. Michael Goldberg, are you familiar with who this man is?
A. Yes.
Q. Has Goldberg ever sold FRTs for you?
A. I have no idea. I only know him because he owns the gun store in Alachua where I pick stuff up, like guns.
Q. So he's never sold FRTs in cash for you?
A. No idea.
For me? No. I don't know Goldberg that well.
Q. For Performance Triggers?
A. No, no. I don't have that kind of relationship.
Goldberg --
Q. Michael --
A. -- that's the kind of relationship I have with him. It's Goldberg. He owns the gun shop.
Q. And then the last point that we have --
MR. ROTH: Mr. Contarino, if you can bring up the web browsers.
BY MR. ROTH:
Q. So before you we have the Wayback Machine?
A. Sure.
Q. And the Wayback Machine, what's the URL on it?
Up top where you would type in the URL, do you see that?
A. Fasttriggers.com.

Q. Thank you.

And then over on the right-hand side, we have a date. What's the date for that?

A. January 5th, 2024.

Q. All right. So in front of us on the screen, homepage of Fast Triggers, we have a WOT advertised for sale?

You see that?

A. Uh-huh.

Q. So Fast Triggers has sold these WOT triggers?

A. No idea. Might have advertised. Sold, no idea.

Q. So we see that it advertised, but you don't know whether or not it consummated a sale?

A. Correct.

MR. ROTH: Thank you. I have no further questions.

THE COURT: Mr. Smith?

MR. SMITH: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. SMITH:

Q. Mr. McKnight, you have testified that you were responsible for having products removed from the Performance Triggers' website based on the injunction issued by the arbitrator; is that right?

A. Yes.

Q. Okay. And initially -- the injunction was issued on January 20th.

Were those products still on there for a few days after that?

A. I -- maybe. I don't know. I'd have to look. I'd have to look at the dates.

Q. Okay. Who ultimately told you to take those products down?

A. Ultimately?

Q. Uh-huh.

A. Came from Chris.

Q. Okay. And that was because Chris was afraid of --

THE COURT: I usually insist on last names. I've been pretty good --

THE WITNESS: Rios.

MR. SMITH: Christopher Rios. I'm sorry, Your Honor.

THE COURT: I'm sorry. I was going to finish the sentence.

Folks, let's let one another finish sentences.

That's Mr. Rios?

MR. SMITH: Correct, Your Honor; Christopher Rios, yes.

THE COURT: And there are two Rioses, so it's fair enough to use "Chris." I'm just making sure we are not doubling back to one of the other folks. Got it.

MR. SMITH: Completely understand, Your Honor.

BY MR. SMITH:

Q. After you took those -- about how many products did you

take off the website?

A. There were 13 or 14, I think, on the initial list.

Q. Okay. And about how many products was Performance Triggers selling overall -- I'm sorry.

About how many -- yeah -- products, different product lines?

A. 7 to 8,000, depending on the day.

Q. So this was a small percentage of the product line; right?

A. Correct.

Q. But what was the impact on revenue by removing those --

(Indiscernible crosstalk.)

A. Massive.

BY MR. SMITH:

Q. Explain.

A. 90 percent reduction.

Q. Okay. So it's fair to say that Performance Triggers was making money off of FRTs prior to the injunction?

A. Definitely.

Q. And what did that injunction do to the value of the Performance Triggers' website?

A. Oh, killed it. I mean -- yeah, it very much damaged any prospect of doing anything with it, but it also damaged the viability of it going forward because the pages were down for so long.

Q. Okay. And when Reggie Robinson took over

performancetriggers.com, did you put those products back up on the website for him?

A. I don't know if it was myself or -- or Ben. It was probably me that turned them back on or rebuilt them or -- I don't really know.

Q. Okay. Have you received any compensation from Reginald Robinson related to any work that you've done on the Performance Triggers' website?

A. No.

Q. After the injunction was entered by the arbitrator and entered by this Court on February -- well, entered by the arbitrator with the bond payment shortly after February 27th, 2026, have you sold any of the products that would be considered FRTs as defined by the plaintiffs?

A. Personally, no. Through Fast Triggers and Trigger Parts, yes.

Q. Are those companies controlled by you or are you just providing input to them on their website?

A. Input to them through their website.

Q. Can you call them up and say, Hey, you need to take these down?

A. I could, but that's already been done.

Q. Right. But prior to this, back in February could you have --

(Indiscernible crosstalk.)

A. I could have had some influence on that for sure.

BY MR. SMITH:

Q. Would it have ultimately been your decision?

A. Ultimately, no. There's a lot of things that aren't my decision, but I can have some inputs.

Q. So it's fair to say that you were actually not the one controlling Fast Triggers or Trigger Parts USA?

A. No.

Q. Other than through Fast Triggers or Trigger Parts USA, have you or any entity that you've been -- had an ownership or a controlling interest in sold any FRTs or FRT parts as defined by the plaintiffs since February 27th, 2026?

A. I don't believe so, if I understood the question. But, no, I don't think so.

Q. Okay.

MR. SMITH: Nothing further, Your Honor.

THE COURT: Redirect?

MR. ROTH: No, Your Honor.

THE COURT: Mr. McKnight, why was Performance Triggers dissolved back in 2024?

THE WITNESS: The reason it was dissolved --

THE COURT: You and I are close together, but the lawyers need to hear you too.

THE WITNESS: Oh, sorry.

The original intention was basically to split the

company into two parts: One for marketing and one more manufacturing research, development and design.

Yeah, I mean, that was it. And then, I mean -- you know, other than that, I don't really know. There was a lot that's happened in the last couple of years.

THE COURT: Somebody thought the best way to split a company in half was to dissolve it?

THE WITNESS: Yee -- well, originally the intention was to have the assets acquired by a new entity and I -- I honestly can't tell you why we didn't do it or why it didn't get done. I don't remember what was going on back in December of 2024, whether it was a terrible period for the trigger industry or what, or whether we were going through personal stuff at the time.

THE COURT: You're involved in this lawsuit where this is a big deal and --

THE WITNESS: Oh, yeah, 100 percent.

THE COURT: I'm sorry. You go ahead and then I'll --

THE WITNESS: I apologize.

THE COURT: -- talk.

THE WITNESS: I apologize.

THE COURT: You are involved in this lawsuit where this is a big deal where your lawyer has talked about it and the parties are arguing about it, and you're here on the stand and you don't remember because you hadn't thought about it?

THE WITNESS: Yes, that's correct.
THE COURT: What was your involvement in the sale to Bump?
THE WITNESS: Not much other than -- nothing really. I mean, it was between him and Chris. I didn't have to do anything.
THE COURT: Did you approve of it?
THE WITNESS: I thought it was a great deal for Reggie, yeah, absolutely.
THE COURT: You've gotten no money out of it?
THE WITNESS: No, sir.
THE COURT: How did anybody get money out of Performance Triggers?
THE WITNESS: There was actually quite a few people that did make money out of it and supported a lot of vendors.
And to be fair, we haven't even had a year of really good sales yet to recoup what started three or four years ago.
So we had limp along, limp along, good, then lawsuit, now...
THE COURT: Performance Triggers had revenue from the website of -- I think the number thrown around was 6.7 million.
THE WITNESS: Yeah, 6 and a half.
THE COURT: What did you net out of that?
THE WITNESS: That's a -- I don't know. I haven't done that part yet. Probably not as much as you would think

based on inventory, marketing costs, some of the overhead.

Yeah, I'd have to sit down with Eva. It's been a pretty tumultuous year.

THE COURT: Performance Triggers file its tax returns every year?

THE WITNESS: No, it hasn't yet this year. I mean, this year is -- it's 2025. We haven't done that yet, no.

THE COURT: Does it have a calendar fiscal year or a different fiscal year?

THE WITNESS: Calendar year, January to December.

THE COURT: Prior to the 2025 tax year, did it file its taxes every year?

THE WITNESS: I would have to ask Eva where she's at on it.

THE COURT: I'm talking about 2024 taxes and earlier.

THE WITNESS: Well, there wouldn't have been -- there would have been part of a 2023, I think. 2024 would have been almost the full year -- first full year. Well, I guess there was in 2023.

I'd have to look. I honestly don't know where we are at on it.

THE COURT: You file your tax returns every year?

THE WITNESS: Yes, sir. I haven't yet this year. I filed an extension.

THE COURT: What's your understanding of the repayment

agreement as to the $275,000 sale price for the Performance Triggers assets?

THE WITNESS: Mostly a handshake deal based on, I guess, survivability of the asset.

THE COURT: Handshake is how you decided on it, but what I want to know is what's the agreement?

THE WITNESS: Oh, I don't know how much Reggie is paying out. It's based on profitability. And right now I don't -- I couldn't tell you right now. I haven't paid attention to it in the last 45 days.

THE COURT: Did you have an understanding at the time of the transaction about when this was going to be repaid?

THE WITNESS: Well, on the time of the -- at the time of the transaction and if we could have based it on the previous months, it could have been less than a year. Now I'd assume, without putting too much pressure on him, it will take him a year and a half to two years to pay it back without damaging the underlying business.

THE COURT: Did you have an understanding of how the amount of the payment or the timing of the payment was going to be determined?

THE WITNESS: It would have been nice if it would have been weekly or at least once a month, but now it's probably going to be once a month, you know. I mean --

THE COURT: That was your understanding, it would have

been nice?

You go into a $275,000 deal and the agreement is, Well, it would be nice?

THE WITNESS: Yes. And given the circumstances, it would be nice, but the -- Chris understands the reality of the situation. Who would touch an asset that potentially is going to be under prosecution or pressure for litigation?

THE COURT: So no agreement?

THE WITNESS: No, we have an agreement.

THE COURT: Well, tell me what the agreement is. That's what I'm --

(Indiscernible crosstalk.)

THE WITNESS: The cash payout, you mean?

THE COURT: Let me finish.

THE WITNESS: Yes.

THE COURT: I feel like I'm pulling teeth. What I'd like to know is what was the agreement?

I don't want you to tell me about what would have been nice and what people think. I want to know what the agreement was.

What was the agreement as to when the $225,000 balance would be repaid?

THE WITNESS: There isn't a specific agreement for the remaining balance. The remaining balance was based on profitability of the underlying business. I mean, it could be

$7,500 a month; it could be 15,000; it could be 5,000.

THE COURT: And it could be a week and it could be a month?

THE WITNESS: And it also could be out of business in three months or six months.

THE COURT: Questions just to follow up on mine, Mr. Roth?

MR. ROTH: No, Your Honor.

THE COURT: Mr. Smith?

MR. SMITH: No, sir.

THE COURT: Thank you, Mr. McKnight.

You may step down, return to counsel table.

(Mr. McKnight exited the witness stand.)

THE COURT: Please call your next witness.

MR. CONTARINO: Your Honor, Ms. Sherrie McKnight.

(Ms. McKnight entered the witness stand.)

THE COURTROOM DEPUTY: Please raise your right hand.

**SHERRIE MCKNIGHT, PLAINTIFF'S WITNESS, DULY SWORN**

THE COURTROOM DEPUTY: Please be seated.

For the record, please state your name and spell your last name for the record.

THE WITNESS: Sherrie McKnight, M-c-K-n-i-g-h-t.

DIRECT EXAMINATION

BY MR. CONTARINO:

Q. Ms. McKnight, you are the president of High Kaliber

Studios; isn't that right?
A. Yes.
Q. And what do you do in that role as president?
A. Nothing.
Q. As president do you have access to the High Kaliber Studios' bank account at Capital City Bank?
A. No.
Q. Who does?
A. I don't know. I don't have anything to do with it.
Q. Even though you are the president of the company?
A. Yes.
Q. Why are you president?
A. It's an old corporation, as far as I know, and I don't do anything with it.
Q. So you're president, you understand, because it's an old corporation?
A. I don't have a better answer. I don't have anything to do with it.
Q. You saw before that there were checks in the High Kaliber Studios' bank account, I guess the associated account of Performance Triggers.
Did you see those?
A. I saw everything on the screen.
Q. And are you able to explain how those checks made out to Fast Triggers would be deposited into High Kaliber's associated

bank account of Performance Triggers?

A. No, because I don't have access to any bank accounts.

Q. Okay.

MR. CONTARINO: All right. That's all, Your Honor.

THE COURT: Cross-examine?

MR. SMITH: Just briefly, Your Honor.

CROSS-EXAMINATION

BY MR. SMITH:

Q. Ms. McKnight, since the injunction was entered by the arbitrator in January and officially went into place February 27th, have you or any company that you've been associated with sold any Forced Reset Triggers or Forced Reset Trigger parts as they have been defined by the plaintiff?

A. No.

MR. SMITH: No further questions, Your Honor.

THE COURT: Thank you, Ms. McKnight.

You may step down.

THE WITNESS: Thank you.

(Ms. McKnight exited the witness stand.)

THE COURT: Please call your next witness.

MR. CONTARINO: That's all we -- plaintiff rests.

THE COURT: Evidence for the defense?

MR. SMITH: No further witnesses, Your Honor.

THE COURT: Argument for the plaintiff?

MR. CONTARINO: Just a second, Your Honor.

THE COURT: Oh, Exhibits 18 and 40 were not formally admitted. You probably meant to offer them.

MR. CONTARINO: Yes, Your Honor. Exhibit 18 is the High Kaliber 2025 Annual Report. We'd like to admit that into evidence.

THE COURT: All right. That's admitted.

(PLAINTIFF'S EXHIBIT P18: Received in evidence.)

THE COURT: And 40?

MR. CONTARINO: And Exhibit 40 is the email address -- email to Mr. Josh Baker, and he authenticated that he received that.

I'd like to admit that into evidence.

THE COURT: All right. That one is admitted.

(PLAINTIFF'S EXHIBIT P40: Received in evidence.)

THE COURT: Closing arguments for the plaintiff.

I guess my first question -- maybe start with the easy ones -- Mr. Rios and Ms. McKnight probably are not in contempt.

Do you agree with that?

MR. CONTARINO: Ms. McKnight appears to have no knowledge of even why she's president of High Kaliber, so I would agree with that.

The testimony from Mr. Rios was -- caused a lot more questions, I think, than answers. And that's part of why in this application we -- we sought discovery, but I think on the evidence today alone I would agree with that.

THE COURT: All right. Now, let's go to the harder ones.

MR. CONTARINO: Your Honor, the testimony from Mr. Robinson was revealing. As predicted, quite different from the arm's length transaction that has been touted, it was anything but. Mr. Robinson is yet another cutout to create yet another appearance of separation while Mr. McKnight retains control over the Performance Triggers operation.

Mr. Robinson said multiple times that he -- the deal was set up so -- I think essentially a quote here -- *So we can just keep everything going on*. He said, quote: *A lot of stuff just stayed the same*.

He -- the whole basis of this 7-plus-million-dollar-a year company being sold for $250,000 is that someone who buys it can't -- can't sell these website -- can't sell these triggers on the website, and yet the very day that he purchases it or the day after, he's selling the triggers on the website.

It doesn't -- it doesn't add up. I think that's a faulty argument. It's failed.

And we hear about the payment terms. I mean, 25,000 -- especially at this point $25,000, that was the cost. There is no obligation.

THE COURT: I think he said 50.

MR. CONTARINO: 50,000. 275 -- you are right, 275 total, and 50,000 has been paid, and then there is nothing that

requires him to make good on the rest of that payment, apparently, if the sales don't continue. But even as the sales continue, and Mr. Robinson said they have and he's been doing well, no further payments have been made; no further payments need to be made. There's no agreement.

It would have been nice: Mr. McKnight is talking about how Christopher Rios is feeling in terms of the transaction. It's fairly clear the -- the controlling party here is Anthony McKnight.

And Douglas Rios testified about how when he left in 2024 because he wanted to do his own thing and Performance Triggers dissolved, his brother left at the same time. It doesn't add up that Performance Triggers dissolves; Christopher Rios leaves, but Christopher Rios is still the owner up until 2026, a year and a half -- more than a year and a half after he's left.

Mr. Robinson also paints that picture. He doesn't know almost anything about this company. He doesn't know employees. He doesn't know where products are -- are purchased from. He doesn't know brands that are on the website.

He has employees that at first he claimed he didn't know their last name, then, when pressed, reversed course. That's not credible. That's not credible testimony.

The Performance Triggers now is controlled just as it was before. And while -- anyone can say anything about not

receiving any money and there's no agreement here. There's no agreement; that means that there can't be any agreement, and that's what we see.

THE COURT: I don't know if you asked for Mr. Robinson to be held in contempt, but I didn't issue a show cause order about him being held in contempt.

So I can't told him in contempt today; true?

MR. CONTARINO: We served our order -- we served our motion on him, but you did not include him in the order to show cause.

So, you know, there's an application against him for that relief, and I don't believe that your order precludes it, and I think it could.

THE COURT: Well, I'm not sure I can hold somebody in contempt I haven't given notice that that's the issue.

He doesn't have a lawyer here, although he's sat at counsel table -- or in front of the bar for the whole proceeding.

MR. CONTARINO: Well, yeah. My point is he does have notice of -- because we served him, and that's what our intent was with being -- so that brings us to, you know, these -- whether it's cut out people or website, it's the same scheme here. We have documents showing the history of entities being set up to get around certain things. We saw it with the preliminary injunction in the patent case.

The merchant account for Performance Triggers is created smack in the middle of Your Honor deciding whether that should remain vacated or not. You ultimately decided for it not to -- for it to say vacated in June 2022. And in -- and so nothing was done with that merchant account, stayed inactive.

And then just as the parties are getting to the settlement and have settled, but a few days before submitting the consent judgment to Your Honor, they make sure that merchant account is active and continuing sales on a platform that would be violating the settlement agreement entered days before.

These other websites, there's no answers. There's no answers for why there's money being deposited into Performance Triggers' bank account controlled by Anthony McKnight where it's being paid -- made payable to Trigger Parts USA. There are -- the answer for why his billing information, his residence would be in the merchant account information received by third-party subpoena is that he helped out with the website. At times he referred to the website as "we": We didn't sell or did sell things.

Same for Trigger Parts USA. Fast Triggers and Trigger Parts USA, they are really just kind of parallel schemes to get around these -- the settlement agreement. If Christian Griffin really owns these, the secrecy on these just would not need to exist.

Christian Griffin lives in Florida; he works for

Anthony McKnight, and yet the addresses for Trigger Parts -- the address for Trigger Parts USA is in Dallas, Texas. The -- there's no -- there's no entity that owns these.

I mean, so it's a sole proprietorship. Anthony McKnight is controlling and said -- admitted that if the -- after the Court's injunction if something needed to be taken down, he could do it. He did do it. He said that he did it today -- he did it yesterday, took both websites down.

This is not -- the records and actions of Mr. McKnight are not -- not ones that reveal compliance with the Court's order, but defiance, and in a -- at times in a -- a backhanded way to avoid detection, and this shouldn't be countenanced.

We've looked at the shifting parties in the Performance Triggers' owner -- ownership and operation from Exhibits P4 through P9. We look at the signature card for Capital City Bank, one that apparently after the dissolution of Performance Triggers Capital City Bank was fine to keep open. That is not -- that is not what I understand as industry practice in the banking field.

THE COURT: I would not expect a bank to routinely check on the status of a corporation that has a corporate account.

You think banks routinely do that?

MR. CONTARINO: What I'm saying is that Mr. McKnight testified he alerted them that it was dissolved, and after

alerting them, they did nothing.

THE COURT: I guess we are both saying the same thing: It does not ring true that you would tell the bank that the corporation had been dissolved and the bank would say, We don't care; just keep operating.

MR. CONTARINO: Correct.

THE COURT: But one would expect a bank that had a corporate account opened not to know immediately when its account holder got dissolved.

MR. CONTARINO: Correct.

There's no explanation for the dashboard still being in the possession of Mr. McKnight. And there's no information for if the transfer happens February 9th, there should be -- and that record is within Mr. McKnight's possession, there should be a flat line for the rest of the duration. There should be no income because it doesn't belong to him and it's not in his ownership or control. We don't see that. We see continued sales from February through March 2026.

There's unexplained information in that merchant account application where Douglas Rios' social security number should be there. It's not. No one knows why.

In all, Your Honor, the plaintiffs here have met the burden of a preponderance of the evidence.

THE COURT: Isn't the burden clear and convincing evidence? It's a contempt proceeding.

MR. CONTARINO: I understood civil contempt was preponderance, but if that's not, then --

THE COURT: I think it's clear and convincing, but I'll go back and read the case again.

MR. CONTARINO: Then clearly and convincingly we have shown that a contempt ruling here is appropriate and there should be repercussions for --

THE COURT: What do you want me to do?

Suppose I agree with you that Performance Triggers and Mr. McKnight are -- have been in contempt.

What do you want me to do?

MR. CONTARINO: Part of what we asked for, because there is the shifting assets constantly, is a special master to figure out what is actually going on behind the scenes.

That's in our papers. You know, we do not believe the Performances website should be up continuing to sell in violation of the Court's order. And there should be some damages awarded for this behavior.

THE COURT: All right.

MR. CONTARINO: That's all I have.

Thank you, Your Honor.

THE COURT: I'll give you a couple of the citations on clear and convincing evidence. They include *FTC vs. Leshin*, L-e-s-h-i-n, 16-618 F.3d 1221. It's an Eleventh Circuit case from 2010 and it relies on *Riccard* -- R-i-c-c-a-r-d -- *versus*

*Prudential Insurance Company*, which is 307 F.3d 1277, Eleventh Circuit 2002.

The *Leshin* case, the requirements for a finding of a civil contempt are set out at page 1232. And then *Riccard*, they are set out at page 1296.

Mr. Smith?

MR. SMITH: Thank you, Your Honor.

The motion before the Court today is whether or not Douglas Rios, Sherrie McKnight, Anthony Rios -- I'm sorry -- Anthony McKnight are in contempt of the injunction entered by the arbitrator blessed by this Court --

THE COURT: And --

MR. SMITH: -- and this Court, correct, Your Honor.

THE COURT: And Performance Triggers?

MR. SMITH: And Performance Triggers, correct, Your Honor.

THE COURT: But as my first question to Mr. Contarino suggested, it's clear to me that Ms. McKnight and Mr. Rios are not in contempt.

I thought Mr. Rios was straightforward answering the questions.

MR. SMITH: Thank you, Your Honor.

THE COURT: I should say this in advance on the hearing. These are my hearings -- these are my rulings for purposes of this hearing. And for purposes of the hearing, I

credit Mr. Rios' testimony, for the most part. I'm not going to say I've gone back through every question and answer and agreed with it, but I thought he was candid and responded to the questions, and the evidence does not establish that he was back-involved and in violation of the preliminary injunction.

Ms. McKnight testified credibly. As far as I can tell, she didn't have anything to do with this. And so they are not in contempt.

MR. SMITH: Thank you, Your Honor. I appreciate that.

THE COURT: But there's a question you need to address for Mr. McKnight and for Performance Triggers.

MR. SMITH: Sure. Well, first of all, Your Honor, Performance Triggers has not been an entity since Oct -- November of 2024.

THE COURT: That's an odd position to take, because they were in business for a long time after that, so --

MR. SMITH: The website was operating, Your Honor, but Performance Triggers itself was -- the company had been dissolved.

Yes, the website was operating. It was operating under Anthony McKnight. That we can all agree on. We can agree that the asset was owned by Christopher Rios. He went through C&C Holdings --

THE COURT: I don't agree it was owned by Christopher Rios.

MR. SMITH: His name --

THE COURT: You say, We all agree. I'm not sure I agree with that.

MR. SMITH: Okay. Well, I would argue that according to the corporate records, C&C Holdings Group was the president and owner of Performance Triggers.

THE COURT: Yeah, the corporate records say it was dissolved.

MR. SMITH: Correct.

THE COURT: And yet the evidence is pretty clear it was going gangbusters. It did $6.7 million in 2025.

MR. SMITH: Well, Your Honor, I think the distinction here is that the website, performancetriggers.com, did $6.7 million in revenue. But at that time it would not have been attributed to Performance Triggers, Inc., because it was a dissolved entity.

THE COURT: Well, whose revenue was it?

Who is paying tax on that net income?

MR. SMITH: That I don't know, Your Honor.

But there would have been no corporate tax filings for Performance Triggers, Inc., in 2025 as a dissolved corporation unless it was still going through the winding-up phase.

So -- but regardless --

THE COURT: Wait. Sometimes you just scratch your head. You think a business that files a paper that says, We are

dissolved, keeps operating and generates revenue and net income doesn't have to file a tax return?

So just no taxes payable?

MR. SMITH: No.

THE COURT: Why don't they all dissolve?

MR. SMITH: I believe the asset would have gone to the successor in interest, whether it was another corporation or an individual who took over that asset, and they would be responsible for the taxes. In that case I would say it would be Anthony McKnight, likely, responsible for those taxes.

That being said, the question before the Court today is whether or not Anthony McKnight sold FRTs or FRT parts or worked with someone else to sell FRTs and FRT parts after the injunction was entered on February 27th, 2026.

Whether or not there was a performancetriggers.com merchant account set up in 2022 and started operating in October of '22, is, quite frankly, irrelevant to this, Your Honor. As Mr. McKnight testified, Performance Triggers has 7 or 8,000 different products available on its website.

Plaintiffs have presented no evidence that that website was set up to begin selling FRTs immediately after the settlement agreement. That's pure speculation. There is no evidence of what was on the Performance Triggers' website in 2022, 2023, or even 2024. They are focused on -- and the brunt of their case is that they started selling FRTs and FRT parts in

violation of the settlement agreement sometime in 2025, which led to this lawsuit.

So trying to say that -- them setting up a website and a merchant account for performancetriggers.com back in 2022, quite frankly, is smoke and mirrors and trying to say that they are going to do business selling FRTs without any evidence. They are speculating that simply because they set up a new website to sell gun parts, 7 to 8,000 different types of gun parts, does not necessarily make it a violation of the settlement agreement in 2022, 2023, 2024.

Arguably, they are now claiming in 2025 there were sales that violate that. But the question is what happened after the court entered the preliminary injunction on February 27th, 2024 -- I'm sorry -- 2026.

Mr. McKnight has testified that to the extent he had some control or some input -- he didn't say he had control; he had input -- into Fast Triggers and Trigger Parts USA, he recommended and they eventually did take those sites down. For Performance Triggers, he took the site down immediately -- well, within days, long before the preliminary injunction was actually entered and bonded on February 27th.

THE COURT: He told me that he helped Mr. Griffin run Trigger Parts and Fast Triggers, and those entities were selling FRTs after the entry of my preliminary injunction.

What more do I need to hold him in contempt?

MR. SMITH: I think the question is whether or not he was controlling -- had a controlling interest in those entities and was selling in violation of the order.

THE COURT: You think that he was free to sell FRTs as long as he wasn't the top guy?

MR. SMITH: I think if he had gone -- if the top guy insists on continuing to sell them because he's the guy in charge, Mr. McKnight can influence that. I don't think the evidence is that he actually controlled that, Your Honor.

THE COURT: So you think --

MR. SMITH: And --

(Indiscernible crosstalk.)

THE COURT: You think it was okay after I entered my injunction for him to help sell FRTs?

MR. SMITH: If he is assisting on a website e-commerce.

THE COURT: What he told me on the witness stand right there was he helped run the place.

Isn't that what he said?

MR. SMITH: I don't believe -- when I asked, Your Honor, he said that -- when I asked him if he had control over those and whether he had made the final decision to take parts down or not, he testified that that was not his decision; he was not in control.

THE COURT: I think on direct he said that he helped

Mr. Griffin run Trigger Parts and Fast Triggers. Now, I don't take notes verbatim, so that may not be a quotation, but that's pretty close.

MR. SMITH: Well, Your Honor, that's why I asked the clarifying questions as to whether or not he had any control on Fast Triggers or Trigger Parts USA, which he testified that they are not his to control.

THE COURT: So the injunction says that he is prohibited from engaging in the manufacture or sale of Forced Reset Triggers or any parts.

I didn't draft the language, the arbitrator did, and I enforced his order, so the prohibition is from engaging in the sale of Forced Reset Triggers.

MR. SMITH: Correct, Your Honor.

THE COURT: Also manufacture; but not involved, engaging in the sale. So when he helps run a business that's selling Forced Reset Triggers, your position is that's okay?

MR. SMITH: Our position, Your Honor, is that he was assisting in running a website and an e-commerce site. He was not directly involved in the products being sold through those sites. And the Court may differ and I'm sure --

THE COURT: Well, that's why I asked the question. I wanted to hear your explanation of why that was okay.

MR. SMITH: Sure.

He was not in control of the sites. They were not his

to control. He was providing input; he was providing back-end support to make sure they are running right, which also brings us to Performance Triggers after the asset purchase agreement was entered.

It's not uncommon when a company is sold, particularly an asset sale -- and this was not a company sale; this was a sale of assets. But it's not uncommon in the e-commerce world or other places that when that happens employees who have been there and who have corporate knowledge, move with the company to the new owners. It happens quite frequently.

The evidence is that when the injunction was entered and those products came off the Performance Triggers' website, it devastated the revenue. It plummeted -- 90 percent, I believe Mr. McKnight testified to.

THE COURT: That's not really what the graph they showed indicates. They --

MR. SMITH: Actually, Your Honor --

THE COURT: I'm sorry. Go ahead.

MR. SMITH: -- it is. If you look at the February time frame and the sales, they drop off dramatically, almost to nil, and then they go back up after the site is back up under Mr. Robinson.

THE COURT: Mr. Contarino, can you stick that up there real quick?

I do remember a spike at the end. That was the end of

March, so let's --

MR. SMITH: That was --

THE COURT: -- pull it up, and then we'll talk about it.

MR. SMITH: If we look at that, Your Honor, the items ordered, single value.

THE COURT: I'm with you. I'm looking at the chart that you've got up.

11,439 items ordered in the first quarter of 2026, and it looks like you are right, they were sold -- a lot of them sold in January. They don't have the lines drawn up here, but it looks like maybe early February, and then it goes pretty flat. There are some being sold, but then a lot gets sold in March.

MR. SMITH: Correct. And I think it's the same way on the revenue, Your Honor, on the grand total summary on the left. It's very dramatic that there is a definite dip in the revenue. And that would be, in our minds, the time when the FRTs and FRT parts were taken down off Performance Triggers.

THE COURT: That seems to match up.

That does undercut your argument that they had 70,000 products. It does sound like the FRTs were the ones that were generating all the revenue.

MR. SMITH: Well, Your Honor -- yeah, and if you have -- we went through this in the arbitration hearing, but

when the decision came out that Rare Breed had -- or the announcement came out that Rare Breed had settled with the ATF and the Department of Justice, the FRT market exploded.

I mean, it went crazy with everybody out there. As Mr. McKnight said, there's probably 70 or 80 websites out there selling FRTs. It absolutely exploded and the revenues went through the roof for a very short period of time until everybody started getting sued, obviously.

THE COURT: I get it. Let's go back. You are talking about the sale of assets and it's a turnkey operation. And I get it that can happen.

Why is it okay for Mr. McKnight to help out with setting up a turnkey operation that's going to sell FRTs?

MR. SMITH: I believe all Mr. McKnight testified that he did was relist the items, put them back up. Is that a violation? More than likely.

I don't think he thought about it that way at that time. He was just helping the new owner take over the business and help him learn the ropes. Was it a poor choice? I would say it probably was. Was it a willing contempt of a court order? I don't believe it was, Your Honor.

And, again, the standard here is clear and convincing evidence. I don't think the plaintiffs [sic] have met their burden that Mr. McKnight is intentionally willfully violating the Court's order.

He testified that he's received no money from FRTs since the injunction went into place. He's not selling FRTs. Yes, he probably relisted the items for Performance Triggers when Mr. Robinson bought the assets; however, that was actually before the February 27th date.

Mr. Robinson bought the assets on February 9th. The injunction was not bonded until February 27th. Arguably, Mr. McKnight was not in violation of the injunction at that point because it actually was not yet effective.

THE COURT: I think what we are here about is violating my injunction, March 16th, at least. March 16th, I think, was the date of my injunction.

MR. SMITH: Sure.

But that would -- so, Your Honor, I don't think they have met the burden for clear and convincing evidence to show Mr. McKnight or Performance Triggers is in violation of the arbitrator's injunction, which is why we are here today.

THE COURT: I thought we were here on my injunction, but I'll go back and read my order. It may be both.

Give me just a second.

(Pause in proceedings.)

THE COURT: The show cause order deals with the March 16th order, not with the arbitrator's order. We are talking about contempt of court, and the court order was March 16th.

Let me give you a chance to respond to one specific -- and we came close to this. One of the questions was after the injunction was entered by the arbitrator and entered by this Court, have you sold any of the products that would be considered FRTs by the plaintiff?

The answer was: *Personally, no. Though Fast Triggers and Trigger Parts USA, yes.*

MR. SMITH: Agreed, Your Honor.

THE COURT: All right. Thank you.

Any rebuttal?

MR. CONTARINO: No, Your Honor.

THE COURT: All right. I'm not going to try to dictate a detailed set of findings at this point. I'll get you an order.

I expect it to say that Mr. McKnight is in contempt -- or has been in contempt and then Performance Triggers has been in contempt; that Mr. Rios is not and that Ms. McKnight is not.

The last question I read -- I mean, Mr. McKnight was involved in sales of Forced Reset Triggers through Fast Triggers and Trigger Parts USA that violated the injunction. He helped in a number of other respects. Those were violations of the injunctions. I will consider -- and I'm not going to announce a definitive ruling right now -- whether to expand the injunction to make clear that Bump cannot sell FRTs.

The defense is right, there can be a sale of assets

and a turnkey operation and the owner and a CEO of a business doesn't need to know all the details. In fact, most any business worth having, the CEO doesn't know all the details. If it's a very big business, there's some things that one person can't know all of.

There are probably things that go on at any of the great corporations -- you can name any of them -- and that chief executive has the big picture and makes the decisions but doesn't know all the details. But Mr. Robinson's knowledge of what went on at that company -- what goes on at that company is very thin. And so while the defense is right that there can be a turnkey operation, there's something to be said for the plaintiff's view that this whole thing is just a sham.

There's not a contempt issue with Mr. Robinson, because I didn't include him in the show cause, and I don't think that issue was clearly enough raised for Mr. Robinson to come and know there was a potential of contempt ruling against him here today. But I will give more thought to whether the injunction should be expanded to make clear that Mr. Robinson's company, Bump, can't continue to sell parts that are sold directly by Mr. McKnight. It would be a violation of the injunction.

We've got a couple other things we need to deal with, and we have a few more minutes to do it. I do not have the attorney eyes-only materials.

Did you file those? And where did you file? You may have delivered hard copies to the Clerk of Court here in Gainesville.

MR. CONTARINO: For the decisions, Your Honor?

THE COURT: Yes.

MR. CONTARINO: I saw an entry that they were delivered, but I'm not -- it was while we have been here.

THE COURT: Make sure that microphone is on and keep standing and speaking up real loudly.

MR. CONTARINO: Sorry, Your Honor.

THE COURT: I did not have them available before I came this morning, and I've been busy today so...

MR. CONTARINO: Right. I understand they were delivered today. I saw a notation on the docket but also wasn't -- I think it would have just been today is what I understand.

THE COURT: While I'm thinking about it, do a notice of filing and file all the exhibits from this hearing.

The most recent thing I see on here is 297. That's what I read. That's been here.

THE COURTROOM DEPUTY: It was filed today, Your Honor.

THE COURT: Okay. All right. I'm being told that's the new stuff, and I haven't had a chance to read that.

Mr. Smith, you want to be heard on the attorney eyes only? It really should be a limited set of things.

How do you want me to proceed? I can give you a chance -- I don't think there is anything urgent about it.

MR. SMITH: Your Honor, I'm honestly trying to remember which documents they were. I believe they were marked "attorneys eyes only" because at the time of the prior litigation, they were marked "attorney eyes only" due to trade secret issues. They were potential design-arounds for products on the '223 patent, if I recall correctly. And I believe they may have been possible agreements with other parties, but I'm not 100 percent certain on that either.

THE COURT: From the motion it didn't sound to me like it was trade secret design-around information, but, Mr. Roth and Mr. Contarino, what -- is there anything we can accomplish without me reading these documents?

MR. CONTARINO: Well, right, they were licensing agreements from years ago. They were a -- I think a publically filed application with the patent office. There was --

THE COURT: Well, let's leave it this way: Mr. Smith file a response. Next Friday work?

MR. SMITH: Sure.

THE COURT: By next Friday file a response. Go through there, and if it's some very old licensing agreement, it probably is not useful to mark it as information today. And if it's some of the things that were referred to in the motion, it doesn't sound like they should have ever been marked "attorney

eyes only" anywhere.

Look, if Mr. McKnight has other irons in the fire and he doesn't want Mr. DeMonico to know his strategy for the next round, that makes perfect since. And that's why there is such a thing as an "attorney's eyes only" designation, so if it makes a difference in the litigation, Mr. Contarino will know about it, but Mr. DeMonico can't use it for competitive advantage.

But that's a narrow class of stuff. And if this is not that stuff, then your response to the motion ought to be, "We give up."

MR. SMITH: Understood, Your Honor.

THE COURT: There is bickering about who didn't take what phone calls and whatever. I tell lawyers every chance I get, there's a meet-and-confer requirement. It's probably misnamed. Nobody expects you to meet anymore, but it's gotten to where I get these and the lawyers have never picked up the phone to even make a phone call. Talk to each other.

You folks are way too good of lawyers to not talk to each other. I don't think I'm giving away any trade secrets. You've all got telephone. Use them.

You want more time on the plaintiff's side?

MR. ROTH: Correct.

THE COURT: I guess partly what I say is, Really? You know, I usually scratch my head when a plaintiff starts asking me for more time.

MR. CONTARINO: Mr. Roth is prepared to do this.

THE COURT: All right. Tell me about it.

MR. ROTH: Yes, Your Honor. So with regard --

THE COURT: Come to the lecturn.

MR. SMITH: Your Honor, if this is the motion to continue and extend deadlines, I honestly may have missed that communication from Mr. Roth, but, again, he didn't pick up the phone. We don't have -- actually object to --

THE COURT: Oh, you'd be surprised how many motions put things off where both sides agree and sometimes I don't.

If you haven't heard my speech, here it is. I think we in the federal judiciary -- juries, judges, even appellate courts -- I think we do an excellent job of deciding cases when we finally get around to deciding cases.

But here's one your clients will all appreciate -- they are here in the courtroom -- it takes too long and it costs too much. And every time I put a trial back, the total cost of the litigation goes up, every -- I think every time.

I get a lot of contingent cases where all it means is the plaintiff's lawyer has to spend more time, but if they win, the defense has to pay not only their own increased fees, but the plaintiff's increased fees. It just takes too long and it costs too much.

Now, I don't want the defense to be able to stonewall and hurt your ability to present your case on the plaintiff's

side, so they can't just run out the clock on discovery to keep you from being able to get what you need.

I guess part of the question is what do you really need? I mean, you did a pretty good job of this stuff. There's some more things you need. I think you need their tax returns.

I mean, it seems to me that if you are looking at who was benefiting from this business, people don't always put all their revenue on their tax returns, but they often do. And, you know, if there are tax returns for all these businesses and so forth, that may be what you need.

What else do you need?

MR. ROTH: Up to the lecturn, Your Honor?

THE COURT: Please.

MR. ROTH: So, Your Honor, with regard to what we need, we have a fundamental difficulty of we don't know what exists and is available. If you recall the hearing that we were in Tallahassee for two months ago, a big component of those motions to compel was the claim by defendants that they had deleted all these records: Big Daddy Unlimited, Big Daddy Enterprises, Blackstock, Inc. Those were gone completely unavailable.

Those records would be for a time period where we could see if there were contumacious sales, because there is for the old case, the contempt case for the WOT and the Alamo 15. So we have the representations -- and Your Honor addressed that

it was conclusory. We didn't know what the diligent search was and it seemed a pretty big statement to make that none of this exists.

Speaking of tax returns, Your Honor spoke with Mr. Smith about how these entities even filed their taxes if they didn't have records anymore, what was going on with that. We didn't know.

So part of your order on the motion to compel was that Doug Rios and Mr. Anthony McKnight had to provide us declarations attesting to their search and their production so we could evaluate -- did you look? Did you really look? Did you ask third parties? -- everything involved with their obligations.

Now we are two months away from that hearing, almost two months away from Your Honor's order on the order to compel, we have not received those declarations. So we are still left wondering if their search was fulsome and complied with the obligations; if the production that we received is all that could possibly be available, because there's much that we did not get that we want to review.

THE COURT: So you can take their depositions next week and find out the answer to that.

MR. ROTH: So with regard to that, Your Honor, we depose them next week. Our deposition is doubly hampered in that context, one, not having the records to base questions on,

which does harm a deposition's utility; and then, two, dealing with the attorneys eyes-only issue, there's so much that our clients could not review and the masters of lure and facts and knowledge about the nature of the FRT industry, about the players.

They live and breathe it. It's their life. We are just attorneys. We don't know the industry. We can't evaluate a lot of these facts and records the way that our clients can.

And so if something is overdesignated and kept from them, it's meaningfully kept from our ability to use, such as for a deposition. And so with that issue not likely to be decided, because he has the response deadline for next Friday, before depositions would have to get in before May 1st, deposition is hampered again. That's where we have a strong difficulty.

And then on top of that, we further have the recent statement from Mr. Smith in the email that I believe I filed with this motion where he states -- and would this be something you need me to put up on the screen or do you have the exhibit?

THE COURT: Tell me the number, and I've got it.

MR. ROTH: Okay. What is the ECF number for the motion to continue?

I apologize for not having that.

THE COURT: It's 293. I've got that motion.

What do you want me to look at?

MR. ROTH: I believe the Exhibit A is correspondence between Mr. Roth and Mr. Smith.

THE COURT: Yeah.

MR. ROTH: So it would be that.

THE COURT: I've read all this.

MR. ROTH: So the third page out of the five, towards the bottom we have the email from Mr. Smith to me. This was in response to me asking about those declarations, which we to date still have not received. And in it he says: *I also want to let you know that we have retained an electronic discovery firm which is pulling documents and will be providing its own reports on that discovery.*

So I did ask follow-up questions to Mr. Smith. I did not call him on the phone, so that is taken under advisement for the future, absolutely. But I did ask follow-up questions about when that had been retained, was this for all of the clients that he was representing that produced a production to us -- because I wanted to know the prior representations. We don't have records. This is all we have. Things were deleted. Was that a professional's opinion or was this just taking an amateur look? We don't know. We don't have the declarations from Rios and McKnight giving that info.

So now here we are April 17th, close of discovery is in about two weeks, and we don't know if even the one production that we got is a genuine production, if there is going to be a

supplemental production, maybe; if there is stuff that is left out. We have no knowledge of this, but we have an indication that what we got was not with a professional's touch and insight, and this matter and its complexity has shown itself to require that.

And so with the deposition difficulties, with the no attorneys eyes-only documents that we can confer with our clients on up to this point, with this new statement and what it could mean, we fear that we, plaintiffs, are hampered in our ability to make use of discovery and show our case. Our ability to do our case is solidly dependent upon this discovery.

They would have the records: Did you sell WOTs? Did you sell Alamo 15 after the injunctions? We can't tell that. We can look at the Wayback Machine.

THE COURT: Why didn't you go to the Wayback Machine -- you've done that -- and find the sale of the ads for these products?

Do you have the same kind of charts we were just looking at about the revenue generated by the website?

MR. CONTARINO: No.

MR. ROTH: No, Your Honor, we don't have that kind of financial data.

THE COURT: And is there not a third-party provider that you can subpoena that for? This stuff may be getting old, so they may not keep it that long, but they might.

MR. CONTARINO: Well, Your Honor, part of this was Fast Triggers that, we saw today, up until this point defendants have categorically denied any involvement with whatsoever. And if there's no company that -- if it's just laced into another -- whether it's an entity of Mr. McKnight or something else or -- we have a hard time trying to get financials from him.

And you know --

THE COURT: Mr. Smith, who's got the financials for Fast Triggers?

Who's got the website revenue information like was put up today for these entities?

MR. SMITH: I believe Mr. McKnight can access that, Your Honor.

THE COURT: Oh, they can subpoena it. Who is the company they need to send a subpoena to?

MR. SMITH: Well --

THE COURT: Or if Mr. McKnight can just access it and turn it over, good.

So next Friday -- can you turn that over by next Friday?

THE DEFENDANT: No problem.

THE COURT: So by next Friday, that's April 24th, turn over the website revenue for --

MR. CONTARINO: Fast Triggers and Trigger Parts USA.

THE COURT: -- Fast Triggers and Trigger Parts USA and

the enjoined entities --

MR. CONTARINO: We've had another issue --

THE COURT: -- and all their tax returns.

MR. CONTARINO: -- with Mr. Andrew Meyers, who Mr. Smith is representing, getting any information from him. We know that he ran multiple websites that sold the WOT, and our understanding was the connection with defendants -- there was representations in response to our third-party document request, subpoena request to him -- again, completed by Mr. Smith -- that records from him would be produced in a span of two weeks ending March 13th, 2026, and nothing has been produced from him, not a document.

THE COURT: Mr. Smith, what's up with that?

MR. SMITH: Your Honor, one of the reasons that we have employed an e-discovery vendor in this case is because of the mistrust between the parties. After the accusations that we were withholding documents related to the WOT and the Alamo 15, we thought it prudent to hire a third-party vendor to do this discovery; to dig into all of the devices, all of the available phones, laptops, desktops, and cull all that data out for review so that we have a clear picture of what's actually there.

That process is near completion and should be done by early next week, and then all those documents will be produced for both the arbitration and, to the extent applicable, to the WOT and Alamo 15.

THE COURT: So also by next Friday you can turn over the results of the vendor's search and all the documents the vendor found.

MR. SMITH: I believe that is correct, Your Honor.

MR. CONTARINO: And may I ask, Counsel, is that including Mr. Meyers?

MR. SMITH: That should include everyone; yes.

MR. CONTARINO: At that point, Your Honor, we have a week to try to get -- scramble to get multiple depositions in based on information we receive on a Friday for the week after.

MR. SMITH: Which, Your Honor, is why we are not opposed to extending these deadlines.

THE COURT: Anybody have the scheduling order? I'm trying to find it.

All right. I got it. It's ECF Number 247.

Does anybody think they are going to move for a summary adjudication of this, or are we going to have a hearing?

I'm skeptical that it's a summary adjudication, but you can talk me out of it.

MR. CONTARINO: Well, it seems possible. If it's the scope -- I mean, if we just take Fast Triggers -- just using Fast Triggers as one example, if it's as easy as Wayback Machine documents showing the sale of these triggers, finances, showing income from it, then -- I mean, that's the -- that's it. That's the summary.

So I can't guarantee it, Your Honor, but we would be shooting for that, if possible.

THE COURT: Even that would be liability only.

MR. CONTARINO: Pardon me?

THE COURT: That would be liability only.

MR. CONTARINO: True.

THE COURT: There's time in here to keep most of this schedule. I always try to give enough time to deal with any summary adjudication before you have to start the pretrial process. It's better not to have those overlapping so that when you set down to do a pretrial stipulation, you are dealing with the actual issues after any ruling at the summary adjudication part. So we've done that here.

But, look, if two more weeks for discovery, would that -- if I moved it back to May 15th with what we just talked about, you have a petty good chance to get it all by then; don't you?

MR. ROTH: Your Honor, it sounds like that. We hope for that. The only thing I have to mark out is given the difficulty of things that have happened up to now, we just -- we can't guarantee that we won't experience a problem with what's produced. I don't want to curse it. I don't want to jinx it. But if it comes up, I just want to note we may end up before you again. And it's not an attempt at delay; it's trying to vindicate our rights.

THE COURT: All right. Well, let's do this: I've heard what you say. I'll slide the schedule a little bit. I'll try to keep from overlapping any summary adjudication. It may make it go a little bit faster. If there really is a summary adjudication here, it may not take the full briefing schedule that I would have in an entire lawsuit.

Let me sharpen the pencil and get it out and see what I can do with the schedule, but count on having a least a couple of extra weeks for discovery.

MR. ROTH: Thank you, Your Honor.

THE COURT: And then talk to each other. I may even set a status conference a couple of weeks down the road, two or three weeks down the road, to make sure you got everything you were supposed to get and that we are back on schedule, confirm that the revised schedule you are going to get will be okay.

I will try to get you this as quickly as I can. I do have a fairly high-maintenance trial starting Monday, so I'll be busy next week, but I've got a little time over the weekends and maybe in the evenings. I'll try to get you an order pretty quickly.

What else can we accomplish today, Mr. Roth?

MR. ROTH: So, Your Honor, a point related to what we discussed and then I believe we have the motion to modify the protective order beyond today. So just noting that was on the docket for us.

THE COURT: Mr. Smith, is it any problem for them to use the stuff that's been produced in one of these cases to produce it in connection with the other case? I mean, it's litigation pretty closely related.

MR. SMITH: I'd like an opportunity to think about that one, Your Honor, only because the arbitration includes records from a variety of different products that are not implicated in this case. And I think documents and document production related to the WOT and the Alamo 15 should be the ones that are used in this case because that is the only issue.

THE COURT: But what does it hurt if the lawyers can use it all? I mean, you have one opinion about what relates and they have a different opinion about what relates, but this is stuff they have already seen.

So to the extent they've seen it already, if I say, Well, they can use it for this case, if it's really not relevant, it doesn't matter whether they use it for this case.

MR. SMITH: Fair enough.

THE COURT: It's just not going to make any difference.

MR. SMITH: Fair, Your Honor. I think we can probably resolve this one.

THE COURT: All right. Then I'll say you can use the stuff in connection with both cases, limited by the same order that limits it already.

MR. ROTH: Yes.

Thank you, Your Honor.

THE COURT: All right. Good.

MR. ROTH: Last point I just wanted to address from the motion to continue. I just wanted to note the declarations that Your Honor ordered in your order to compel did not have a specific date for their timeliness to be done. I'm not sure if what you already asked for here encompasses those declarations.

We would like to see them. We'd like to understand what's been searched and produced --

THE COURT: Yeah --

MR. ROTH: -- if that's included with the rest.

THE COURT: -- by April 24th. Wrap it all up by April 24th.

What else?

MR. ROTH: I have nothing further.

THE COURT: Feel free to say "That's all."

MR. ROTH: That's all.

THE COURT: All right. Mr. Smith, what can we accomplish from your perspective?

MR. SMITH: I don't believe we have anything pending, Your Honor.

THE COURT: Thank you all. We are adjourned.

(Proceedings concluded at 4:59 PM on Friday, April 17, 2026.)

* * * * * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. Any redaction of personal data identifiers pursuant to the Judicial Conference Policy on Privacy is noted within the transcript.

/s/ Megan A. Hague 4/20/2026

Megan A. Hague, RPR, FCRR, CSR Date
Official U.S. Court Reporter

**I N D E X**


| OTHER RECORD MADE | PAGE |
|---|---|
| Opening Statement By Mr. Contarino | 4 |
| Opening Statement By Mr. Smith | 5 |
| Closing Argument By Mr. Contarino | 248 |
| Closing Argument By Mr. Smith | 256 |

| PLAINTIFF'S WITNESSES | PAGE |
|---|---|
| LAWRENCE DEMONICO | |
| Direct Examination By Mr. Contarino | 11 |
| Cross-Examination By Mr. Smith | 56 |
| JOSHUA BAKER | |
| Direct Examination By Mr. Contarino | 74 |
| Cross-Examination By Mr. Smith | 82 |
| REGINALD ROBINSON | |
| Direct Examination By Mr. Roth | 83 |
| Cross-Examination By Mr. Smith | 146 |
| Redirect Examination By Mr. Roth | 154 |
| Further Examination By Mr. Smith | 161 |
| Further Examination By Mr. Roth | 165 |
| Further Examination By Mr. Smith | 166 |
| DOUGLAS RIOS | |
| Direct Examination By Mr. Contarino | 167 |
| Cross-Examination By Mr. Smith | 177 |
| Redirect Examination By Mr. Contarino | 182 |
| Further Examination By Mr. Smith | 186 |
| Further Examination By Mr. Contarino | 189 |

| PLAINTIFF'S WITNESSES (Cont.d) | PAGE |
|---|---|
| ANTHONY MCKNIGHT | |
| Direct Examination By Mr. Roth | 194 |
| Cross-Examination By Mr. Smith | 235 |
| SHERRIE MCKNIGHT | |
| Direct Examination By Mr. Contarino | 245 |
| Cross-Examination By Mr. Smith | 247 |


**E X H I B I T S**


| PLAINTIFF'S EXHIBITS | | OFFERED | RECEIVED |
|---|---|---|---|
| P4 | Performance Triggers Articles of Incorporation | 14 | 14 |
| P5 | Performance Triggers May 2022 Amendment | 14 | 14 |
| P6 | Performance Triggers 2023 Amendment | 15 | 15 |
| P7 | Performance Triggers 2023 Annual Report | 15 | 15 |
| P8 | Performance Triggers 2024 Annual Report | 16 | 16 |
| P9 | Performance Triggers 2024 Articles of Dissolution | 16 | 16 |
| P10 | Certification of Business Records for Capital City Bank | 18 | 18 |
| P11 | C&C Holdings Group, LLC, EIN Form | 18 | 18 |
| P12 | Performance Triggers Capital City Bank account agreement | 18 | 18 |
| P13 | Performance Triggers bank account statement dated 1-31-25 | 19 | 19 |

| PLAINTIFF'S EXHIBITS (cont'd.) | | OFFERED | RECEIVED |
|---|---|---|---|
| P14 | ACH single payment report | 20 | 20 |
| P15 | We Got Ammo, Inc., Articles of Incorporation | 23 | 23 |
| P16 | Cover Letter from the amendment section for We Got Ammo, Inc. | 24 | 24 |
| P17 | WGA Global 2026 Annual Report | 25 | 25 |
| P18 | High Kaliber 2025 annual report | 248 | 248 |
| P19 | Screenshot of a product and performance dashboard report for the Performance Triggers' website. | 27 | 27 |
| P20 | David Bitar declaration | 29 | 29 |
| P21 | Merchant Information Document from authorize.net | 29 | 29 |
| P22 | Merchant Information Form from authorize.net | 34 | 34 |
| P23 | Checks/Money Orders for deposit into Performance Triggers bank account | 35 | 35 |
| P24 | Cloudflare, Inc., certificate of authenticity | 36 | 36 |
| P25 | Stripe Billing Details | 36 | 36 |
| P26 | Alachua County Property Appraiser's report | 38 | 38 |
| P27 | Screenshot of fasttriggers.com | 40 | 40 |
| P28 | Stripe Billing Details | 42 | 42 |
| P29 | Big Daddy Unlimited, Inc. 2022 Annual Report | 44 | 44 |

| PLAINTIFF'S EXHIBITS (cont'd.) | | OFFERED | RECEIVED |
|---|---|---|---|
| P30 | Merchant Account Report from authorize.net | 46 | 46 |
| P31 | Screenshot of the Trigger Parts USA website | 50 | 50 |
| P32 | Screenshot of Trigger Parts USA website | 48 | 48 |
| P33 | Asset Purchase Agreement | 50 | 50 |
| P34 | Screenshot of the Performance Triggers website | 53 | 53 |
| P35-P37 | Notice Letters from Mr. Contarino to Defendants | 54 | 54 |
| P38 | Text Chain between Baker and Rios | 77 | 77 |
| P39 | Text Chain between Baker and Rios | 78 | 78 |
| P40 | email to Mr. Josh Baker | 248 | 248 |
| P41 | High Kaliber Studios, Inc., Articles of Incorporation | 25 | 25 |
| P42 | Bump Cerakoting & More, Inc. Articles of Incorporation | 52 | 52 |
| P43 | Rios-Zumont text exchange | 174 | 174 |
| P47 | Return of Article of Organization for Florida, Limited Liability Company | 146 | 146 |