**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**GAINESVILLE DIVISION**

| | |
|---|---|
| Rare Breed Triggers, LLC and ABC IP, LLC,<br><br>*Plaintiffs*,<br>v.<br><br>Big Daddy Enterprises, Inc., et al.,<br><br>*Defendants*. | Case No. 1:21-cv-00149-RH-HTC |
| -and- | |
| Rare Breed Triggers, LLC and ABC IP, LLC,<br><br>*Plaintiffs*,<br>v.<br><br>Big Daddy Unlimited, Inc., et al.,<br><br>*Defendants*. | Case No. 1:22-cv-61-RH-HTC |

**PLAINTIFFS' MOTION FOR SANCTIONS AGAINST ADAM V. FLOYD, TO REVOKE HIS PRO HAC VICE ADMISSION, AND FOR AN ORDER TO SHOW CAUSE**

This motion concerns authorship, identity, and candor. Adam V. Floyd's actions implicate the Florida Bar Rules prohibiting deceit and obstruction. The documentary record shows:

1. On December 11, 2025, Defendants are concerned that responses to some of Plaintiffs' third-party subpoenas are due.

2. On December 11, 2025—when Defendants are represented solely by Smith—neither Defendants nor Floyd can reach Smith.

3. Unable to reach Smith on December 11, 2025, Floyd devises and executes a plan to write to third-party subpoena recipients in Smith's name and under his signature to advise them that a motion to quash would be filed and to formally request that no documents be produced.

    a. Floyd confirms to his former clients, Defendants Anthony McKnight and Douglas Rios, that the subpoena response deadline is December 11, 2025; states that "[w]e'll" still send out letters to the third-party recipients and "object"; and asks McKnight and Rios if they have Smith's letterhead.

    b. Floyd prepares the body of the letter to the third-party subpoena recipients.

    c. Floyd asks McKnight to replicate Smith's letterhead (a "rough imitation") so letters to third-party subpoena recipients can be served.

    d. Floyd instructs McKnight to add the substantive portion of the letter Floyd prepared to the letters to the third-party recipients, "[p]referably on Smith's letterhead."

    e. Floyd approves the replicated Smith letterhead McKnight created, writing to McKnight "Boy's got some skills!"

    f. Floyd asks McKnight to add the body of the letter Floyd prepared to the remaining third-party subpoena recipients and to send them out via email and Federal Express.

4. Unable to reach Smith on December 11, 2025, Floyd also drafts, signs Smith's name to, and serves objections to subpoenas on behalf of five third parties that are Smith's clients, not Floyd's.

5. In serving those objections, Floyd represents to Plaintiffs' counsel that Smith asked Floyd to send the objections and that Floyd was "just a messenger."

Yet Floyd's own contemporaneous emails show that he was not merely a messenger. He was the author, organizer, and sender.

The same record supports a prima facie showing that Smith had not authorized Floyd's use of Smith's name, signature, or letterhead when these specific communications went out. At minimum, that authorization question requires a verified response and an evidentiary hearing. What the documentary record establishes conclusively is Floyd's role: his emails, the native-file metadata, and the documents themselves establish that he drafted the substance, directed creation of the imitated letterhead and transmission of the resulting letters, prepared the subpoena objections, and served them. McKnight's declaration independently corroborates that account: Floyd wrote the substantive body for the letters, asked whether McKnight could produce them on Smith's letterhead (or a "rough imitation" thereof), reviewed the completed version before transmission, and had McKnight copy Smith's letterhead and ship them. Declaration of Anthony McKnight (Aug. 14, 2026) ("McKnight Decl.") ¶¶ 26–30.

Plaintiffs therefore move under the Court's inherent authority and Northern District of Florida Local Rule 11.1(G) for: (1) an order requiring Floyd to show cause; (2) an interim prohibition on his acting in these consolidated cases and in the related case of Case 1:25-cv-00181-RH-MAF while discipline is considered;

(3) revocation of his pro hac vice admission at ECF No. 138 at 2, ¶ 2,[1] and in the related case at ECF No. 87 in Case No. 1:25-cv-00181-RH-MAF after notice and an opportunity to be heard; (4) an award of the reasonable attorneys' fees and costs that Plaintiffs would not have incurred but for the misconduct; (5) preservation and disclosure; and (6) transmission of the Court's final findings to the appropriate disciplinary authorities.

## BACKGROUND

### A. Floyd was admitted pro hac vice in June 2022 and represented Defendants only through entry of the permanent injunction in October 2022.

On June 18, 2022, the Court granted Adam V. Floyd permission to appear pro hac vice on behalf of Defendants in this action. ECF No. 138 at 2, ¶ 2. On the same date, the Court granted Floyd's pro hac vice admission in what is now a consolidated matter with this one, Case No. 1:22-cv-00061-RH-HTC. ECF No. 35 in Case 1:22-cv-00061-RH-HTC.

Floyd thereafter represented Defendants in connection with the resolution of the two actions. His representation continued through entry of the Consent Judgment and Permanent Injunction on October 19, 2022 ("permanent injunction"), which resolved the matters. ECF No. 194.

[1] To the extent Floyd's PHV admission in Case 1:22-cv-00061-RH-HTC remains active, revocation of it, too, would be required. See ECF No. 35 in Case 1:22-cv-00061-RH-HTC.

In July 2025, Plaintiffs moved to reopen these cases, for expedited discovery, and for an order to show cause for contempt. ECF No. 200. Defendants responded through Michael Smith of The Fowler Law Firm P.C. ECF No. 206 at 5. Defendants stated that they had retained Smith anew for this contempt proceeding after the permanent injunction was entered. *Id.* at 2. Floyd never appeared for any Defendant after the motion to reopen was filed, though he did—in his own name and from his own firm—serve responses to subpoenas directed to third-parties Atrius Development Group, Malcolm Brown, and Lea Androli.

Yet no order terminated or revoked Floyd's pro hac vice admission after the October 2022 permanent injunction, when his representation ended. As of December 11, 2025, Floyd's admission therefore remained a matter of record even though, by his own actions and by the filings in this matter over the last year, he no longer represented any party.

**B. From the reopening of these cases through December 11, 2025, Michael Smith alone represented Defendants.**

From July 29, 2025—when Defendants responded to Plaintiffs' motion to reopen, through December 11, 2025—the date at issue in this motion—and for a few days thereafter, Smith alone represented Defendants in this matter.[2] *See* ECF Nos. 206, 212, 214, 217, 221, 223, 225, 226. In September 2025, Floyd was

[2] Ryan Santurri filed a notice of appearance for Defendants on December 16, 2025. ECF No. 238. Santurri is not implicated by the facts of this motion.

determining whether to appear in the consolidated cases, but that appearance would have been for Atrius Development Group, not for McKnight or Rios. Ex. 13.

McKnight confirms that Smith was his lawyer of record, McKnight Decl. ¶ 10, as the pleadings submitted on behalf of McKnight and his co-Defendants similarly confirm, ECF No. 206. He nevertheless states that Floyd performed legal work Smith was not doing, received payment from McKnight for that work, issued no invoice, and communicated directly with McKnight without Smith present or copied. *Id.* ¶¶ 12–15. Yet McKnight did not understand Floyd to be his lawyer. *Id.* ¶ 16. These facts support requiring Floyd to identify whom he represented, the scope of any engagement, and the authority for his work.

**C. On December 11, 2025, responses to several of Plaintiffs' third-party subpoenas were due.**

On the afternoon of December 11, 2025, McKnight forwarded information concerning Plaintiffs' third-party subpoenas to Floyd. Ex. 1 at 1. At 3:21 PM EST, Floyd responded that the subpoena responses were due that day. *Id.*

**D. Neither Defendants nor Floyd could reach Smith that day.**

The contemporaneous emails from McKnight and Floyd show that neither Defendants nor Floyd could make contact with Smith. Rather than obtain letterhead, instructions, or approved language from Smith, at 3:31 PM EST, Floyd asked McKnight and Rios whether they possessed Smith's letterhead. Ex. 2 at 1.

When McKnight responded that the only Fowler Law Firm document in his possession was his original engagement letter in PDF form, Floyd did not direct McKnight to wait for Smith, send Smith a draft, or obtain authorization from Smith's firm. Instead, at 3:49 PM EST, Floyd asked McKnight to create a "rough imitation" of the firm's letterhead. Ex. 4 at 1.

Even after the letters and objections had been prepared and transmitted, the contemporaneous communications continued to reflect that Floyd had not established direct contact with Smith. At 5:13 PM EST, Floyd stated that his wife would speak with Smith's wife that evening. Ex. 7 at 1. The context for the wives to speak was the inability to reach Smith. *See id.*

McKnight independently confirms that Smith could not be reached for roughly two weeks; McKnight called and sent messages without success; and Floyd said he did not know where Smith was. McKnight Decl. ¶ 24.

**E. Unable to reach Smith, Floyd used McKnight to write to the subpoena recipients in Smith's name and asked them to withhold documents.**

Without having reached Smith, Floyd decided that correspondence to the subpoena recipients should appear to originate from Smith. Floyd expressly told McKnight and Rios that "[t]he letters need to go out from him." Ex. 2 at 1.

**i. Floyd confirmed the deadline to McKnight and Rios and asked whether they had Smith's letterhead.**

At 3:21 PM Eastern, Floyd told McKnight and Rios that the matters were "all due TODAY" and that "[w]e'll still send out letters and object." Ex. 1 at 1.

Ten minutes later, Floyd asked McKnight and Rios: "Do either of you have Michael's letterhead preferably in Word format?" Floyd explained his reason: "The letters need to go out from him." Ex. 2 at 1.

Floyd did not ask whether Smith had authorized letters to be sent in his name. Floyd knew Smith could not be reached—that's why he said his wife would speak with Smith's wife later that evening. He asked only whether Defendants possessed the materials necessary to make the letters appear to have come from Smith.

**ii. Floyd wrote the body of the letter.**

At 3:49 PM, Floyd emailed McKnight and Rios a Word document entitled "Third Party Letter.docx." Floyd instructed McKnight to take the attached document and "add the information from the third party subpoenas." Ex. 3 at 1.

McKnight independently confirms that Floyd wrote and sent him the substantive body for the draft letters; McKnight did not write it. McKnight Decl. ¶¶ 26–27. The attached document from Floyd contained the full substantive body of the proposed communication, leaving placeholders only for the third party's name and address. The form stated, in the voice of Smith's law firm, that "[t]his office

represents the Defendants," that a defendant "will be filing an Emergency Motion for Protective Order and/or to Quash the Subpoena with the Court, next week," and that "we formally request that you voluntarily hold off on the production of any and all documents" until the Court ruled. Ex. 9, Third Party Letter.

The native Word file includes the following metadata:




**Native-file metadata for "Third Party Letter.docx" (Ex. 9).**

### iii. Floyd asked McKnight for a "rough imitation" of Smith's letterhead.

McKnight advised Floyd that he did not possess a Fowler Law Firm letterhead template. McKnight explained that the only Fowler Law Firm "letter" in his possession was the original engagement letter in PDF format. Ex. 4 at 1.

Floyd responded: "Can you do a rough imitation?" Ex. 4 at 1.

Thus, the replicated Fowler Law Firm letterhead was not supplied by Smith or by Smith's firm. It was recreated by Smith's client from an engagement letter at Floyd's direction.

McKnight further states that he created a copy not only of Smith's letterhead but also of Smith's signature, and placed the letters on that letterhead over the copied signature. McKnight Decl. ¶ 28.

**iv. Floyd directed that the completed letters go out "[p]referably on Smith's letterhead."**

In the same 3:49 PM email that transmitted the "Third Party Letter.docx," Floyd instructed McKnight to combine the attached language with information taken from the individual third-party subpoenas. Ex. 3 at 1.

Floyd directed that the resulting letters be placed "[p]referably on Smith's letterhead." He further instructed McKnight to email the letters, if an email address was available, and send them by Federal Express. Ex. 3 at 1.

Floyd initially identified CyberSource, M Merchant, and NMI as the recipients for whom the letters should be prepared. Ex. 3 at 1.

**v. Floyd approved the imitation: "Boy's got some skills!"**

After receiving Floyd's request for a "rough imitation," McKnight sent Floyd a proposed version and asked, "Like this?" Ex. 5 at 1.

Floyd approved the work, responding: "Boy's got some skills!" Ex. 5 at 1.

Floyd further stated that he was "keeping a copy, just in case we need it again." Ex. 5 at 1.

McKnight states that he sent the completed letter back to Floyd before the full set of letters went out and asked Floyd how they looked. McKnight Decl. ¶ 29.

**vi. Floyd directed McKnight to repeat the process for the remaining recipients and send the letters out.**

After approving the imitation, Floyd instructed McKnight: "Yeah, can you repeat for those third-parties and send them out?" Ex. 5 at 1.

That direction followed Floyd's earlier instructions to transmit the letters by email, where possible, and by Federal Express. Ex. 3 at 1.

McKnight thereafter reported that letters to Cloudflare, CyberSource, M Merchant, and NMI had been sent by overnight delivery, with signature required, and dated December 11, 2025. Ex. 7 at 1.

The completed letters bore Fowler Law Firm letterhead, identified Smith as their author and responsible lawyer, included a signature block in Smith's name, and stated that the firm representing Defendants was requesting that the recipients withhold subpoenaed documents pending a motion that would be filed the following week. Ex. 10 (signed letters to Cloudflare, CyberSource, and NMI).

McKnight confirms that he then printed and shipped the letters to the subpoena recipients. McKnight Decl. ¶ 30.

### F. Floyd drafted, signed Smith's name to, and served subpoena objections for five nonparties who were Smith's clients, not his.

Floyd simultaneously undertook to prepare formal objections on behalf of subpoenaed nonparties who were clients of Smith, but whom Floyd did not claim to represent. At 3:49 PM, Floyd told McKnight and Rios: "I will draft and serve objections for C&C, Myers, Chris Rios, Delta 7, and Performance Triggers." Ex. 3 at 1. He further stated: "I already did *my clients* this morning." *Id.* (emphasis added)

At 4:36 PM, while directing McKnight to repeat the imitation-letterhead process, Floyd reported: "I'm halfway through these objections." Ex. 5 at 1. At 5:12 PM, Floyd confirmed to McKnight that he—not Smith—had completed and served the objections: "I just timely served all the responses for Smith's clients: Myers, C&C, C. Rios, Delta 7, and Performance." Ex. 6 at 1.

The objections Floyd served identified Smith as the responsible lawyer and bore an electronic signature in Smith's name, including "/s/ Michael J. Smith," even though Floyd had drafted the objections and transmitted them from his own email account. *E.g.*, Ex. 11 (Andrew Myers Responses).

The present record does not show that Smith reviewed, approved, signed, or authorized Floyd to serve those particular objections in Smith's name before they were transmitted.

**G. Floyd then told Plaintiffs' counsel that Smith had asked him to send the objections and that he was "just a messenger."**

At approximately 5:11 PM EST on December 11, 2025, Floyd emailed Plaintiffs' counsel and attached the five sets of subpoena objections. Floyd copied Smith on the email. Ex. 12.

Floyd represented to Plaintiffs' counsel: "Michael Smith asked me to email you the attached responses to third-party subpoenas." Floyd then added: "To be clear, I do not represent the parties, I'm just a messenger." *Id.* Floyd's contemporaneous emails to McKnight, on the other hand, show that he had decided objections would be served, personally drafted the objections, reported that he was "halfway through" them, and ultimately confirmed that he had "timely served all the responses for Smith's clients." Exs. 3, 5 & 6.

Although Smith purportedly later emailed at 5:41 PM EST asking for an extension concerning Defendants' discovery responses, the present record does not show that Smith participated in drafting the letters or objections, reviewed or approved them, signed them, or authorized their transmission before they were sent. Instead, the present record cuts the other way: it indicates Smith had no involvement because neither Floyd nor Defendants could reach him.

**H. The "Smith letter" prompted Cloudflare to ask Plaintiffs' counsel to delete documents Cloudflare had already produced.**

As noted above, McKnight confirmed on December 11, 2025, that four letters were sent via Federal Express to the subpoena-recipients, including to Cloudflare. Ex. 7. Floyd responded that those four subpoena-recipients included "everyone on [his] list," and that Smith would need to deal with the more recent ones. Ex. 7. Floyd had also previously instructed McKnight to email the letters. Ex. 3.

At a little after 5 PM EST on December 11, 2025, Cloudflare called and wrote to Plaintiffs' counsel requesting that counsel delete records Cloudflare had produced at 2:18 PM EST earlier that day. Ex. 14 at 2–4, 6–7. A Cloudflare representative advised Plaintiffs' counsel that Cloudflare had received notice that a motion to quash would be filed the following week. During that call and in writing at 5:57 PM EST, Plaintiffs' counsel explained that counsel had already downloaded and reviewed the production but would delete its saved copies of the records and retain the transmission email. Ex. 14 at 8. Plaintiffs' counsel had not forwarded the production to anyone externally, including Plaintiffs, before deleting it.

Defendants filed a motion for a protective order (motion to quash) on December 18, 2025. ECF No. 239. On January 23, 2026, the Court entered an order quashing some subpoenas and denying the motion to quash others. ECF No. 263.

The Court did not quash the Cloudflare subpoena. Plaintiffs' counsel therefore followed up with Cloudflare on February 5, 2026, to relay that the Court did not quash the Cloudflare subpoena and to request that the documents previously produced be produced again. Ex. 14 at 11. Cloudflare re-sent its production on February 10, but sent it to a former email address of Plaintiffs' counsel. Ex. 14 at 18. Having received no response by February 16, Plaintiffs' counsel advised Cloudflare that counsel would re-download the documents from the original transmission email now that the motion to quash had been denied. Ex. 14 at 14. Plaintiffs' counsel obtained the re-sent production on February 17. Ex. 14 at 21. Cloudflare's deletion request thus temporarily interrupted Plaintiffs' access to the production and required additional follow-up to recover it. Notably, the Cloudflare documents confirmed McKnight's creation of and involvement with FastTriggers.com. ECF No. 299 in Case No: 1:25-cv-181, Hr'g Tr. 36:4–39:6. And the archived webpages of FastTriggers.com show that WOTs were offered for sale after the Court's permanent injunction. ECF No. 322-4.

### I. Floyd previously made direct contact with a represented party, after being turned away by his counsel.

On November 27, 2023—about a year after these consolidated cases were resolved via entry of the permanent injunction on October 19, 2022—Floyd contacted Glenn Bellamy, counsel for Plaintiff Rare Breed Triggers, LLC ("RBT"), to gauge RBT's willingness to have McKnight, Rios, and Floyd himself obtain

triggers seized by the ATF and "sell[] them." Ex. 15 at 5. Floyd approached RBT's counsel because any sale of forced reset triggers would depend on a license from RBT. *Id.*

While aware of the then-active preliminary injunction from the Eastern District of New York that prohibited Plaintiff RBT from selling or acting in concert to sell forced reset triggers, Floyd said they "would of course be willing to share the profit" with Plaintiff RBT. *Id.* at 4. RBT's counsel responded to Floyd that the preliminary injunction prevented RBT from "even consider[ing] or discuss[ing] any type of arrangement like what [Floyd] propose[d]." *Id.* at 3.

About a month later, Floyd tried a second time to get a license from RBT, this time contacting RBT President Lawrence DeMonico directly via telephone. *See* Ex. 16 (referencing Floyd's voicemail). Floyd shared the reason for the meeting once he and DeMonico met in person. *See* Ex. 16, Ex. 17, Tr. 25:2-10.

Specifically, Floyd sought to pay RBT for a license to the '223 Patent so Floyd "personally" could "get[] into the FRT business," possibly with Defendants Rios and McKnight because "they already have a lot of connections in the area" and "it would be easier" for Floyd. *Id.* Tr. 1:15-20, 3:12-22; *see also* ECF Nos. 7, 91 in Case No. 1:25-cv-00181-RH-MAF (audio recording of meeting). Floyd suggested the license payment be made through a charitable contribution to a litigation fund to try to get around the E.D.N.Y. injunction that prevented RBT,

DeMonico, and others from engaging in any forced reset trigger sales. *Id.* Tr. 1:22–2:9.

## ARGUMENT

### I. The Court may limit Floyd's activities and impose discipline in these cases for good cause, after notice and an opportunity to be heard.

Local Rule 11.1(C) authorizes attorneys not admitted to the Florida Bar to appear pro hac vice in the Northern District of Florida. An attorney admitted pro hac vice must comply with Florida's rules of professional conduct. N.D. Fla. Loc. R. 11.1(G)(1).

Local Rule 11.1(G)(8) provides that, "[f]or good cause," "the Court may limit an attorney's activities or impose discipline in a case, after giving any appropriate notice and opportunity to be heard."[3] Local Rule 11.1(G)(7) separately provides that a person may be held in contempt of court if the person "acts as an attorney in this District in violation of this rule" or "pretends to be entitled to act as an attorney in this District but is not."

Failure to comply with Florida's professional conduct rules, or conduct "inconsistent with the high level of professionalism expected in the District," are both grounds for disbarment, removal, or suspension. N.D. Fla. Loc. R. 11.1(G)(4)(d)–(e). "The attorney may be prohibited from acting on a case in this

---

[3] The "'Court' means an assigned judge in a case." N.D. Fla. Loc. R. 2.1(C).

District after notice is given and while the attorney's removal or suspension is under consideration." N.D. Fla. Loc. R. 11.1(G)(4).

The Court also has inherent authority to discipline the attorneys who appear before it. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) ("[A] federal court has the power to control admission to its bar and to discipline attorneys who appear before it.").

## II. Putting Smith's name and signature on letters and objections that Floyd wrote was dishonest under Florida Bar Rule 4-8.4(c).

Florida Bar Rule 4-8.4(c) prohibits attorneys from engaging "in conduct involving dishonesty, fraud, deceit, or misrepresentation." A lawyer's unauthorized use of another lawyer's signature in a legal proceeding is a violation of Florida Bar Rule 4-8.4(c) because it is "dishonest to opposing counsel." *Fla. Bar v. Ross*, 140 So. 3d 518, 522 (Fla. 2014). "[I]n order to sustain a violation of rule 4-8.4(c), the Bar must prove intent. The intent element can be satisfied, however, merely by showing that the conduct was deliberate or knowing." *Fla. Bar v. Brown*, 905 So. 2d 76, 81 (Fla. 2005) (citations omitted).

In *Ross*, the Florida Supreme Court ruled that the attorney (Ross) violated Florida Bar Rule 4-8.4(c) when he filed a complaint with the signature of another attorney (Waddington) without Waddington's permission. *Id.* at 520, 522. The Court described this conduct as "unacceptable" and "outrageous," and imposed a

three-year suspension. *Id.* at 522, 525.[4] Even if counsel of record's signature is used without authorization, that too "constitutes egregious conduct." *Aldahlawi v. Embry-Riddle Aeronautical Univ., Inc.*, No. 2020-31272-CICI, 2023 Fla. Cir. LEXIS 7902, at *7 (Fla. 7th Cir. Ct. June 14, 2023), *aff'd*, No. 5D2023-2369 (Fla. 5th DCA Apr. 1, 2025) (per curiam); *see also Fla. Bar v. Kickliter*, 559 So. 2d 1123 (Fla. 1990) (attorney disbarred for forging his client's signature on a will when the client had died without signing the document, despite substantial mitigating factors such as the "absence of a dishonest or selfish motive, a cooperative attitude, good character and reputation, remorse, and the imposition of criminal penalties").

This is because if "lawyers and the public cannot rely upon the authenticity of legal papers, the very foundation of our legal system becomes fractured and unsustainable." *Ross*, 140 So. 3d at 522. Purposely using the signature of another

[4] To be sure, some of that three-year suspension can be attributed to Ross's failure to provide a proper accounting of $5,000 he retained for work he performed under a $10,000 retainer—even though there was no allegation against Ross that he intentionally misappropriated client property. *Ross*, 140 So. 3d at 523–24. (The Court also considered two aggravating factors (a prior 30-day suspension and more than 30 years in practice) and three mitigating factors (absence of dishonest or selfish motive, imposition of other penalties or sanctions, and remorse). *Id.* at 520–21.) On the other hand, two of the seven Florida Supreme Court justices dissented from the suspension order as not adequately severe and would have disbarred Ross instead. *Id.* at 525-26 (Labarga, J., dissenting, with Canady, J., concurring in that dissent). Ross filed the complaint with the forged signature in federal court in the Central District of California. *Ross v. Olund*, Case No. 2:09-cv-07021-R-RC. That court found Ross in contempt, ordered Ross to pay $5,000 to the court, ordered Ross to pay adversary counsel's and Waddington's attorneys' fees, and referred Ross's activities to the Florida Bar. Ex. 18.

attorney is not a simple mistake but "an intentional grievous act." *Id.* "[B]asic fundamental dishonesty . . . is a serious flaw, which cannot be tolerated, . . . demonstrates the utmost disrespect for the court[,] and is destructive to the legal system as a whole." *Id.* (second alteration in original) (citations and internal quotation marks omitted).

In *Florida Bar v. Forrester*, 818 So. 2d 477, 483 (Fla. 2002), the Florida Supreme Court concluded that attorney Forrester violated Florida Bar Rule 4-8.4(c) because she told opposing counsel at a deposition that she did not know the location of an exhibit when she did know its location. She knew the location of the exhibit because she moved it. *Id.* Although Forrester truthfully responded that she was "not seeing [the exhibit]," her answer was intended to mislead opposing counsel because she knew where the exhibit was located and failed to provide that information when asked. *Id.* When opposing counsel again asked Forrester for the exhibit, she provided it. *Id.* Nevertheless, the Court found Forrester guilty of violating Florida Bar Rule 4-8.4(c). *Id.*; *see also Fla. Bar v. Berthiaume*, 78 So. 3d 503, 505, 510 (Fla. 2011) (attorney guilty of violating Florida Bar Rule 4-8.4(c) by serving a subpoena when there was no pending case and the purported subpoena was not authorized by law).

"Misrepresentations and dishonesty [therefore] warrant severe discipline." *Ross*, 140 So. 3d at 522. Discipline must protect the public from unethical conduct,

must be fair but also sufficient to sanction the conduct and promote reformation and rehabilitation, and must be severe enough to deter others. *Id.* at 523. "Florida lawyers should not and cannot be allowed to forge signatures on legal papers." *Id.*

Floyd deliberately used, and coached McKnight to use, Smith's identity, signature, and law-firm letterhead. Nothing in the record shows that Smith authorized any of it. Smith alone represented Defendants, yet neither Floyd nor Defendants could reach him. Exs. 2, 4 & 7. Floyd nevertheless decided that "[t]he letters need to go out from [Smith]," authored the substantive form in the voice of Smith's firm, directed McKnight to create a "rough imitation" of the firm's letterhead, approved that imitation, and instructed that the completed letters be sent. Exs. 2–5 & 9. McKnight's declaration corroborates Floyd's authorship and control. McKnight Decl. ¶¶ 26–30.

Floyd also personally drafted and served five sets of objections identifying Smith as counsel and bearing "/s/ Michael J. Smith," even though the objections were transmitted from Floyd's own account and Floyd reported that he—not Smith—was "halfway through" them and had "timely served all the responses." Exs. 3, 5, 6 & 11. As in *Ross*, the resulting papers presented another lawyer as the author and signer of legal documents that Floyd himself created and served.

Floyd also misrepresented his role. He told Plaintiffs' counsel that "Michael Smith asked me to email you" the objections and that Floyd was "just a

messenger." Ex. 12. The "messenger" description was not a fair account: before that email, Floyd had decided objections would be served, selected the nonparties, drafted the objections, and served them. Exs. 3, 5 & 6. Like the misleading answer in *Forrester*, that description concealed Floyd's role and supports an inference that it was calculated to make opposing counsel believe the objections originated with and had been authorized by Smith. The separate statement that Smith asked Floyd to send the objections is facially inconsistent with, and unexplained by, the cited emails, which show no direct contact between Floyd and Smith and show Floyd arranging indirect contact through their wives after the statement. Exs. 7 & 12.

Floyd acted deliberately. The conduct was not an accidental signature or clerical carryover: it involved drafting a form, soliciting and approving imitated letterhead, inserting Smith's electronic signature on five legal responses, coordinating delivery, and falsely minimizing Floyd's role. Cloudflare acted on a "Smith" letter by requesting that Plaintiffs' counsel delete documents Cloudflare had already produced, temporarily interrupting Plaintiffs' access and requiring recovery efforts. Ex. 14 at 2–8, 11–21. Perhaps the case resolves earlier if relevant records—like Cloudflare's—are provided before the motion to quash is filed and decided. Unless rebutted, those deliberate steps and effects support a finding of dishonesty, deceit, and misrepresentation under Rule 4-8.4(c).

## III. Injecting misattributed papers into discovery was prejudicial to the administration of justice under Florida Bar Rule 4-8.4(d).

Florida Bar Rule 4-8.4(d) prohibits attorneys from engaging "in conduct in connection with the practice of law that is prejudicial to the administration of justice." The Florida Supreme Court qualifies a lawyer's unauthorized use of another lawyer's signature in a legal proceeding as "conduct prejudicial to the administration of justice" and therefore a violation of Florida Bar Rule 4-8.4(d). *Ross*, 140 So. 3d at 522.

The Florida Supreme Court in *Ross* concluded Ross violated Florida Bar Rule 4-8.4(d) based on the same conduct that violated Rule 4-8.4(c), discussed above. *Id.* In *Berthiaume*, the Court ruled Berthiaume violated Florida Bar Rule 4-8.4(d) (and 4-8.4(c)) because she served a subpoena when there was no active case that would legitimize it. 78 So. 3d at 505, 510. This was "prejudicial to the administration of justice." *Id.* at 505. Rule 4-8.4(d) is not confined to papers filed with a court. In *Feinberg*, the Florida Supreme Court rejected a referee's contrary recommendation and found a Rule 4-8.4(d) violation where an attorney "deliberately made untruthful statements" to opposing counsel about his own conduct, explaining that "[w]hile conduct that actually affects a given proceeding may be prejudicial to the administration of justice, conduct that prejudices our system of justice as a whole also is encompassed by rule 4-8.4(d)." *Fla. Bar v. Feinberg*, 760 So. 2d 933, 938 (Fla. 2000) (quoting *Fla. Bar v. Machin*, 635 So. 2d

938, 939–40 (Fla. 1994)). Such deception, the Court reasoned, implies a willingness "to undermine the adversarial process." *Id. Feinberg* involved a prosecutor, and the Court imposed only a public reprimand in light of the "unique circumstances" there; but it was explicit that "[h]ad the unusual circumstances of the instant case not been present, substantially more severe discipline would have been imposed." *Id.* at 939.

The same conduct was prejudicial to the administration of justice here. Floyd caused legal objections and letters requesting a production hold to appear authorized and signed by counsel of record, although the present record shows that Floyd—not Smith—drafted and served the objections and drafted the substance of the letters before directing McKnight to finalize and send them. Exs. 3–6 & 9–12. And McKnight confirms the completed letter was returned to Floyd for review before service. McKnight Decl. ¶¶ 29–30. By injecting misattributed legal papers into discovery and materially contributing to an interruption in Plaintiffs' access to responsive evidence, Floyd engaged in the same type of conduct *Ross* treats as prejudicial under Rule 4-8.4(d).

**IV. Using Smith's apparent authority to obtain a production hold obstructed Plaintiffs' access to evidence under Florida Bar Rule 4-3.4(a).**

Florida Bar Rule 4-3.4(a) prohibits attorneys from "unlawfully obstruct[ing] another party's access to evidence" or counseling or assisting "another person to do

any such act." In *Forrester*, the Florida Supreme Court ruled that Forrester violated Florida Bar Rule 4-3.4(a) when she accepted an exhibit that her client removed from the table at a deposition and then implied to opposing counsel that she did not know the exhibit's whereabouts when asked. 818 So. 2d at 481–83. The Court so ruled even though Forrester gave opposing counsel the exhibit later in the deposition when Forrester was asked for it again. *Id.* at 480.

The Court rejected Forrester's argument that Florida Bar Rule 4-3.4(a) was not violated because her actions deprived her adversary of evidence for only a short time, or because there were additional copies of that evidence available. *Id.* at 481–82. The Court noted the rule's comment that evidence in lawsuits must be "'marshalled competitively'" and that "'[f]air competition'" in the adversary system relies on prohibitions against "'obstructive tactics in discovery procedure.'" *Id.* at 481 (quoting R. Regulating Fla. Bar 4-3.4(a), cmt.).

Floyd unlawfully obstructed Plaintiffs' access to evidence and counseled and assisted others in doing so. The asserted unlawfulness does not rest merely on a request for a temporary production hold. On the present record, it rests on Floyd's unauthorized use of counsel of record's identity, signature, and apparent authority to make that request. Directing the use of imitated Smith letterhead, Floyd drafted a letter requesting that subpoena recipients "voluntarily hold off on the production of any and all documents" and instructed McKnight to send it by email and Federal

Express. Exs. 3–5 & 9–10. The record does not show that Smith authorized the request before transmission, and the request preceded any motion to quash or court-ordered relief; the motion was not filed until December 18, 2025. ECF No. 239. McKnight likewise confirms Floyd wrote the substantive body for, and reviewed the completed letter, before McKnight shipped the full set. McKnight Decl. ¶¶ 26–30.

The communication prompted Cloudflare to request that Plaintiffs' counsel delete documents already produced, temporarily interrupting Plaintiffs' access and requiring recovery efforts. Ex. 14 at 2–8, 11–21. The Court did not quash Cloudflare's subpoena. ECF No. 263. Under *Forrester*, the temporary interruption does not preclude a violation, nor does the later availability of another copy. Floyd's authorship, delivery instructions, and use of Smith's apparent authority materially contributed to that interruption and, unless rebutted, support a finding that Floyd violated Rule 4-3.4(a).

## V. Asking nonparty subpoena recipients to withhold documents violated Florida Bar Rule 4-3.4(f).

Florida Bar Rule 4-3.4(f) prohibits a lawyer from "request[ing] a person other than a client to refrain from voluntarily giving relevant information to another party unless the person is a relative or an employee or other agent of a client, and it is reasonable to believe that the person's interests will not be adversely affected by refraining from giving such information."

The "Smith" letters asked Cloudflare, CyberSource, M Merchant, and NMI—entities the record does not identify as Floyd's clients—to "voluntarily hold off" providing relevant documents to Plaintiffs before any court order issued. Exs. 3–5 & 9–10. To the extent compliance with that request was voluntary, the request falls within Rule 4-3.4(f). Floyd cannot avoid responsibility merely because McKnight finalized and transmitted the letters at Floyd's direction. *See* Fla. Bar Rule 4-8.4(a). McKnight confirms that he printed and shipped the letters only after returning the first letter of the set to Floyd for review. McKnight Decl. ¶¶ 29–30.

## VI. Obtaining an extrajudicial production hold before seeking relief from the Court was not a reasonable effort to expedite this litigation under Florida Bar Rule 4-3.2.

Florida Bar Rule 4-3.2 states that a "lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client." Delay is not reasonable when "done for the purpose of frustrating an opposing party's attempt to obtain rightful redress or repose." *Id.*, cmt. The yardstick is "whether a competent lawyer acting in good faith would regard the course of action as having some substantial purpose other than delay." *Id.* The contemplated motion to quash may have served a legitimate purpose. But the unauthorized use of Smith's identity to obtain an immediate extrajudicial production hold before seeking judicial relief did not. Floyd drafted the request, directed McKnight to reproduce Smith's letterhead, approved the imitation, and instructed transmission. Exs. 2–5 & 9–10.

Unless rebutted, those acts support a finding that Floyd failed to make reasonable efforts to expedite the litigation in violation of Rule 4-3.2.

## VII. If Floyd represented Defendants, he counseled and assisted McKnight's conduct in violation of Florida Bar Rule 4-1.2(d).

Florida Bar Rule 4-1.2(d) states that a "lawyer must not counsel a client to engage, or assist a client, in conduct that the lawyer knows or reasonably should know is criminal or fraudulent."

If Floyd represented Defendants, the record supports a finding that he counseled and assisted McKnight's allegedly fraudulent conduct. Although Smith had not been reached and the record shows no advance authorization, Floyd directed McKnight to imitate Smith's letterhead, approved the imitation, and instructed transmission of letters appearing to come from Smith. Exs. 1–5 & 9–10. McKnight states no one told him that using another lawyer's letterhead and copied signature was improper. McKnight Decl. ¶ 32.

## VIII. If Floyd represented the nonparty subpoena recipients, his "just a messenger" statement violated Florida Bar Rule 4-4.1(a).

Subsection (a) of Florida Bar Rule 4-4.1 prohibits a lawyer from knowingly making a false statement of material fact or law to a third person when representing a client. In *Feinberg*, the Florida Supreme Court approved the finding that an attorney violated Rule 4-4.1(a) by telling opposing counsel, on more than

one occasion, that he had not met with counsel's client when in fact he had. *Feinberg*, 760 So. at 938.

Floyd's "just a messenger" statement was knowingly false and material. Ex. 12. Before sending it, Floyd had announced, "I will draft and serve objections," reported that he was "halfway through these objections," and confirmed that he had "timely served all the responses for Smith's clients." Exs. 3, 5 & 6. The statement concealed the actual author and sender while attributing the objections to counsel of record. Floyd's separate statement that "Michael Smith asked me to email you" the objections is facially inconsistent with, and unexplained by, the cited emails, but they do not exclude another form of communication outside the exhibits. The show-cause response should identify the date, time, method, participants, and substance of any such communication.

And Floyd's disclaimer that he did not represent the parties does not place the communication outside Rule 4-4.1(a). In substance, he acted for Smith's clients (the subpoenaed nonparties) by preparing and serving their objections under their counsel's identity. Having undertaken those acts, Floyd could not knowingly misstate his role. Unless rebutted, the "messenger" characterization therefore supports a Rule 4-4.1(a) violation.

### IX. If Floyd represented the nonparty subpoena recipients, he neither consulted them nor abided by their objectives, as Florida Bar Rule 4-1.2(a) requires.

Florida Bar Rule 4-1.2(a) requires a lawyer to "reasonably consult with the client" so the lawyer is able to "abide by a client's decisions concerning the objectives of representation."

If Floyd represented the non-party subpoena recipients, the record reflects no consultation with them about their objectives or authority to object. Floyd selected the recipients, drafted their objections, signed Smith's name, and served the responses, while disclaiming representation. Exs. 3, 5–6, 11–12. By substituting his own strategy and Smith's apparent authority for the clients' decisions, Floyd failed to reasonably consult with them or abide by their objectives.

### X. A violation of any other Florida Bar Rule is necessarily a violation of Florida Bar Rule 4-8.4(a).

Florida Bar Rule 4-8.4(a) provides that a lawyer shall not "violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another." A lawyer who is found to have violated a Florida Bar Rule other than 4-8.4(a) "is necessarily guilty of violating rule 4-8.4(a)." *Fla. Bar v. Feinberg*, 760 So. 2d 933, 938 (Fla. 2000). Accordingly, if the Court finds Floyd to have violated a different Florida Bar Rule, then Floyd necessarily violated Florida Bar Rule 4-8.4(a), as well.

McKnight's declaration and the cited emails supply direct evidence of conduct accomplished through another: Floyd wrote the substantive body for the letters; McKnight copied Smith's letterhead and signature, returned the completed letter to Floyd for review, and then shipped the full set, at Floyd's direction. McKnight Decl. ¶¶ 26–30.

### XI. Floyd's actions could harm McKnight.

Floyd coached McKnight to engage in conduct that could expose McKnight to felony liability.[5] Floyd drafted the substantive body of the letters asking subpoena recipients to withhold production, directed McKnight to create a "rough imitation" of Smith's letterhead, approved the imitation, and instructed McKnight to complete and send the letters using Smith's name. That conduct potentially implicates, among others, 18 U.S.C. § 1512(b)(2)(a) (felony evidence tampering by knowingly using misleading conduct to induce another to withhold records or documents from an official proceeding). It also potentially implicates, among others, Fla. Stat. §§ 914.21–914.22 (felony evidence tampering through misleading conduct intended to induce withholding of records from an official proceeding) and

[5] Plaintiffs do not ask the Court to adjudicate criminal liability. The cited statutes are relevant only to whether Floyd knowingly counseled potentially criminal or fraudulent conduct, the seriousness of the alleged misconduct, and the need for preservation and a complete show-cause record.

Fla. Stat. § 817.568(2)(a) (felony fraudulent use, without authorization or consent, of another person's personal identification information).[6]

### XII. The Court should order Floyd to pay attorney's fees and costs under its inherent authority or, alternatively, under 28 U.S.C. § 1927.

A federal court has the inherent power "to control admission to its bar and to discipline attorneys who appear before it." *Chambers*, 501 U.S. at 43. The court also has the inherent power to punish for contempt. *Id.* at 44 (citation omitted). With that inherent power comes the discretion to fashion appropriate remedies for conduct that abuses the judicial process. *Id.* at 44–45. One such remedy that comes with the court's inherent power is assessing attorneys' fees against counsel for bad-faith conduct. *Id.* at 45–46.

In addition to the Court's inherent power, 28 U.S.C. § 1927 provides a means to require attorneys to personally pay for attorneys' fees and costs caused when they multiply "the proceedings in any case unreasonably and vexatiously." 28 U.S.C. § 1927. Bad faith is the "touchstone." *Schwartz v. Millon Air, Inc.*, 341 F.3d 1220, 1225 (11th Cir. 2003). "A determination of bad faith is warranted where an attorney knowingly or recklessly . . . engages in litigation tactics that needlessly obstruct the litigation of non-frivolous claims." *Id.*

---

[6] A felony conviction can disqualify a citizen from voting until the applicable restoration requirements are satisfied, including any required parole or probation terms. *See* Fla. Const. Art. VI, § 4.

Floyd's bad faith actions multiplied the proceedings and empower the Court to assess attorneys' fees and costs (1) under its inherent power to fashion appropriate remedies or (2) under 28 U.S.C. § 1927. Plaintiffs request a liability determination now and will submit a separate, documented fee-and-cost application if relief is granted.

## CONCLUSION

For the reasons set out above, Plaintiffs respectfully request that the Court grant their motion.

Dated: August 14, 2026

**CONTARINO ROTH LLC**

By: *\/s/ Josiah Contarino*
Josiah Contarino (admitted PHV)
Jacob William Roth (Bar No. 1036551)
Contarino Roth LLC
2255 Glades Road, Suite 324A
Boca Raton, FL 33431
561-872-6508
jroth@contarinoroth.com
jcontarino@contarinoroth.com

**WOOD HERRON & EVANS LLP**

Glenn D. Bellamy (admitted PHV)
Wood Herron & Evans LLP
600 Vine Street, Suite 2800
Cincinnati, Ohio 45202
gbellamy@whe-law.com

*Attorneys for Plaintiffs*

**LOCAL RULE 7.1(B) CERTIFICATION**

Undersigned counsel for Plaintiffs certifies that, on August 13, 2026, at 4:28 PM Eastern, Plaintiffs' counsel emailed Defendants' counsel Ryan Santurri, and Adam Floyd, advising that Plaintiffs intended to file a motion for sanctions against Mr. Floyd, revocation of PHV in the consolidated cases and in 1:25-cv-00181, and order to show cause, for unauthorized interference with the discovery process in the consolidated cases related to subpoenas Plaintiffs issued in November and December 2025. At the time of this filing, Plaintiffs' counsel has received no response.

**LOCAL RULE 7.1(F) CERTIFICATION**

Undersigned counsel for Plaintiffs certifies that this memorandum complies with Local Rule 7.1(F) because it contains 7,244 words, excluding those portions exempted by the rule.

*<u>/s/ Josiah Contarino</u>*
Josiah Contarino

**CERTIFICATE OF SERVICE**

Pursuant to Local Rule 5.1(F)(1), this filing and its attendant papers, if any, are being served through an electronic filing system and will be received by all

counsel included on the Pacer service list for this matter, including Mr. Santurri and Mr. Floyd.

*/s/ Josiah Contarino*
Josiah Contarino